**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **DF VENTURES, LLC, and DAYMOND JOHN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | Civil Action No. 1:23-cv-2862 |
| | ) | |
| **v.** | ) | JURY TRIAL DEMANDED |
| | ) | |
| **FOFBAKERS HOLDING COMPANY, LLC,** | ) | |
| **JABEZBAKER, LLC, JAMES A. BAKER a/k/a AL** | ) | |
| **BAKER,** *individually*,  **BRITTANI BO BAKER,** | ) | |
| *individually*, **and SABRINA BAKER,** *individually*, | | |
| | | |
| **Defendants.** | | |

**<u>AMENDED VERIFIED COMPLAINT</u>**

Plaintiffs DF VENTURES, LLC ("DF Ventures"), and DAYMOND JOHN ("John") (together, "Plaintiffs")[1] by and through their undersigned counsel, file the following Amended Verified Complaint against defendants FOFBAKERS HOLDING COMPANY, LLC ("FOFBakers Holding"), JABEZBAKER, LLC ("Jabezbaker"), JAMES A. BAKER a/k/a AL BAKER ("Al Baker"), BRITTANI BO BAKER ("Brittani Baker"), and SABRINA BAKER ("Sabrina Baker") (defendants Al Baker, Brittani Baker, and Sabrina Baker are collectively referred to as the "Baker Defendants") (hereinafter "Defendants").  In support thereof, Plaintiffs state as follows:

## I.     INTRODUCTION

1.      This action arises out of Defendants' willful and malicious smear campaign against Plaintiffs and their affiliated entities, employees, and advisors (collectively, the "Affiliates") with the intent of "going viral", in an effort to disparage and defame Plaintiffs and the Affiliates and cause irreparable harm to their businesses and reputations.

---

[1] "Plaintiff(s)" refers to John and/or DF Ventures, as the case may be.

2.      Plaintiff DF Ventures, Defendant FOFBakers Holding, and a third entity, Rastelli Partners, LLC, together own a BBQ food company, FOFBakers, LLC ("FOFBakers" or the "Company"). John, through his entity DF Ventures, is a minority stakeholder in the Company. The Baker Defendants are the members of defendant FOFBakers Holding, through which they own their membership interest in the Company.

3.      On or about May 18, 2023, Defendants publicized defamatory statements about Plaintiffs in an article published in the LA Times ("LA Times Story").  But Defendants did not stop there. Over the past several weeks, Defendants continued to spew false and disparaging statements and homemade videos about Plaintiffs in social media postings on multiple platforms (*e.g.*, TikTok, Facebook, Twitter and Instagram), including falsely accusing John of criminal activity and of siphoning off company funds and trying to steal Defendants' business.

4.      Defendants have posted approximately fifty homemade videos and photos and hundreds of additional posts and comments on social media attacking and defaming John publicly, that cumulatively have been viewed in excess of four million times.

5.      Contrary to Defendants' misrepresentations, John (through DF Ventures) is the sole NON-managing Member of the Company and has *no* access to the Company's bank accounts or credit cards, nor to its books and records.[2]

6.      As set forth in the Company's operating agreement, John is the only member who does not participate in the management, control, decisions or operations of the Company. Those are the responsibilities of the Company's managers: Ray Rastelli Jr. ("Rastelli Jr.") and Defendant Al Baker.

---

[2] To the extent financial information related to the business dealings between the Rastelli Parties and the Defendants is included herein as exhibits, such information has been obtained from the Rastelli Parties as part of this proceeding.

7.      In contrast to how he has been portrayed by Defendants in the LA Times Story and in Defendants' social media posts, John's economic interest in the Company is limited to a royalty of 1.7777% on the first $5 million in gross sales (reduced to 1.3333% of sales thereafter) and a 20% interest if the Company is ever sold.

8.      John's duties are solely limited to acting as a "brand ambassador", using his connections to seek out potential sales contacts or marketing opportunities for the Company. As such, it is impossible for Plaintiff(s) to be engaging in any of the activities that Defendants are falsely accusing John of in their public statements and videos.

9.      Moreover, John is operating at an overall financial loss from his business dealings with Defendants, while Defendants have received approximately $744,600.

10.     Since meeting the Defendants, Plaintiff(s) has invested approximately $200,000 in this venture and has only received back a total of $113,295.02 in distributions in connection therewith; a loss of approximately $86,705.

11.     Additionally, in engaging in their smear campaign, Defendants have breached, and continue to breach, various contractual obligations, including confidentiality and non-disparagement, as well as committing unlawful defamation and illegally recording and posting phone conversations without consent.

12.     Defendant Al Baker has also breached, and continues to breach, his fiduciary duties to Plaintiff(s) as a Manager of FOFBakers, by sabotaging the business so that no one will want to buy the product, thereby reducing the potential value of the Company and damaging Plaintiff(s)' ability to recoup its investment and receive its royalty.

13.     Moreover, Defendants' false and defamatory accusations that John has hidden or taken Company funds is particularly outrageous because Defendant Al Baker himself has

misappropriated Company funds by repeatedly using the Company's credit card for personal expenses. Since March 2020, Defendant Al Baker has charged approximately $60,480 to the Company's credit card; almost all of which are unauthorized and are for personal expenses having nothing to do with the Company. Upon information and belief, Defendant Al Baker charged a significantly higher amount of unauthorized charges from 2015 to February 2020.

14.    Defendants' actions are likely to cause substantial irreparable harm to John absent an injunction prohibiting them from unlawfully defaming John and violating their non-disparagement and confidentiality obligations. Indeed, at least two companies have expressed concern about entering into business relationships with John while these allegations are publicized (regardless of their falsity), with one such company canceling an appearance.

15.    Accordingly, Plaintiff(s) seek immediate and permanent relief against Defendants to prevent further harm to Plaintiffs' and their Affiliates' businesses and reputations.

## II.    PARTIES

### *Plaintiff John*

16.    John is a domicile and citizen of New York and is the founder and CEO of the apparel company, "For Us, By Us," more widely known as, "FUBU." In addition, John is the CEO of "The Shark Group" consulting company.

17.    John is a trailblazing entrepreneur who, in addition to maintaining his extensive business portfolio, devotes his time to guiding individuals, brands, and organizations seeking to reach their full potential.

18.    Since 2009, John has served as an investor on the ABC television program "Shark Tank."  As an investor on "Shark Tank," John has invested into numerous startup companies, after

4

hearing pitches from, and negotiating with, aspiring entrepreneurs. John has invested in a number of companies that later went on to achieve commercial and financial success.

19.     John has won the Crain's Business of New York Under Forty Award, the NAACP Entrepreneur of the Year Award, Ernst & Young's New York Entrepreneur of the Year Award, the Congressional Achievement Award for Entrepreneurship, and was appointed as a Global Ambassador to the White House by President Obama.

20.     John is currently a Celebrity and Player Advisory Council Member to the US Tennis Association Foundation and a Board Member of Petco Love (Petco's charitable foundation) in addition to many other philanthropic positions.

21.     In addition, John was recently named the American Cancer Society's 2023 National Ambassador.

22.     Three years ago, John launched and now annually curates Black Entrepreneurs Day ("BED"), which is an annual celebration of Black business and culture. The event is taped in front of a live audience at Harlem's world-famous Apollo Theater and is viewed by over 7.5 million people annually. The event includes conversations, hard-hitting roundtables with top brand executives, and musical performances by iconic artists. Through BED, John has assisted in donating over $700,000 ($25,000 grants to twenty-eight small black-owned businesses) and provided one-on-one mentoring sessions with such businesses. The event has won four Webby Awards and is currently planning for its fourth year of the event to be held in October 2023.

23.     John's extraordinary business acumen and mission to help others discover their business potential have caused him to become one of the most sought-out motivational speakers in the country.

24. John devotes a significant portion of his time to speaking engagements, brand endorsements, and other public-facing opportunities to support his wide portfolio of business ventures and educate entrepreneurs of all levels nationwide.

25. John is also the author of four bestselling books, most recently including his first children's book, "Little Daymond Learns to Earn", which was a New York Times, Wall Street Journal, and Amazon bestseller that teaches children and their families financial intelligence and the importance of entrepreneurship.

26. Over a period of decades, John has painstakingly developed his own personal brand as well as those of his business interests. The goodwill he has generated through his efforts is incalculably valuable and is a main channel through which he develops new business relationships and maintains existing business relationships.

**_Plaintiff DF Ventures_**

27. Plaintiff DF Ventures is a limited liability company formed in the state of New York with principal place of business at 958 Salt Point Turnpike, Pleasant Valley, New York.

28. John is the majority owner of DF Ventures, which was formed to be the entity through which he holds his interest in FOFBakers, LLC.

29. Larry Fox ("Mr. Fox") is a minority owner of DF Ventures.

30. John and Mr. Fox are the only two members of DF Ventures.

31. John and Mr. Fox are both domiciled in and are citizens of New York.

**_Defendants_**

32. Defendant Al Baker is an individual who, upon information and belief, is domiciled in and a citizen of the State of Florida. Defendant Al Baker has held himself out to be a citizen of Florida in a February 8, 2019 Notice of Removal signed by his then-counsel and filed with the

court in a separate action. A true and accurate copy of a Notice of Removal filed in a separate

litigation, wherein Defendant Al Baker stated that he is a citizen of the State of Florida, is attached

hereto as **Exhibit A**.

33.     Defendant Brittani Baker is an individual who, upon information and belief, is

domiciled in and a citizen of either the State of California or the State of Ohio. Defendant Brittani

Baker is defendant Al Baker's daughter. In the aforementioned Notice of Removal, Defendant

Brittani Baker held herself out to be a citizen of Ohio. *See* Ex A.

34.     Defendant Sabrina Baker is an individual who, upon information and belief, is

domiciled in and a citizen of the State of Florida and, is defendant Al Baker's wife. In the

aforementioned Notice of Removal, Defendant Sabrina Baker held herself out to be a citizen of

Florida. *See* Ex. A.

35.     Defendant FOFBakers Holding is a limited liability company registered in the State

of Ohio with its principal place of business at 820 Center Road, Avon, Ohio 44011.

36.     As represented in the aforementioned Notice of Removal filed by Defendants,

Defendants Al Baker, Sabrina Baker, and Brittani Baker are the only members of Defendant

FOFBakers Holding, whose respective states of citizenship are described above in Paragraphs 32-

34. Thus, upon information and belief, none of the members of Defendant FOFBakers Holding

(i.e., defendants Al Baker, Brittani Baker, and Sabrina Baker) is a citizen of New York.[3]

---

[3] Plaintiffs have formed this good faith belief based upon a search of public records, including those filed with the Ohio, Florida, California, and New York Secretaries of State, federal and state court dockets in each of the aforementioned states, as well as representations of Defendants in a prior public filing. In a prior court filing, the Baker Defendants held themselves out to be the only members of FOFBakers Holding. *See* Exhibit A; *see also Lincoln Ben. Life Co. v. AEI Live, LLC*, 800 F.3d 99, 103-04 (3d Cir. 2015).

37.     Defendant Jabezbaker is a limited liability company formed in the State of Ohio with a last known principal office at 17408 Gulf Boulevard, Apt. 903, Redington Shores, FL 33708 and/or 675 S. Gulfview Boulevard #1004, Clearwater, FL 33767.

38.     Upon information and belief, Defendants Al Baker, Sabrina Baker, and Brittani Baker are the only members of Defendant Jabezbaker, whose respective states of citizenship are described above in Paragraphs 32-34. Upon information and belief, no member of Defendant Jabezbaker is a citizen of New York.[4]

### III.     JURISDICTION AND VENUE

39.     This Court has original jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

40.     This Court has personal jurisdiction over the parties pursuant to a forum selection clause in a settlement agreement and an amendment to an operating agreement, pursuant to which the parties agreed that the United States District Court for the District of New Jersey shall retain jurisdiction to enforce the terms of the settlement agreement and to grant injunctive relief related to the operating agreement.

41.     Venue is proper because FOFBakers, LLC's principal place of business is in County of Gloucester, New Jersey, and its books and records are maintained at that location.

### IV.     FACTUAL BACKGROUND

---

[4] Plaintiffs have formed this good faith belief based upon a search of public records, including those filed with the Ohio, Florida, California, and New York Secretaries of State, federal and state court dockets in each of the aforementioned states, as well as representations of Defendant Al Baker in the Operating Agreement for FOFBakers, LLC and the representations of Defendants Al Baker and Brittani Baker in the filings for a patent that is owned by Jabezbaker. A true and accurate copy of the Operating Agreement, which includes the relevant patent filing, is attached hereto as **Exhibit B**. *See Lincoln Ben. Life Co.*, 800 F.3d at 103-04 (holding that a plaintiff may plead diversity of citizenship by alleging that none of a defendant LLC's members are citizens of the same state as the plaintiff upon information and belief, after consulting sources at its disposal, including court filings and other public records).

**a.  History of the Relationship Between Plaintiffs and Defendants**

42.     In 2013, Defendants pitched their business, Bubba's Q, on the television show "Shark Tank," wherein John and other successful entrepreneurs bid on stakes in fledgling businesses in an attempt to help those businesses succeed. Defendants accepted John's bid to partner with Defendants in their meat business.

43.     The on-air verbal agreement on "Shark Tank" was that John would invest $300,000 for a 30% stake in the venture contingent on securing a large meat processing company to license the patent. Such ownership was later reduced to 20%.

44.     Soon thereafter, it became apparent that the venture was not going to be able to immediately secure a licensing deal from a meat processing company. As a result, John and Defendant Al Baker focused on launching the business together (with John bankrolling all expenses).

45.     In the first week after airing on "Shark Tank," sales were approximately $400,000 (in contrast, Defendants' sales for the two-year period preceding their appearance on Shark Tank totaled only $154,000). However, Defendant(s) did not have an adequate co-packer in place capable of producing the product on a larger scale to meet the increased demand. The venture was immediately confronted with delays in servicing orders and increased costs to meet demand. Securing a larger co-packer to handle larger volume orders and high demand at more affordable pricing became the paramount objective.

46.     John assisted Defendants by helping introduce them to, and assisted them with vetting, various co-packers in the United States and Canada, made introductions to synergistic relationships, promoted the business, procured opportunities to expand the business via trade shows, and bankrolled the venture's expenses over a two-year period to the tune of approximately

$100,000 prior to the formation of FOFBakers -- during which time John never received a single dollar from the sale of any of the products

47.     In or around February 2014, John and his team assisted Defendants in vetting a co-packer in North Carolina, which included site visits and test runs of product. John paid for all expenses related thereto. Defendants ultimately rejected the opportunity after a 2-3 month process.

48.     In or around April 2014, John introduced Defendants to a large co-packer on Long Island about becoming the venture's co-packer. John and his team assisted in vetting the opportunity and paid all expenses associated therewith including all travel costs. Defendants ultimately rejected the opportunity after a 3-4 month process.

49.     In or around July 2014, John introduced Defendants to the largest meat producing company in Canada about the potential of becoming the new co-packer. The parties went through a lengthy due diligence process that included trips to Canada and John's team assisted the Defendants in the vetting process while paying for all expenses associated therewith. Defendants ultimately rejected the opportunity after a 4-5 month process.

50.     John continued to assist Defendants by making introductions to co-packers and/or assisted with vetting multiple opportunities; all of which were ultimately rejected by the Defendants.

51.     In October 2014, John arranged for booth space solely at his sole expense at one of the largest industry trade shows (NACS in Las Vegas), personally appeared at the show, and walked the floor to foster relationships while also providing personnel from his own team to work the show. John paid for all expenses including travel and lodging for the Baker family, booth space, banners, shipping of product, and paid people to work at the booth.

52.     In May 2015, "Shark Tank" launched a new show called "Beyond the Tank" and John and Defendants appeared on the premiere episode (the "Episode").

53.     On the Episode, the parties discussed how they were losing business opportunities because their co-packer (who Defendant Al Baker had put in place) was unable to produce enough product at affordable prices and to meet demand.

54.     Defendant Al Baker acknowledged that it was he who had selected the co-packer that was causing the business to come to a standstill, admitting on the Episode that, "I chose them. I accept that!"

55.     On the Episode, John explained how he had brought cruise lines, grocery stores and additional trade show opportunities to meet new customers to the forefront but there was no way for the venture to move forward because it was unable to fulfill any such orders and demand through the current co-packer.

56.     The parties acknowledged that John had introduced great co-packers to the Defendants that were capable of handling large volume and demand but Defendant Al Baker admitted, "very few people can make this specific product."

57.     John made it clear on the Episode that unless Defendant Al Baker was able to source a new relationship to produce the product, John "was willing to lose the money invested and to write it off and walk away."

58.     Defendant Al Baker admitted that he had been searching for the right co-packer for 2 1/2 years and promised he would get it done expeditiously.

59.     Even years later, on February 9, 2017, Defendant Al Baker sent an email to one of the producers of "Shark Tank" in which Al Baker, in hindsight, praised and acknowledged all of John's efforts during the period prior to finding an adequate co-packer:

*"Daymond has been like receiving our MBA in business, beginning with suggesting and helping us create a website to capture some initial sales when we first aired, where we did $150,000 in sales that night and $400,000 that week. More importantly you see so many investors focused on ROIs before the hard working entrepreneur earns a penny. Not only has Daymond been patient, but he has taught us to see the "forest" and not just the "trees" and to focus on building out a sustainable and profitable business that maximizes long term profitability rather than strictly focusing on short term profits. We feel that we have built an amazing foundation an infrastructure  that will help us more effectively achieve our goals. A large part of Daymond's investment went into building out our infrastructure, vetting co-packers and the expenses that came along with it and building our website."*

### *Formation of FOFBakers and the Operating Agreement*

60.    In 2015, Defendants introduced Plaintiffs to the Rastellis, a co-packer in New Jersey, as another potential co-packing partner. John and his team assisted the Defendants in vetting the opportunity just as they had done with every other opportunity previously. After numerous meetings, FOFBakers was organized to develop, market, sell, and distribute the food product line known as Bubba's Q De-Boned Baby Back Rib Steak and Bubba's Q World Famous, and to develop, market, sell, and distribute food product line extensions that complemented the existing product line and the "Bubba's Q" brand (the "Business").

61.    FOFBakers was formed, and is intended to operate, pursuant to its Limited Liability Company Operating Agreement dated November 11, 2015 (the "Operating Agreement"), a true and accurate copy of which is attached hereto as **Exhibit B**. FOFBakers is owned by FOFBakers Holding, DF Ventures, and Rastelli Partners, LLC. *See* Ex. B.

62.    In order to accommodate this new three-party arrangement, John invested additional money into FOFBakers (additional capital contribution of $100,000 of which Defendants directly received $52,500) and agreed to reduce his initially agreed-upon ownership percentage from 30% to 20%.

63.     Pursuant to Section 4.1(a) of the Operating Agreement, the management of FOFBakers is vested in two Members who have been appointed as managers, Rastelli Jr. and defendant Al Baker (collectively the "Managers").

64.     As set forth in the Section 4.1(d) of the Operating Agreement, the "Managers have full, exclusive and complete discretion, power and authority...to manage, control, administer and operate the business and affairs of the Company...and to make all decisions affecting such business and affairs" (collectively, "Managerial Control").

65.     Plaintiff(s) is the sole non-managing Member of the Company without any Managerial Control and with no direct access to accounts or financial information. The Managers, including Al Baker,  are solely responsible for the Company's accounting and books.

66.     In fact, Plaintiff(s) is specifically excluded from Managerial Control as a Member as set forth in Section 5.2 of the Operating Agreement which provides, in relevant part, as follows:

> *Except as otherwise provided herein, or in any employment agreement between the Company and a Member, **the Members (other than the Managers), shall not participate in the management or control of Company business**, nor shall the Members transact and [sic] business for the Company, nor shall the Members have the power to act or bind the Company, said powers being vested exclusively in the Managers.*

(emphasis added)

67.     As such, Plaintiff(s)' role in the Company is set forth in Section 6.1(d) of the Operating Agreement which provides, in relevant part, as follows:

> *Daymond John, individually, has agreed to serve as a brand ambassador and on-air television personality for the Company, to provide or cause to be provided by [DF Ventures] sales contacts to the Company, and to provide or cause to be provided by [DF Ventures] marketing, promotion, product development, sales, and advertising services and support to the Company.*

## *Plaintiffs' Performance of Their Obligations Under the Operating Agreement*

68. Plaintiff(s) has continually fulfilled its obligations in the Operating Agreement by, *inter alia*, supplying sales contacts, providing numerous marketing opportunities and leads (including sales opportunities on the "Good Morning America" television show and the online platforms Shop.com and Zulilly.com), attending trade shows, and making multiple other introductions to benefit the Company.

69. John has also fulfilled his obligation as a brand ambassador by creating sales and product videos, making multiple in-store appearances, appearing on radio, television and in-print to promote the product, and utilizing John's social media presence to gain more brand support.

70. Plaintiff(s) provided personnel to participate in regular monthly sales calls to help support FOFBakers' sales initiatives and also on member calls to receive updates and to learn how Plaintiff(s) could assist in any way.

71. Mr. Fox of Plaintiff(s) would often follow up such calls with a recap email of what was discussed on such calls, including sales leads and projections discussed and provided by the Managers on the call.

72. John was instrumental in helping the Company land a nine-week limited time offer ("LTO") with Carl's Jr. ("Carl's"), a fast food chain, for a burger to be topped with two of the Company's ribs. In fact, John agreed to do a public speaking engagement for Carl's free of charge to serve as goodwill for the Company.

73. John was also instrumental in arranging for the Company to be added to a "Shark Tank Update" segment that aired on April 14, 2017 focusing more attention on the Company and the products.

***The Prior Dispute***

74.     In late 2018, Plaintiffs continued their efforts of bringing sales contacts to the Company and was able to introduce the Company to one of the three largest fast food chains in the world (the "Fast Food Chain") to discuss the possibility of adding the Company's products to the Fast Food Chain's menu. After garnering significant early interest from the Fast Food Chain, the opportunity was stalled because of discord between the Managers, during which Defendant Al Baker became non-responsive and refused to participate in key decisions and approvals necessary to move forward with the opportunity.  In other words, while Defendants claim they were left in the dark about business opportunities, in fact they refused to come to the table when business opportunities were presented.

75.     In or around January 2019, Rastelli Jr., on behalf of Rastelli Partners LLC (Rastelli Jr. and Rastelli Partners LLC together, the "Rastelli Parties"), brought a civil suit against Defendants regarding, *inter alia*, Defendants' continued failure to meet their obligations under the Operating Agreement (the "Prior Dispute").

76.     Based upon the legal action, FOFBakers Holdings and Defendant Al Baker consented to cooperate pursuant to a court order dated February 15, 2019.

77.     On February 22, 2019, the Managers (Al Baker and Ray Rastelli Jr) participated in binding arbitration and the Arbitrator ruled in favor of the Rastelli Parties' on all issues presented.

78.     Even after these legal issues with Defendants, Plaintiffs continued to fulfill their obligations and kept the Fast Food Chain business opportunity alive for the Company, but it eventually lost momentum after six months of constant delays and hurdles.

### *The Parties Restructure Their Income In a Settlement Agreement Resolving the Prior Dispute*

79.     On or around September 5, 2019, the Rastelli Parties, Defendant FOFBakers Holding, and Plaintiff DF Ventures entered into a settlement agreement and release (the

"Settlement Agreement") to resolve in full the Prior Dispute brought by the Rastelli Parties and to address FOFBakers Holdings' request to re-characterize some of their economic benefits set forth in the Operating Agreement to an ongoing royalty on gross sales. The Baker Defendants also signed the Settlement Agreement in their individual capacities.

80.    Plaintiff DF Ventures, Rastelli Partners, and Defendant FOFBakers Holding also signed an Amendment to the Operating Agreement (the "Amendment") at that time.  Defendants Brittani Baker, Al Baker, and Jabezbaker signed an Addendum to the Operating Agreement (the "Addendum"), pursuant to which they agreed to certain terms in the Amendment including, but not limited to, Sections 4, 6, 9, 11, 12, 13 and 14 therein.  The Settlement Agreement, Amendment, and Addendum are collectively referred to as the "Settlement Documents", which are attached hereto as **Exhibit C**.

81.    Defendants were represented by counsel throughout negotiation of the Settlement Documents.

82.    In addition to FOFBakers Holding and Al Baker, Jabezbaker, Sabrina Baker and Brittani Baker were significantly involved in settlement negotiations, and all were represented by counsel throughout the negotiation process.

83.    Defendants received significant compensation through the Settlement Documents, including an upfront lump sum payment of $33,333.33 and an additional $100,000 (monthly payments of $8,333.33 for a period of twelve months). The Defendants also sought to restructure their streams of income flowing from the Company, so the Amendment restructured Defendant FOFBaker Holding's' 45% interest from profit distributions to regular ongoing royalty payments (Defendant's Royalty") on gross sales of 4% on the first $5 million of gross sales (and reduced to

3% thereafter) while retaining its 45% interest if the Business is ever sold. Defendant's Royalty payments were payable to the Baker Defendants through their other entity, defendant Jabezbaker.[5]

84.     Effective as of the Settlement Effective Date, Plaintiff DF Ventures also entered into an agreement ("DF Restructuring Agreement") to restructure its 20% economic interest from profit distributions to regular ongoing royalty payments (Plaintiff's Royalty") on gross sales of 1.7777% on the first $5 million of gross sales (and reduced to 1.3333% thereafter) while retaining its 20% interest if the Business is ever sold. *See* DF Restructuring Agreement, attached as **Exhibit D.**

85.     Plaintiff's Royalty in the DF Restructuring Agreement was calculated and determined based upon the exact ratio of Plaintiff DF Ventures' economic interest of 20% compared to Defendant's economic interest of 45% multiplied by the Defendant's Royalty (4%) [20/45 x 4% = 1.7777%]. However, unlike the Defendants, Plaintiff(s) (i) received no lump sum payments and no additional monthly payments as part of the settlement and (ii) agreed to pay its share of certain Company expenses. *See* Ex. D.

86.     The Business sold approximately $18 million in product from 2015 to present. Net profits in the meat industry are razor-thin – typically in the range of 1-8% of sales. The average net margins of the largest meat company in the world and the largest meat company in the United States (over the last 8 years, i.e., since 2015) is 4.55%.[6]

---

[5] Based upon the LA Times Story and the Defendants' own statements, Defendants Al and Sabrina Baker had moved from Cleveland to Florida and had begun "looking to purchase a multimillion-dollar home" leaving defendant Brittani Baker and their son to run the restaurant (which was unrelated to the Business) they had owned for 13 years. Soon thereafter, the restaurant went out of business in 2019. Presumably, the loss of their restaurant business and financial pressures associated with their new lifestyle is what prompted Defendants to seek to re-characterize their economic interests set forth in the Operating Agreement.

[6] Specifically, JBS - the largest meat company in the world – has reported net margins averaging 7.14% over the last 8 years. Tyson – the largest meat company in the United States – has reported net margins averaging 1.86% over the last 8 years. The combined net average for both companies is 4.55% during that time period. *See* Spreadsheets detailing the margins of JBS and Tyson, attached as **Exhibit F.**

87.    Since meeting the Defendants in 2013, Plaintiff(s) have received a total of $113,295.02 in distributions in connection with this venture and are operating at an overall net loss of approximately $86,705 since entering into business with the Defendants. See itemized list of distributions to Plaintiffs, attached as **Exhibit E**.[7]

88.    The Defendants have received approximately $744,600 (not including amounts misappropriated by Defendant Al Baker) in connection with this venture, representing approximately 4.14% of total sales. A spreadsheet outlining payments to the Bakers is attached as **Exhibit G**.[8]

89.    In other words, Defendants have received payments amounting to approximately 4.14% of total sales for their 45% interest in the Company (which is considered a startup), while the top and most established meat companies in the United States and the world report average net profit margin of 4.55% for their ***entire*** companies during the same period.

### *Defendants' Non-Disparagement and Confidentiality Obligations and General Release under the Operating Agreement and Settlement Documents*

90.    In addition to the relevant provisions cited in Paragraphs 63 through 67, Section 11.1 of the Operating Agreement concerns confidentiality (the "Confidentiality Provision"), and provides, in relevant part, as follows:

> *Each of the Members shall, during the term of this Agreement and at all times thereafter, maintain in confidence all confidential and proprietary information and data of the Company and of the other Members and their Affiliates, (each, a "disclosing party") disclosed to it (the "Confidential Information"). Each of the Members further agrees that it shall not use the Confidential Information during the term of this Agreement or at any time thereafter for any purpose other than the performance of its obligations or the exercise of its rights under this Agreement. The Company and each Member shall take all reasonable measures necessary to*

---

[7] Plaintiffs obtained this information from the Rastelli Parties in connection with this proceeding, and do not have any independent access to this financial information beyond their own documentation of payments made to them.
[8] Plaintiffs obtained this information from the Rastelli Parties in connection with this proceeding, and do not have any independent access to this financial information.

*prevent any unauthorized disclosure of the Confidential Information by any of their employees, agents or consultants.*

91.     Section 11.3 of the Operating Agreement relates to the Confidentiality Provision,

and provides, in relevant part, as follows:

*Each Member acknowledges and agrees that any breach of the provisions of Section 11.1 of this Agreement is likely to result in irreparable injury to the Company, the other Members and their respective members, shareholders, partners, officers, affiliates, employees, and agents, and that the remedy at law alone will be an inadequate remedy for such breach, and that in addition to any other remedy they may have, the Company the other Members, or their respective members, shareholders, partners, officers, affiliates, employees and agents shall be entitled to specific performance of Section 11.1 of this Agreement by such Member and **to seek both temporary and permanent injunctive relief** (to the extent permitted by law)...*

92.     Section 4 of the Settlement Agreement provides a general release of claims, (the

"Release") stating, in relevant part, as follows:

*In consideration of the promises in this Agreement, each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker on behalf of themselves and all persons or entities claiming by, through or under them (together, the "Releasors"), do hereby release, remise, acquit and forever discharge each other, and all related persons and entities...from any and all actions, causes of action, claims, suits, demands, covenants, debts, obligations, accounts, contracts, agreements, promises, controversies, liabilities, judgments, damages, losses, costs, charges, expenses, fees, attorneys' fees and executions, of every kind and nature whatsoever either at law or in equity, contingent or fixed, known or unknown, that the Releasors had, have or claim to have against the Releasees from the beginning of the world to this date including, but not limited to, all claims arising from, connected with, or relating to, the matters which are the subject of the Litigation; ...*

93.     Section 5 of the Settlement Agreement (the "Non-Disparagement Clause")

provides in relevant part as follows:

*Each Party [Rastelli Partners, LLC, Raymond M. Rastelli, Jr., DF Ventures, LLC, FOFBakers Holding Company, LLC, and James A. Baker a/k/a Al Baker] and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to make any written or verbal remarks or statements (even in the form of an opinion) about any other Party to anyone including, but not limited to, any such*

> *other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in, that are <u>in any way negative, disparaging or false</u> or which <u>could adversely impact the reputation, goodwill, credibility or value</u> of any such other Party or entity or could discourage current and/or prospective customers from buying products from them…Each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to interfere with any other Party's business relationships, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in.*

(emphasis added).

94.     Pursuant to Section 6 of the Supplement, the prevailing party in any litigation in connection with the original Operating Agreement or the Settlement Agreement and Amendments is entitled to reasonable attorney's fees and costs from the non-prevailing party.

### *Plaintiff(s) Continue to Fulfill their Obligations Under the Operating Agreement*

95.     The COVID-19 pandemic dramatically disrupted the Company's supply chains, resulting in limited to no inventory. During the pandemic, Plaintiffs were able to leverage their relationships with the largest pork producing company in the world to assist the Company by making introductions ("Introductions") to some of its suppliers.

96.     After the Introductions were made, the Managers (Al Baker and Rastelli, Jr.) embarked on the process of vetting the new potential suppliers. In May 2022, Defendants Al Baker and Brittani Baker and the Rastellis booked trips down to Mexico to meet with the new potential suppliers; ultimately, the Defendants did not show up for the meetings. The Rastelli Parties continued to move forward with the potential suppliers and kept Plaintiff(s) and Defendants informed.

97.     Based upon Plaintiff(s)'s efforts, the Company now has a new supplier set to supply large volume of product to the Business on a regular basis at affordable prices beginning in the next few weeks.

***Defendant Al Baker's Embezzlement of Company Funds***

98.     Plaintiffs have also come to learn that Defendant Al Baker has had credit card linked to the Company, that he has charged approximately $60,480 since March 2020; almost all of such charges are for personal expenses having nothing to do with the Company. *See* redacted credit card statements, attached as **Exhibit H**.[9] These charges include countless payments of personal phone bills, Amazon accounts, restaurants, airline tickets for personal travel for Al Baker and his family, rental cars, tires for their car, personal Paypal payments, Sunpass, hotels, Target, Sam's Club, groceries, drug stores, clothing stores, home goods; all having nothing to do with the Business.

99.     Upon information and belief, Defendant Al Baker has been using the Company as his own personal piggy-bank by charging personal expenses to the Company for even greater amounts from 2015 to February 2020.

100.    While it is clear under the law that Managers of a company cannot use corporate funds for personal expenses, the members even went so far as to include specific language in the Supplement to the Settlement Agreement which states that, "*All of Al's expenses shall be submitted to the [Rastellis] for reimbursement....[Rastelli] will furnish Al with a credit card for **approved** expenses.*" (emphasis added).

**b.      Defendants' Breach of their Contractual Confidentiality and Non-Disparagement Obligations**

101.    On or around May 18, 2023, the LA Times published the LA Times Story titled "*Ex-NFL Player Thought 'Shark Tank' would Launch His Barbecue Empire, It Became a Nightmare, He Says.*" A true and accurate copy of the LA Times Story is attached as **Exhibit I**.

---

[9] Plaintiffs obtained this information from the Rastelli Parties in connection with this proceeding, and do not have any access to this account.

102.    In the LA Times Story, Defendants discuss and disclose Confidential Information in violation of the Confidentiality Provision under the Operating Agreement, including, but not limited to:

a.      A December 2015 email related to monthly profit projections for Bubba's Q, which is operated by FOFBakers under the Agreement.

b.      Multiple additional emails between defendant Al Baker, Rastelli Food, and Larry Fox (who was serving as the project manager overseeing DF Venture's investment and John's obligations), regarding specific financial concerns related to FOFBakers, including profit or disbursement information;

c.      Negotiations and financial information related to an agreement to sell FOFBakers products at Carl's Jr. and Hardee's;

d.      An email between defendant Brittani Baker and "Rastelli executives" about the operation of a software system containing financial information; and

e.      Information regarding FOFBakers' profits.

103.    The LA Times Story notes that the LA Times reviewed documentation of the above-described Confidential Information while drafting the LA Times Story  – documentation that the LA Times presumably obtained from Defendants, in violation of defendant FOFBaker Holding's contractual obligations under the Operating Agreement's Confidentiality Provision.

104.    Further, in the LA Times Story, Defendants make a series of disparaging or defamatory statements, including, but not limited to:

a.      Falsely accusing Plaintiffs of "*misleading them, trying to take over their business and depriving them of the profits from potentially lucrative partnerships*;" – when, in fact Plaintiff DF Ventures is the sole non-managing Member of the Company, is not a

signatory to any account and has no direct access to any such information, has no Managerial Control of the Company and just has a 1.7777% royalty interest on gross sales.

b.      Falsely accusing John of "ceasing" communications with Defendants until one month ago when the LA Times began to draft the LA Times Story; when, in fact, Plaintiffs (despite the limited role as a brand ambassador and non-Manager) were able to introduce a new supplier that is now set to supply product to the Business on a regular basis at affordable pricing. After such introduction, Defendant Al Baker, breached his fiduciary obligations by failing to show up in Mexico to vet the opportunities and report back to Plaintiff(s) once supply was finalized and procured.

c.      Falsely accusing  John of "economically marginalizing" them; when, in fact, John bankrolled the venture prior to Plaintiff(s) and Defendants entering into the Operating Agreement with the Rastelli Parties, and made a significant capital contribution to the Business while the Defendants have not contributed a single dollar to the venture since appearing on "Shark Tank." The Defendants have received in excess of $744,600 (plus amounts that were misappropriated by Defendant Al Baker) while Plaintiffs are still operating at a loss.

d.      Falsely asserting that the $659,000 of profit Defendants have received through sale of Bubba's Q products is a suspiciously low number compared to the gross sales of the products, and then insinuating that Plaintiff(s) and the Rastelli Parties have improperly withheld a sum of money from them; when, in fact, the Defendants received in excess of $744,600 (plus amounts that were misappropriated by Defendant Al Baker) and that net margins are razor thin averaging between 1-8% on gross sales throughout the meat industry.

e.     Falsely asserting that John revised deal terms and instead of investing $300,000 for a 30% equity interest, changed the terms to $100,000 for a 35% interest, when in fact, the original deal terms were contingent upon securing a large meat processing company to license the product, and when that could not be accomplished, John bankrolled all expenses of the venture for the first two years for approximately $100,000, and upon formation of the Company, made a capital contribution of $100,000 in exchange for a 20% equity interest.

f.     Falsely accusing Plaintiffs of taking advantage of Defendants during negotiations, when, in fact, Defendants have been represented in all negotiations by numerous attorneys; (albeit, seven different attorneys, all of whom, upon information and belief, have now cut ties with the Defendants); and

g.     Falsely accusing Plaintiffs of withholding FOFBakers' financial information or profits from Defendants -- when, in fact, Plaintiff is the sole non-managing Member of the Company, and as such, has no direct access to such information nor any responsibility with regard to it and no Managerial Control. There is no way for Plaintiffs to withhold any such information or profits.

105.   The LA Times reporter who wrote the LA Times Story reached out to John for comment, but John was unable to comment on many questions due to his confidentiality obligations under the Operating Agreement and Settlement Agreement as a Member of FOFBakers.

106.   At the same time, Defendants began – and actively continue – to engage in a malicious social media smear campaign directed at tarnishing Plaintiffs' and their Affiliates'

reputations, further exposing Confidential Information, and making disparaging comments and false accusations against Plaintiffs to Plaintiffs' and/or Affiliates' extreme detriment.

107. The same day that the LA Times Story was published, on or around May 18, 2023, a TikTok account, "@bubbasQfoodtrucks", (the "TikTok Account") posted a video featuring Defendant Brittani Baker, entitled "Did you see my dad & I on Shark Tank?" (the "First Video") that contained disparaging remarks about John.[10]

108. Upon information and belief, the TikTok Account is operated and controlled by Defendant Brittani Baker.[11]

109. Across the homepage of the TikTok Account, Defendant Brittani Baker has branded a new slogan for the Company, "*Daymond John & Rastelli Food ARE trying to steal my families [sic] business*", which is a blatant lie – indeed, it is impossible for Plaintiff, as sole non-managing Member with a minority interest, to steal the Defendants' business.

110. In the First Video, Defendant Brittani Baker falsely and disparagingly claims that her business has been a "nightmare" since partnering with John, and makes a vague and unfounded accusation that other "small businesses" have been negatively impacted by partnering with John.

111. On or around May 19, 2023, the TikTok account @albubbabaker111 ("Al Baker TikTok Account") posted a video titled "Did you see my dad & I on Shark Tank," which directs viewers to the LA Times Story and falsely claims that John failed to help defendant Al Baker "scale [his] business". Upon information and belief, the Al Baker TikTok Account is owned and operated by Al Baker.

---

[10] The TikTok Account can be viewed at the following link: https://www.tiktok.com/@bubbasqfoodtrucks

[11] Brittani Baker has also reposted most, if not all, of the mentioned videos from the TikTok on her personal Instagram account, @brittanibobaker, as well as on Facebook, in an attempt to maximize her audience.

112.   On or around May 20, 2023, the TikTok Account posted another video entitled "Sharing my Shark Tank Nightmare?" (the "May 20 Video") in which Defendant Brittani Baker hurls a false and thinly-veiled accusation that John siphoned off company funds, "*where did the money go?*", again claims that partnering with John was a "nightmare," discloses a private email from John, and utilizes the "hashtags" #SharkTankNightmare and #wheresthemoney, presumably in an attempt to get the hashtags to start "trending" on the TikTok platform and potentially "go viral." Defendant Brittani Baker's statements in the May 20 Video are false, as Plaintiffs have no access to and are not signatories to any of the Company's accounts and have no Managerial Control of the Company, and thus it is impossible for Plaintiffs to siphon off any funds.

113.   On or around May 20, 2023, the Al Baker TikTok Account re-posted the TikTok Account's May 20 Video with the additional caption "Where did the money go?"

114.   On or around May 21, 2023, the TikTok Account posted another video, entitled "Partnering with Daymond John Has been a Nightmare?" (the "May 21 Video"), wherein Defendant Brittani Baker shared private emails from John related to the hiring of an individual to help with the Bubba's Q website and disparaged John by claiming that he negatively impacts small businesses.

115.   On or around May 21, 2023, the Al Baker TikTok Account re-posted the TikTok Account's May 21 Video, with the additional caption "Business since #SharkTank has been a nightmare saddened to find out we weren't the only small business affected by this. You can read the full article with the link in my bio or on LATimes.com. #WHERESTHEMONEY?"

116.   On or around May 21, 2023, the Al Baker TikTok Account again reposted the TikTok Account's May 21 Video with additional voiceover of defendant Al Baker stating that

Defendant Brittani Baker is exposing "corporate injustices" at the hands of John and encouraging his followers to go to the TikTok Account, stating that he **"wants this to go viral."**

117.    Defendant Sabrina Baker has also re-posted the LA Times Story on Facebook seeking to rally viral support.

### *Defendants' Defamatory and Disparaging Posts Continue Even After Plaintiffs Serve a Cease and Desist Letter*

118.    On or around May 21, 2023, Plaintiffs served Defendants with a cease and desist letter (the "Cease and Desist Letter"), indicating that Defendants were in breach of the Agreements and demanding that Defendants cease making publicly disparaging or defamatory remarks against Plaintiffs, and further, cease publicly revealing Confidential Information. A true and accurate copy of the Cease and Desist Letter is attached hereto as **Exhibit J**.

119.    Defendants have entirely ignored the Cease and Desist Letter, and have continued to post outrageous, damaging, and false video content with the goal of inflicting harm on Plaintiffs.

120.    On or around May 21, 2023, Defendant Brittani Baker created a GoFundMe page, on which she has posted defamatory and disparaging statements about John and the Rastelli Parties, including that, "Our product has generated over $18 million in sales. However, despite this, we have received less than 4% of the revenue before taxes spread out over the past 8 years. While facing an attempted takeover of our company and Patent. We refuse to let injustice prevail!"

121.    On or around May 22, 2023, the TikTok Account posted yet another video entitled "I don't know who needs to hear this?" (the "May 22 Video") wherein Defendant Brittani Baker states that John has had a negative impact on other small businesses; shares photos of John with disparaging captions such as "I am NOT to be trusted with anything," "I will Gaslight you, take your money, your time and self esteem," and "I repeat DO NOT TRUST ME"; claims that she was "forced to settle" with John in the Prior Dispute.  Defendant Brittani Baker further professed her

27

desire to spread her allegations publicly as much as possible to "get her story out," and claimed that she would have "so much more information coming soon". These accusations are riddled with innuendos that John is criminally stealing from the Defendants, which is outlandish.  Again, Plaintiffs have no access to and are not signatories to any of the Company's accounts and have no Managerial Control of the Company. Plaintiff simply has a 1.7777% Royalty and owns its 20% minority interest if the Business is sold.

122.    On or around May 22, 2023, the TikTok Account posted yet another video entitled "The plot thickens what do you guys think about this" wherein Defendant Brittani Baker discloses portions of the Operating Agreement containing net profits, member names, and member voting interests, as well as documents containing purported profit projections for FOFBakers, in violation of the Operating Agreement's confidentiality provision.

123.    On or around May 22, 2023, the TikTok Account posted yet another video titled "Tell me what you think about this……you know the receipts are included" wherein Defendant Brittani Baker claims that her family and other small businesses have been impacted by the "Daymond John nightmare," shares emails with John, discusses alleged details of one of John's business deals, claims that John is attempting to push Defendants out of their business, and proclaims "there is still more to this story."

124.    On or around May 22, 2023, the TikTok Account posted yet another video titled "What's the common denominator in all this mess?" wherein Defendant Brittani Baker alleges that John pressured another small business into making a deal that was allegedly detrimental to it, asking "Where's the money?," speculating that Plaintiff(s) have been withholding funds from Defendants and another small business, and querying, "so what's the common denominator in all this mess?" while posting a photo of John with the caption "This Man".

125.    On or around May 22, 2023, the TikTok Account posted yet another video titled "The People Arent' [sic] Falling For the People's Shark B.S.?" wherein Defendant Brittani Baker discusses a portion of the Amendment to the Operating Agreement related to Rastelli Foods' payment of John, falsely accuses John of a "bold face lie" related to the profit margins of Bubba's Q, claims that John is trying to "play people," insinuates that John has been dishonest about the profits of the business and that he has left millions of dollars unaccounted for, and asks "Where did the money go?"

126.    Like the previous videos, the statements in that video are lies for the aforementioned reasons – John has no management role in the Company and is simply a minority owner.

127.    On or around May 23, 2023, the TikTok Account posted a video containing Defendant Brittani Baker revealing confidential information including private emails containing FOFBakers' profit projection information, and alleging falsely that Plaintiff(s) and the Rastelli Parties had been withholding profits from Defendants

128.    Subsequently, on or around May 23, 2023, when the TikTok Account was flagged as under review, Defendant Brittani Baker resorted to posting on other social media platforms, encouraging her followers to re-post the false and disparaging statements.  For example, Defendant Brittani Baker pleaded, "Can y'all please share this as much as you can EVERYWHERE!?"

129.    Comments by third parties on these posts clearly show that many are accepting the false and disparaging statements regardless of the truth.

130.    On or around May 24, 2023, the Al Baker TikTok Account posted a video wherein Al Baker indicates the "NFL Alumni" are joining his "campaign" to "expose" Plaintiff(s) and the Rastelli Parties, and announcing that he and Defendant Brittani Baker were starting a new show

on the NFL Alumni Media platform to release "raw and authentic conversations" about their "nightmare," which will include guest speakers.

131.   Defendant Al Baker also used the well-recognized NFL trademark logo and music as part of his ongoing disparagement of Plaintiff(s) and their Affiliates.

132.   On or around May 24, 2023, the TikTok Account posted a video with images of John and the LA Times Story, thanking the journalist for helping to "expose" Defendants' "#SharkTanknightmare". Notably, because Defendant Brittani Baker also used the hashtag "#DaymondJohn", this video will appear any time that an individual searches John on this social media site.

133.   Since the initial filings in this action, about which Defendants received due notice, Defendants have posted at least ten additional videos in which they continue to make disparaging and defamatory statements about Plaintiff(s) and improperly disclose confidential information, in violation of their contractual obligations.

134.   For example, on or around May 26, 2023, the TikTok Account posted a video indicating that Defendant Brittani Baker hadn't even shared "a quarter" of what she planned to share about Plaintiff(s) and the Rastelli Parties, sharing private emails regarding business negotiations relationships of FOFBakers, and insinuating that John had not worked in Defendants' best interests.

135.   On or around May 27, 2023, the TikTok Account posted a video wherein Defendant Brittani Baker accuses John and the Rastelli Parties of "manipulating the numbers to their advantage," alleging that Defendants had "no choice but to settle" in the Prior Dispute, and discussing financial information and business negotiations of FOFBakers. - Once again, this is a

complete lie as Plaintiff(s) have no direct access to any financial data, so it is impossible for Plaintiffs to manipulate any numbers.

136.    On or around May 28, 2023, the TikTok Account posted a video containing a recording of a portion of a conversation between Defendant Brittani Baker and John, to which John did not consent, revealing email conversations regarding business negotiations for FOFBakers, and asking viewers to "blow this video up" and "tag" news organizations or streaming services so that the story would be picked up and spread further. Each time an individual in the comments section "tagged" a media organization such as CNN, Inside Edition, Netflix, Hulu, MSNBC, CBS, Oprah Winfrey, and ABC News, the TikTok Account responded thanking them for the tag, further evidencing that Defendants' goal is to draw public criticism of Plaintiffs and further spread Defendants' false and disparaging narrative.[12]

137.    Furthermore, upon information and belief, Defendant Brittani Baker has been living in California and John was living in Florida at the time of the call. In both California and Florida it is illegal to record telephone conversations without the consent of both parties. Defendant Brittani Baker has engaged in illegal criminal activity and then posted such illegally recorded conversation on the internet.

138.    On or around May 28, 2023, the TikTok Account posted another video containing a portion of an illegally recorded conversation between Defendant Brittani Baker and John, to which John did not consent, stating that working with John has been a "nightmare," and insinuating that the Rastelli Parties and John have been improperly communicating and/or conducting business behind Defendants' backs. The video contains multiple hashtags, including, "#SharkTank,"

---

[12] "Tagging" an account in the comments of a TikTok video causes the account to receive a notification about the tag, which links them to the video to which they were tagged so that it can be viewed.

"#SharkTankNightmare," "#DaymondJohn," "#RastelliFoods," "#storytime," "#viral," "#fyp,"
"#foryoupage," and "#businesstok." [13]

139.    On or around May 29, 2023, the TikTok Account posted another video narrated by
Defendant Brittani Baker containing a recording of a conversation between Defendant Al Baker
(who lives in Florida) and Mr. Fox, to which Mr. Fox did not consent, insinuations that the Court
in the Prior Action was biased in favor of the Rastelli Parties, an indication that Brittani Baker had
illegally recorded multiple other conversations, and hashtags including "#SharkTanknightmare,"
"#DaymondJohn," "#LarryFox," "#RastelliFoods," "#storytime," "#fyp," "#foryoupage,"
"#viral," and "#businesstok."

140.    Upon information and belief, Defendant Al Baker lives in Florida. In Florida, it is
illegal to record telephone conversations without the consent of both parties. Defendants Al Baker
and Brittani Baker (who was not even a party to the call) engaged in criminal activity and then
posted such illegally recorded conversation on the internet.

141.    On or around May 31, 2023, the Tik Tok Account posted another video narrated by
Defendant Brittani Baker, which included the following false statements: (i) John was engaging in
fraud and illegal activities, (ii) that if a restraining order is granted, Plaintiff will take control of
the patents, and (iii) that John controls the Baker Defendants' finances and income.

142.    On or around June 2, 2023, the Tik Tok Account posed another video narrated by
Defendant Brittani Baker which includes innuendos that John is stealing money, and in which she
states, "Do you honestly believe that Daymond John would allow only for us to be paid from the
venture?".

---

[13] The "#foryoupage" and "#fyp" hashtags are used on TikTok when a poster would like a video to be included on
other users' home page, which contains videos from new accounts for the user to discover. Use of these hashtags is
meant to generate a larger audience for the content.

143.    On or around June 3, 2023, Defendant Al Baker posted a homemade video asking people to read stories about what John and the Rastellis are doing to his family. In the video, Defendant Al Baker implores people to help by contacting the Federal Trade Commisssion ("FTC") to complain about what John and the Rastellis are purportedly trying to do to his family and their business and provides direct contact information to the FTC. He explains how the current lawsuit is a distraction and asks people to focus on their complaint with the FTC and provides the FTC Complaint Report number.

144.    On June 4, 2023, Defendant Brittani Baker posted another video on the TikTok Account. Among other fabrications, she states that the Bakers' episode of "Shark Tank" aired again during the past few days, and accuses John, Mr. Fox and the Rastellis of conspiring to re-air the episode in an effort to motivate viewers to buy more product online so they can profit and take advantage of the Defendants. Once again, Defendant Brittani Baker's statements are outlandishly false, as the episode of "Shark Tank" has been in syndication for years on other networks and neither Plaintiff(s) nor the Rastelli Parties have a single thing to do with, or have any influence on when such reruns of the episode air.

145.    Additionally, in the above-referenced TikTok videos, Defendants make numerous references to their false claim related to their $659,000 profit in comparison to the gross product sales figure – discounting the amounts they have actually received, not mentioning the amount misappropriated by Defendant Al Baker, and conveniently omitting the fact that their distributions are actually well above average industry net margins.

146.    The above-referenced videos have been viewed in excess of four million times on TikTok, Instagram, and Facebook, and have generated thousands of comments on the videos themselves, as well as comments on John's own social media accounts.

147.     On June 4, 2023, Defendants diverted the Company's website so that it now automatically redirects to Defendant Brittani Baker's food truck website address ("the Food Truck Website"), effectively removing the Company's website so that customers can no longer order the product online. The Food Truck Website now contains the following defamatory statements, which are seen by anyone who attempts to access the Company's website:

Looking for our Boneless Ribs? Sorry they are not available right now. Unfortunately working with Daymond John, Rastelli Foods, Larry Fox, Ray Jr, & Ray Rastelli 3 is a nightmare and I have to bring awareness to our story and fight for our product. WORKING WITH DAYMOND JOHN AND RASTELLI FOODS SINCE APPEARING ON SHARK TANK IS A NIGHTMARE. DAYMOND JOHN, LARRY FOX, Ray Rastelli Jr Ray Rastelli 3 & RASTELLI FOODS ARE TRYING TO STEAL MY FAMILIES BUSINESS. I am Brittani Bo Baker my dad is former NFLer AL Bubba Baker. Our story has been told by an award winning investigative journalist with the Los Angeles Times Unfortunately we are not the only small business that has been affected by Daymond John and Rastelli Foods. Welcome to our website, where we share the untold story behind our challenging journey with Daymond John and Rastelli Foods. What began as an exciting opportunity on Shark Tank quickly turned into a nightmare as we discovered their relentless efforts to take over our patent and exclude us from our own business. Daymond John and Rastelli Foods have joined forces, intentionally shutting us out of important conversations and decisions concerning our patent. It has become apparent that Daymond John has a confidential payment arrangement with Rastelli Foods, raising serious questions about their motives. This is not the first time Daymond John has engaged in deals with Rastelli Foods, creating a concerning pattern. To add to the ordeal, Daymond John and Rastelli Foods claim to have made zero profits from the substantial $18 million in sales. However, our family has uncovered evidence of hundreds of thousands of dollars in underreported income. Instead of addressing our concerns, they have resorted to bullying and intimidation tactics. When we raised questions about the missing financial records, they retaliated by decreasing our licensing payments. Working with Daymond John and Rastelli Foods has been a true nightmare, with our dreams turning into a constant battle for justice. Our website is dedicated to shedding light on these injustices and rallying support from individuals who believe in fairness and integrity in business. We refuse to let corporate greed prevail and are determined to protect our patent and our rightful place in the industry. By sharing our story and seeking your support, we aim to bring attention to the need for transparency and accountability in business dealings. If you can support our cause by donating to our Go Fund Me campaign, aimed at covering legal fees and ensuring a fair fight against the forces that seek to silence us. Every contribution brings us closer to reclaiming our business and preserving our legacy. Explore Our Website, Get Involved Discover the truth, access supporting evidence, and stay informed about the latest developments. Let our collective voice resound and fight for what is rightfully ours. Stand with us, unite for truth, and let justice prevail!

148.   At all times, Plaintiff(s) have acted within the scope of their obligations to Defendants under the Operating Agreement and Settlement Documents.

149.   As such, Defendants' numerous statements to the contrary are entirely false, and serve only to mislead the public.

150.   As Defendants well know, John is not a Manager of FOFBakers and thus has no role with regard to bookkeeping or managing FOFBakers. Accordingly, as a *non-managing* Member of FOFBakers, John has no access to, or control over, the financial documentation or decisions discussed by Defendants.

151.   Defendants' "where's the money?" accusation is willfully and maliciously false because Defendant Al Baker *is* a Manager of FOFBakers, with access to – and responsibility for – such financial information and has misappropriated Company funds for his own personal benefit.

152.   Defendants' public statements that they only received $659,000 after $16 Million of products have been sold, then demanding "where's the money?" – thereby insinuating that more than $15 Million of revenue is missing-- are defamation by implication, as Defendants are under-reporting what they received and are intentionally omitting the well-known meat-industry fact that net profit margins are razor-thin – typically in the range of 1-8% of sales.

153.   Not only are Defendants' statements false, but numerous posts concern matters that pre-date the Settlement Agreement, all matters which they had every opportunity to raise prior to the Settlement Agreement.

154.   Prior to the Settlement Agreement, the Defendants were provided all documentation requested by their counsel to review any and all concerns, and then after such information was reviewed, the Defendants entered into the Settlement Documents, which includes the Release.

155.    Further, as Defendants either know or should know (due to Defendant Al Baker's role as a Manager), John is operating at an overall financial loss from his decision to become involved with the Defendants.

156.    Despite operating at a financial loss, John has tried to help grow the Company by using his limited, defined role as a brand ambassador for FOFBakers to significantly assist the Company in an attempt to benefit Defendants.

157.    Indeed, Defendants' disparaging statements about John in the posts are directly contradicted by the statements, which up until June 4, 2023, were on the website used to promote the product.

158.    Specifically, in an article dated January 12, 2021 (after the settlement of the Federal Court Action), a copy of which article was published on the product website, Defendant Al Baker praised John: "Daymond John is a great partner. He reached out to me on the show, and he's been true to form ever since.  He's never too busy and always willing to help."

159.    Similarly, only a few months ago, on February 15, 2023, in another article reposted on the product website, Defendant Al Baker attributed Defendants' success to Shark Tank (and by extension, John).

160.    Indeed, as discussed above, from the very outset of John's business dealings with Defendants, John utilized his vast network curated through his decades of successful business to provide contacts to the Company to supply, distribute, and market its product and served as its brand ambassador.

161.    As a result of these public statements by Defendants on various forms of social media and in the LA Times Story, John has suffered, and will continue to suffer, tangible negative impacts to his business relationships and reputation as a result of Plaintiffs' conduct.

162.    In the days since the above-mentioned LA Times Story and videos were posted, John has had several potential business ventures called into question.

163.    For example, one particular company ("Company A"), which had agreed to business terms for John to be a brand ambassador, had begun coordinating scheduling production logistics, and had moved toward executing a formal agreement, has expressed concern to John about the content of the videos and the LA Times Story and, as a result, has indicated a desire to reconsider the potential business relationship.

164.    There is a substantial likelihood that other prospective business ventures with other companies like Company A also could be jeopardized by the disparaging and defamatory statements publicized by Defendants. Such ventures can typically earn John in the range of $250,000 and up.

165.    Additionally, since the LA Times Story and videos were posted, a second company ("Company B"), after extending an official offer for an appearance, contacted John on or around May 22 saying that they "officially have to pull the offer for Daymond John and pivot to other Talent options."[14]

166.    Similarly, there is a substantial probability that other businesses, like Company B, will catch wind of Defendants' disparaging and defamatory posts and cancel paid appearances with John, which typically earn John $50,000-$100,000 per event.

---

[14] Importantly, as Defendants' statements falsely accuse John of criminal conduct and present false facts that have tended to harm, and will continue to harm, John in his business trade and profession, their conduct constitutes slander *per se* and John need not allege specific damages in order for Defendants to be held liable. *See Jobes v. Evangelista*, 369 N.J. Super. 384, 397, 849 A.2d 186, 193 (App. Div. 2004); *see also NY Machinery Inc. v. Korean Cleaners Monthly*, 2018 WL 2455926 at *5 (D.N.J. 2018).

167. Since the LA Times Story was first published, the LA Times has written a second story containing many of the Baker's disparaging and defamatory untrue statements, which has been picked up by hundreds of other news outlets including People Magazine.

168. Enforcement of the lawful obligations owed by Defendants to Plaintiffs is appropriate and necessary to protect Plaintiffs' legitimate business interests, customer and employee relationships, goodwill, and FOFBaker's Confidential Information.

169. Plaintiffs will suffer irreparable harm for which they cannot be adequately compensated by monetary damages alone if the preliminary and permanent injunctive relief requested herein is not granted.

## V.    CLAIMS AGAINST DEFENDANTS

### FIRST CAUSE OF ACTION
### DEFAMATION
### (Against all Defendants)

170. Plaintiffs repeat and reallege paragraphs 1 through 169 of this Complaint with the same full force and effect as if fully set forth herein.

171. Defendants have asserted numerous false statements regarding Plaintiff(s).

172. Defendants have also made other statements that, while facially true, were designed and intended by Defendants to imply a defamatory meaning, and such statements were in fact understood by others to be defamatory.

173. Defendants have asserted such false statements with malice and the intent to harm Plaintiffs' and their Affilates' reputations in the community, or to cause others to avoid Plaintiff(s) and/or their Affilates.

174. Defendants have asserted such false statements publicly, through various forms of social media and the LA Times Story, to multiple third parties around the world.

38

175.     Defendants' assertion of such false statements was willful, malicious, and in reckless disregard of the adverse consequences to Plaintiff(s).

176.     Defendants' statements falsely accuse Plaintiff(s) of the commission of a crime.

177.     Defendants made false statements that have injured Plaintiff(s) in his business trade and profession.

178.     Plaintiff(s) have suffered actual damages as a result of Defendants' defamatory statements.  As such, Plaintiff(s) are entitled to monetary damages and injunctive relief against Defendants.

179.     As Defendants' conduct constitutes slander *per se*, Plaintiff(s) need not provide proof of specific damages in order for Defendants to be held liable.

180.     Plaintiff(s) and their Affiliates have suffered, and will continue to suffer, irreparable harm as a direct result of Defendants' defamatory statements until such time as they are ordered to cease making defamatory statements against Plaintiff(s), and are further ordered to remove any such defamatory statements from social media accounts within their custody or control.

181.     Injunctive relief is necessary as Plaintiff(s) are without an adequate remedy at law to prevent this harm to Plaintiffs.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against all Defendants)

182.     Plaintiffs repeat and reallege paragraphs 1 through 181 of this Complaint with the same full force and effect as if fully set forth herein.

183.     Plaintiffs entered into valid and enforceable Operating Agreement with Defendants related to FOFBakers.

184.     Therein, Defendants acknowledged and agreed to abide by the Confidentiality Provision.

185.   Plaintiffs entered into valid and enforceable Settlement Agreement with Defendants related to the Prior Action.

186.   Therein, Defendants acknowledged and agreed to abide by the Non-Disparagement Provision.

187.   Defendants received due consideration for signing and entering into these contracts containing such non-disparagement and confidentiality provisions.

188.   Defendants have breached their Operating Agreement with Plaintiffs, as Defendants have wrongfully disclosed Confidential Information as defined in the Operating Agreement publicly, through various forms of social media and in the LA Times Story.

189.   Defendants' use of this Confidential Information, including financial information related to FOFBakers that is not publicly available, was not to fulfill their obligations under the Agreement.

190.   Defendants have breached their Settlement Agreement with Plaintiffs, as Defendants have willfully disparaged and defamed Plaintiffs and their Affiliates publicly, through various forms of social media and in the LA Times Story.

191.   Plaintiffs served Defendants with the Cease and Desist letter on or around May 21, 2023, but Defendants have continued to disparage Plaintiffs thereafter in the same public manner.

192.   Plaintiffs have suffered actual damages as a result of Defendants' breaches.  As such, Plaintiffs are entitled to monetary damages and injunctive relief against Defendants.

193.   Plaintiffs have suffered, and will continue to suffer, irreparable harm as a direct result of Defendants' breach of their confidentiality and non-disparagement obligations until such time as they are ordered to cease revealing Plaintiffs' Confidential Information and disparaging or defaming Plaintiffs.

194.    Injunctive relief is necessary as Plaintiffs are without an adequate remedy at law to prevent this harm to Plaintiffs.

**THIRD CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTIES**
**(Against Defendant Al Baker)**

195.    Plaintiffs repeat and reallege paragraphs 1 through 194 of this Complaint with the same full force and effect as if fully set forth herein.

196.    As Al Baker is a Manager of FOFBakers and controlling Member of FOFBakers Holding (a Member of the Company) whereby he owes fiduciary duties to the Company and its Members.

198.    Such duties include, but are not limited to, the duty of trust, duty of confidence, duty of loyalty, duty of care and the duty of good faith and fair dealing.

199.    Defendant Al Baker violated these fiduciary duties through a variety of actions including, without limitation:

(1) posting confidential information of FOFBakers with an intent to harm Plaintiff(s) and their Affiliates;

(2) disparaging Plaintiff(s) openly by making harmful or false claims against them;

(3) calling the business practices of FOFBakers into question in the public arena, thereby diminishing the public's opinion of the Company;

(4) failing to adhere to the terms of the Operating Agreement, for his own personal benefit, to the extreme detriment of Plaintiffs, the Rastelli Parties, and FOFBakers itself; and

(5) misappropriating Company funds by using his Company credit card to pay for personal expenses.

200. Defendant Al Baker, through the above-mentioned actions, has acted purposely to sabotage FOFBakers' business and reputation, resulting in vendors not wanting to carry the product. Thus, Defendant's actions have reduced the value of the Company, and have made it nearly impossible for plaintiff DF Ventures to recoup its investment in FOFBakers.

201. Such conduct also proximately caused damages to the Plaintiffs and the Company including, but not limited to, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

202. Plaintiff(s) have suffered actual damages as a result of Defendant Al Baker's breach of his duties of loyalty and care. As such, Plaintiffs are entitled to monetary damages and injunctive relief against Defendants.

203. Plaintiff(s) have suffered, and will continue to suffer, irreparable harm as a direct result of Defendant Al Baker's breach of the duty of loyalty until such time as he is ordered to cease engaging in actions contrary to his duty to FOFBakers and Plaintiff(s)

204. Injunctive relief is necessary as Plaintiff(s) are without an adequate remedy at law to prevent this harm to Plaintiff(s).

## V.      PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief in the form of a preliminary injunction and until final hearing, and then permanently thereafter, with judgment entered as follows:

A.       For preliminary and permanent injunctive relief against Defendants including compelling Defendants to remove  all social media posts described above related to Plaintiffs and/or their Affiliates from the websites or applications to which they were posted, including, but not limited to, Facebook, Twitter, Instagram, and TikTok;

B.      For preliminary and permanent injunctive relief against Defendants including compelling Defendants to remove all social media posts described above related to the LA Times Story from the websites or applications to which they were posted, including, but not limited to, Facebook, Twitter, Instagram, and TikTok;

C.      For a restraining order against Defendants prohibiting them from directly or indirectly making further disparaging or defamatory remarks against Plaintiffs and/or their Affiliates or disclosing or discussing any further Confidential Information pursuant to the Operating Agreement or Settlement Agreement;

D.      For a restraining order against Defendants prohibiting them from directly or indirectly participating in interviews with media outlets related to their relationship and dealings with Plaintiffs and/or their Affiliates;

E.      For a restraining order against Defendants prohibiting them from continuing to directly or indirectly publicize, disseminate, refer to, re-post, or otherwise direct people to view the LA Times Story;

F.      For a restraining order against Defendants prohibiting them from continuing with their stated plan, described above, to host a radio or podcast show wherein they will directly or indirectly discuss their allegations against Plaintiffs and/or their Affiliates;

G.      For preliminary and permanent injunctive relief against Defendants, their family, their representatives, and any other agents acting on their behalf, directly or indirectly, to retain and preserve all evidence or documentation relevant to the matters discussed herein, including, but not limited to, communications, notes, memoranda, text messages or messages on any other messaging platform, telephone records, facsimiles, posts, videos, and email correspondence, in physical or electronic format;

H.      For entry of judgment in favor of Plaintiffs and against Defendants;

I.      For an award of monetary damages for economic losses (including, but not limited to, lost profits deriving from the Company and from Plaintiff's other business opportunities unrelated to the Company), reimbursement of funds misappropriated by Defendants, damages for reputational harm, and other pecuniary and non-pecuniary losses, in an amount to be determined at trial;

J.      For an award of punitive damages based upon Defendants' willful and/or malicious conduct;

K.      For an award of the fees and costs associated with this action, including attorneys' fees, as well as interest;

L.      For such other and further relief as the Court deems just and proper.

Dated: June 6, 2023
New York, New York

Respectfully submitted,

/s/ Mercedes Colwin
Mercedes Colwin

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **DF VENTURES, LLC, and DAYMOND JOHN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | VERIFICATION TO AMENDED |
| | ) | VERIFIED COMPLAINT |
| **v.** | ) | |
| | ) | |
| **FOFBAKERS HOLDING COMPANY LLC,** | ) | |
| **JABEZBAKER, LLC, JAMES A. BAKER a/k/a AL** | ) | |
| **BAKER,** *individually*, **BRITTANI BO BAKER,** | ) | |
| *individually*, **and SABRINA BAKER,** *individually*, | | |
| | | |
| **Defendants.** | | |

**DAYMOND JOHN,** being duly sworn, deposes and says:

I am a named plaintiff in the above captioned matter, as well as an officer of DF Ventures, LLC, the other named plaintiff. I have read the foregoing Amended Verified Complaint and know the facts stated therein to be true. I base this verification on my own knowledge, information and belief, and as to those matters, I believe them to be true. The grounds of my knowledge, information and belief are derived from my position as officer of DF Ventures, LLC, my personal involvement in the events underlying this litigation, and general investigation into the facts and circumstances described in the Amended Verified Complaint, including, without limitation, my review of relevant records and conversations with relevant parties.

I declare under penalty of perjury that the foregoing is true and correct.

_____
DAYMOND JOHN

June 6, 2023
_____
DATE