# EXHIBIT B

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

### OF

### FOFBAKERS, LLC

### (a Delaware limited liability company)

This **LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF FOFBAKERS, LLC** (the "**Company**") is entered into as of the <u>11th</u> day of <u>November</u>, 2015 by **FOFBakers Holding Company, LLC,** an Ohio limited liability company ("**Baker**"), **Rastelli Partners, LLC,** a Delaware limited liability company ("**RP**"), and **DF Ventures, LLC,** a New York limited liability company ("**Daymond**"), as the members of the Company (sometimes individually referred to as a "**Member**" and collectively as the "**Members**").

### RECITALS:

**WHEREAS,** the Company was formed under the Delaware Limited Liability Company Act, as amended from time to time (the "**Act**") pursuant to the filing of its Certificate of Formation ("**Certificate**") with the Secretary of State of the State of Delaware on October 27, 2015; and

**WHEREAS,** the Company was organized to develop, market, sell, and distribute a specific food product line developed by Baker, known as Bubba's Q De-Boned Baby Back Rib Steak and Bubba's Q World Famous, and to develop, market, sell, and distribute product line extensions that compliment Bubba's De-Boned Baby Back Rib Steak, Bubba's Q World Famous and the "Bubba's Q" brand (the "**Business**"); and

**WHEREAS,** the Members now wish to memorialize and to establish the terms and conditions relating to their relationship and to the governance of the Company.

**NOW, THEREFORE,** the undersigned Members, in consideration of the mutual covenants and conditions herein contained and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, agree as follows:

### ARTICLE 1
### FORMATION, PURPOSE AND DEFINITIONS

1.1. **Definitions.** As used in this Agreement, capitalized terms (other than those specifically defined in this Agreement) shall have the following meanings:

"**Affiliate**" of any Person means (i) any other Person which, directly or indirectly, is in Control of, is Controlled by or is under common Control with, such Person; (ii) any other Person who is a director or officer of (A) such Person, (B) any subsidiary of such Person, or (C)

any Person described in clause (i) above; or (iii) any corporation, limited liability company or partnership which has as a director any Person described in subsection (ii) above.

**"Agreement"** shall mean this Limited Liability Company Operating Agreement, as amended.

**"Business Expenses"** shall mean all cash expenditures of the Company, including, without limitation, (i) taxes (whether federal, state or local) withheld or required to be withheld from sales or salaries including contributions for social security payments, (ii) payment on loans, indebtedness, and other liabilities, (iii) expenses for compensation to employees, accountants, attorneys, consultants, and others, (iv) marketing and advertising expenses, (v) travel, meal, and entertainment expenses, (vi) rents, royalties, and fees, including, but not limited to, those fees payable in accordance with Article 6, (vii) production costs, including, but not limited to, cost of goods sold, product development costs, and inventory management costs, (viii) costs associated with customer service and order processing, and (ix) any and all cash expenditures contemplated in the Operating Budget (as defined in Section 4.4 and approved by the Members in accordance with Section 4.3).

**"Capital"** shall mean the sum of all funds and other property contributed to the Company by the Members as provided herein.

**"Capital Account"** shall mean the book capital account established and maintained for each Member.

**"Code"** shall mean the Internal Revenue Code of 1986, as amended.

**"Company"** shall mean FOFBAKERS, LLC.

**"Control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, beneficial interests, by contract or otherwise. The definition is to be construed to apply equally to variations of the word "Control," including "Controlled," "Controlling" or "Controlled by."

**"Disability"** means a mental or physical condition that renders any Manager unable to carry out his or her responsibilities as a Manager of the Company, as applicable, held by such Manager at the time the condition was incurred for a period of nine (9) consecutive months or 270 days in any consecutive 365-day period.

**"Disabled"** means a Manager that is unable to carry out his, her, or its responsibilities as a Manager of the Company, as applicable, as a result of his or her Disability.

**"Distributable Cash"** shall mean, for any Fiscal Year (as defined herein) or any portion thereof, the total annual cash gross receipts of the Company from all sources plus any reduction in cash reserves of the Company for such period minus (a) Business Expenses (as

defined herein), and (b) all reserves of the Company as determined by the Managers and/or Members, as applicable, for such period.

"**Equity Interest**" of a Member shall mean such Member's proportionate Interest in the Capital and Profits and Losses of the Company, expressed as a percentage as shown on Exhibit A.

"**Gross Asset Value**" means, with respect to any asset, its adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of the asset, as determined by the contributing Member and the Company.

(b)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Tax Matters Partner (as such term is defined in Section 7.4 below), as of the following times:

(i)     The acquisition of an additional Equity Interest in the Company by any new or existing Member in exchange for more than a de minimis contribution of money or other property;

(ii)     The distribution by the Company to a Member of more than a de minimis amount of money or other property as consideration for an Equity Interest in the Company;

(iii)     The liquidation of the Company for federal income tax purposes within the meaning of Regulation § 1.704-1(b)(2)(ii)(g);

Except that the adjustments pursuant to Paragraphs (i) and (ii) immediately above shall be made only if the Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

(c)     The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution.

(d)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of those assets pursuant to Code § 734(b) or Code § 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Regulation § 1.704-1(b)(2)(iv)(m), except that Gross Asset Values shall not be adjusted pursuant to this Paragraph (d) to the extent the Tax Matters Partner determines that an adjustment pursuant to Paragraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Paragraph (d).

(e)    If the Gross Asset Value of an asset has been determined pursuant to Paragraph (a), (b), or (d), that Gross Asset Value shall thereafter be adjusted by the depreciation (as defined by the Code) taken into account with respect to that asset for purposes of computing Profits and Losses (as such term is defined below).

"**Gross Receipts**" shall mean and include the aggregate amount received from all sales of products of every kind or nature sold from, at or in connection with the operation of the Business, whether for cash or credit, but excluding: (i) federal, state or municipal taxes or services taxes collected from customers and paid to the appropriate taxing authority, (ii) refunds, (iii) voided customer purchases, and (iv) sales taxes collected in connection with the operation of the Business.

"**Immediate Family Member**" means a Person's spouse, parent, child (including stepchild), grandchild (including step-grandchild) or sibling.

"**Interest in the Company**" shall mean the respective Voting Interest and Equity Interest in the Company owned by each Member, which ownership relationship between Members is expressed as such Member's Equity Interest and corresponding Voting Interest as set forth on Exhibit A attached hereto.

"**Majority**" means the Member or Members whose Voting Interests represent more than eighty five percent (85%) of the Voting Interests held by all of the Members in the Company.

"**Managers**" shall mean the natural person appointed by RP to serve as a Manager of the Company and the natural person appointed by Baker to serve as a Manager of the Company.

"**Members**" shall mean, unless the context indicates otherwise, the current Members as of the date of this Agreement as set forth on Exhibit A and all other Persons subsequently admitted as Members in accordance with the terms of this Agreement.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, trust or other entity incorporated, organized or otherwise properly formed under the laws of the jurisdiction governing such entity.

"**Proceeding**" shall mean, with respect to any Member: (a) any judgment is obtained in any legal or equitable proceeding against the Member, which has become final and non-appealable, and the sale or attachment of any of the Member's Interests in the Company is contemplated or threatened under legal process as a result of such judgment, (b) any execution is issued on a judgment against the Member, (c) any of the Member's Interests in the Company become the subject of legal attachment, (d) there is instituted by or against the Member any other form of legal proceeding or process by which the sale or transfer of any of the Member's Interests in the Company is contemplated within the next sixty (60) days), (e) the Member makes an assignment for the benefit of creditors, (f) the Member admits its inability to pay its debts as they mature, or commences a voluntary case or proceeding under any Bankruptcy Law (defined

as Title 11 of the U.S. Code or any similar federal or state law for the relief of debtors), or consents to the entry of an order for relief against such Member in an involuntary case or proceeding under any Bankruptcy Law, or consents to the appointment of a receiver, trustee, liquidator or similar official for such Member or for all or substantially all of such Member's property, or (g) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law for relief against the Member in an involuntary case or proceeding and the order or decree remains unstayed and in effect for sixty (60) days.

"**Profits and Losses.**" For each taxable year or other period, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Code § 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be added to such taxable income or loss.

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or that are treated as Code § 705(a)(2)(B) expenditures pursuant to Regulation § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be subtracted from such taxable income or loss.

(c) In the event the Gross Asset Value of any Company asset is adjusted pursuant to Paragraph (b), (c), or (d) of the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses.

(d) Gain or loss resulting from any disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

(e) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for the taxable year or other period.

Notwithstanding the above, any items that are specially allocated to certain Members shall not be taken into account in computing Profits and Losses.

"**Regulations**" shall mean the regulations promulgated from time to time by the U.S. Treasury Department under the Code.

"**Transfer**" shall mean any and all types of dispositions and transfers of an Interest in the Company including, but not limited to, any sale, conveyance, assignment, disposition, distribution, encumbrance, pledge, mortgage, hypothecation or gift.

"**Voting Interest**" shall mean a Member's interest in the right to vote upon Company matters pursuant to the terms of this Agreement, expressed as a percentage as shown on Exhibit A.

1.2.   **Establishment of Limited Liability Company**.   The Members hereby agree to establish and organize a limited liability company pursuant to the provisions of the Act, upon the terms set forth in this Agreement.  The Members are hereby admitted to membership in the Company and, until this Agreement is amended appropriately to contemplate the admission of additional members and their right to participate in the conduct of the Business, the Members shall be the only members of the Company.

1.3.   **Name**.   The name of the Company is "FOFBAKERS, LLC".   The Company may conduct its activities under that name and any other permissible name designated by the Members.  The Managers (as defined herein) shall be responsible for complying with any registration requirements if an alternate name is used.

1.4.   **Principal Place of Business of the Company**.  The principal place of business of the Company shall be located at 300 Heron Drive, Swedesboro, NJ 08085 or at such other or additional locations as the Members may determine.  The registered agent for the service of process and registered office for the service of process of the Company shall be the location set forth in the Company's Certificate of Formation.  The Managers may, from time to time, change such registered office, by appropriate filings as required by law.

1.5.   **Purpose**.  The purpose of the Company is (i) to develop, market, sell, and distribute a specific food product line developed by Baker, known as Bubba's Q De-Boned Baby Back Rib Steak, (ii) to develop, market, sell, and distribute product line extensions that compliment Bubba's De-Boned Baby Back Rib Steak and the "Bubba's Q" brand, and (iii) to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the Act that are related or incidental to and necessary, convenient or advisable for the accomplishment of items (i) and (ii) above.

1.6.   **Duration**.  Unless the Company shall be earlier terminated in accordance with the provisions of this Agreement, it shall have perpetual existence.

1.7.   **Other Activities of Member**.  The Members may engage in or possess an interest in other business ventures of any nature, whether or not similar to or competitive with the activities of the Company.

# ARTICLE 2
## MEMBERS AND THEIR INTERESTS

**2.1.    Members.**  The Members each shall have an Interest in the Company, which shall be expressed as the Member's Equity Interest and corresponding Voting Interest as set forth on Exhibit A hereto.  A schedule of current Members shall be kept at the principal office of the Company.

**2.2.    Capital Contributions.**  Each Member separately has made or has agreed to make a contribution of Capital to the Company in intangibles, cash, and/or property in the amount set forth opposite such Member's name on the attached Exhibit B and which value is proportionate to such Member's Equity Interest in the Company ("**Capital Contribution**").  No Member shall be obligated to make any additional capital contributions to the Company.

**2.3.    Admission of Additional Members.**    Additional Members may be admitted to the Company only upon the written consent of all of the Members.  The Equity Interest(s) in the Company of the most recently admitted Member(s) shall be as specified at the time such new Member(s) shall be admitted, and, correspondingly, the Equity Interest in the Company of each of the then current Members shall be reduced pro rata in proportion to such Member's Equity Interest immediately prior to such admission.  The Voting Interest of the most recently admitted Member(s) shall be specified at the time such new Member(s) shall be admitted, and, correspondingly, the Voting Interests of all of the Members shall be updated accordingly.  The foregoing shall not apply to any substituted Member who is the transferee of an Equity Interest in the Company from another Member hereunder, including, without limitation, a substituted Member who acquires an Interest in the Company in accordance with Article 8.

**2.4.    Limitation of Liability; Other Activities of Members.**    Except as otherwise expressly and specifically provided for in this Agreement, no Member shall have authority, nor shall it undertake, to bind, to act for or to assume any obligation or responsibility on behalf of any of the other Members or the Company.  No Member shall be responsible or liable for any indebtedness or obligation of the other Members incurred or arising either before or after the execution of this Agreement.  It is expressly agreed by the Members that each Member is at all times hereunder acting and performing as an independent individual or entity other than in its capacity as a Member of the Company, and that no act of commission or omission of any Member shall be construed to make or render any other Member its principal, agent, partner or employee liable for such act, except to the extent specifically provided herein.  No Member may in any manner encumber, pledge, transfer, assign or otherwise convey any interest in the Company in contravention of any provision of this Agreement.  The Members and/or their Affiliates may engage in or possess an interest in other business ventures of any nature, whether or not similar to or competitive with the activities of the Company, for their respective accounts and not for the account of the Company or the other Members.  Neither the Company nor any Member shall have any right by virtue of this Agreement nor the relationship created hereby in or to such other ventures or activities, or to the income or proceeds derived therefrom; and the pursuit of such ventures, even if competitive with the Business, shall not be

deemed wrongful or improper.  No Member shall have any liability or obligation for any debts, liabilities or obligations of the Company, nor of any agent or employee of the Company, beyond each such Member's respective Capital Contributions.

      **2.5.**   **Loans.**  If a Member makes any loans to the Company, or advances money on its behalf, the amount of any such loan or advance shall not be deemed an increase in, or contribution to, the Capital Contribution of the Member and shall not affect such Member's Equity Interest in the Company or its Voting Interest.  Interest shall accrue on any such loan at an annual rate agreed to by the Managers and the Member making such loan (but not in excess of the maximum rate allowable under applicable usury laws).

**ARTICLE 3**
**CAPITAL ACCOUNTS, DISTRIBUTIONS, AND ALLOCATIONS**

      **3.1.**   <u>Capital Accounts.</u>

          (a)   <u>Establishment and Maintenance</u>.  A single Capital Account shall be established and maintained for each Member in accordance with the allocation and Capital Account maintenance provisions of the Regulations under Section 704 of the Code, which are hereby incorporated by reference, including, without limitation, a "qualified income offset" within the meaning of Regulation § 1.704-1(b)(2)(ii)(d), the rules regarding allocation of "partner nonrecourse deductions" under Regulation § 1.704-2(i)(1), "minimum gain chargeback" under Regulation § 1.704-2(f) and "partner nonrecourse debt minimum gain chargeback" under Regulation § 1.704-2(i)(4), and the limitation on allocation of losses to any Member that would cause a deficit capital account in excess of such Member's capital contribution obligations and share of minimum gain and partner nonrecourse debt minimum gain under Regulation § 1.704-1(b)(2)(ii)(d) as modified by Regulation §§ 1.704-2(g)(1) and 1.704-2(i)(5).

          (b)   <u>Contributed Property</u>.  To the extent contributed property has a fair market value at the time of contribution that differs from the contributing Member's basis in the property, and to the extent the carrying value of property of the Company for Capital Account purposes otherwise differs from the Company's basis in such property, depreciation, gain, and loss for capital account purposes shall be computed by reference to such carrying value rather than such tax basis.  In accordance with Section 704(c) of the Code, income, gain, loss, and deduction with respect to such property shall, solely for tax purposes, be shared among the Members so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution, or at the time that the carrying value of such property is adjusted under Regulation § 1.704-1(b)(2)(iv)(f), as the case may be.  For these purposes, the Members hereby acknowledge and agree that the carrying value of each of their initial Capital Contributions to the Company in the form of intangibles, cash, and/or property, is set forth opposite each Member's name in the attached <u>Exhibit B</u>.

      **3.2.**   **Return of Capital.**  Each Member is entitled to the return of its Capital Contribution only by way of distributions made pursuant to <u>Article 10</u> hereof.  No Member shall have the right to demand or receive any property other than cash in return for that Member's

Capital Contribution or to bring an action of partition against the Company or its property. The Managers shall have no personal liability for the repayment of the Capital contributed by the Members.

       **3.3.**    **Allocation of Profits and Losses.**  After giving effect to any allocations required by Section 3.1, above, the Profits and Losses realized by the Company shall be allocated among the Members in accordance with their Equity Interests as set forth in the attached Exhibit A.

       **3.4.**    **Cash Distributions.**  Except as otherwise provided in Section 3.5 and Article 10 below (related to Dissolution and Liquidation), distributions of Distributable Cash and/or other assets or property of the Company, from whatever source, shall be made as to the Members in proportion to their Equity Interests as provided in the attached Exhibit A; provided, however, that such distributions shall not be made more frequently than monthly without the unanimous consent of the Members. In making determinations regarding distributions, the Managers may set aside funds and establish reserves for such items as the Managers shall determine, including, without limitation, working capital, capital expenditures, Business Expenses, acquisition of other assets by the Company, and the satisfaction of liabilities (including, without limitation, tax liabilities and contingent liabilities).

       **3.5.** **Payment to Baker.**  Notwithstanding anything contained herein to the contrary, the Members agree that $52,500 of the cash contributed or to be contributed by Daymond to the Company as part of Daymond's initial Capital Contribution shall be distributed to Baker as reimbursement for certain prior business expenses incurred by Baker in connection with the start-up of the Business, including, without limitation, marketing, travel and development expenses (the "Reimbursement"). The Reimbursement shall be distributed to Baker within seven (7) business days from the date of this Agreement.

       **3.6.**    **Restoration of Negative Capital Accounts.**  If upon the dissolution and liquidation of the Company, or the liquidation of any Member's Equity Interest in the Company, the Member has a negative balance in its Capital Account, that Member shall not be required to make any contribution to the Company on account of such negative Capital Account balance.

## ARTICLE 4
## MANAGEMENT OF THE COMPANY

    **4.1.**    **General Provisions.**

        (a)    There shall be two (2) Managers of the Company. As long as RP shall be a Member, it shall be entitled to appoint a natural person to serve as a Manager of the Company. As long as Baker shall be a Member, it shall be entitled to appoint a natural person to serve as a Manager of the Company. RP hereby appoints Raymond M. Rastelli, Jr. as an initial Manager and Baker hereby appoints Al Baker as an initial Manager. Upon RP or Baker respectively ceasing to be a Member (a "Transferring Member"), such Transferring Member's right to appoint a natural person to serve as a Manager of the Company shall terminate, and the

Members other than the Transferring Member shall appoint a replacement Manager by the unanimous written consent of the remaining non-Transferring Members.

(b)     RP and Baker, respectively, shall each have the power, by written instrument, to appoint a successor Manager, to serve upon the death, Disability, bankruptcy, resignation or removal (as described in Section 4.1(c)) of the Manager appointed pursuant to Section 4.1(a) above (each, a "**Triggering Event**"); provided, however, that RP and Baker, respectively, shall each have the right to revoke a written appointment of a successor Manager, by written instrument, at any time prior to the occurrence of a Triggering Event. If a successor Manager fails or ceases to act as Manager, by reason of a Triggering Event, then RP or Baker, as applicable, shall appoint a successor Manager within thirty (30) days of the Triggering Event; provided, however, that if RP or Baker, respectively, fails to appoint a successor Manager within the thirty (30) day period, then a successor Manager shall be appointed by the unanimous written consent of the Members.

(c)     A Manager may be immediately removed from his or her position as a Manager of the Company in the following circumstances:

(i)     The Manager's commission of any act of fraud, gross negligence, or willful misconduct against the Company;

(ii)     The Manager's commission of any felony, embezzlement or misappropriation of money or other property of the Company; or

(iii)     The order or decree of any court of competent jurisdiction.

(d)     The Managers shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs. The Managers shall have the authority to delegate any or all of his responsibilities hereunder, and the power to fulfill such duties in accordance with the terms and conditions under this Article 4, to such officers of the Company or other authorized persons, as well as the power and authority to engage one or more of its Affiliates to provide management, operational, and/or administrative services to or for the Company, for such period of time and under such conditions as the Managers may determine, in their absolute discretion.

(e)     Except with respect to Extraordinary Transactions (as defined in Section 4.3 below) or as otherwise expressly stated elsewhere in this Agreement or as required by the Act, the Managers, without the need for notice to or the consent from all or any of the Members, shall have the full and exclusive power on the Company's behalf, and in its name, to (i) manage, control, administer and operate the business and affairs of the Company and to do or cause to be done anything it deems necessary or appropriate to carry out the purposes of the Company and (ii) execute and deliver such vendor contracts, agreements and other documents as it deems necessary or appropriate to carry out the purposes of the Company.

(f)      Notwithstanding anything herein to the contrary, the Managers shall have no authority to create any note, mortgage, pledge, assignment or other obligation, or any guarantee or suretyship thereof, in favor of any Person, without the express written consent of each Member.  For this purpose, the execution by a Member of a guarantee, surety or similar agreement relating to indebtedness of the Company shall conclusively be deemed to evidence such Member's express written consent.

(g)      If the Managers cannot agree on a particular action or resolution (the "**Resolution**") after a vote on the Resolution has been taken during two (2) separate meetings of the Managers or requests for unanimous written consent, which meetings or requests have been duly called and held pursuant to this Agreement (such disagreement is hereinafter referred to as a "**Deadlock**"), then the Managers shall select an individual who is not an officer, Member, or Manager of the Company (an "**Independent Person**") to serve as a Neutral Arbitrator (as defined below) to resolve the Deadlock, within five (5) business days after the second meeting of the Managers.  If the Managers cannot agree on an Independent Person to serve as the Neutral Arbitrator, then each Manager shall select an Independent Person, the identity of which shall be disclosed in writing to all of the Managers and to each such Independent Person, and the two (2) Independent Persons selected shall then promptly appoint one (1) Independent Person to serve as Neutral Arbitrator, to resolve the Deadlock.  The Neutral Arbitrator shall vote for or against the Resolution at the next duly called and convened meeting of the Managers.

(h)      The "**Neutral Arbitrator**" means, for purposes of this Agreement, a natural person who has no legal, equitable, or economic interest in the Company.  The Neutral Arbitrator's sole obligation, duty, and authority shall be approving or disapproving a Resolution in order to resolve a Deadlock, having only the authority to vote with respect to the approval or disapproval of the specific Resolution causing the Deadlock.  Upon the resolution of the specific Deadlock by the approval or disapproval of the Neutral Arbitrator, said Neutral Arbitrator shall cease to have any obligation, duty or authority whatsoever with respect to the Company.

### 4.2.   Meetings of Managers.

(a)      In General.  Any Manager may call a meeting of the Managers by giving written notice to all Managers not less than two (2) nor more than thirty (30) days prior to the date of the meeting, to consider the affairs of the Company and to take any action permitted to be taken by the Act, this Agreement, or the Certificate; provided, however, that any meeting of the Managers may take place without notice in the event that the Managers consent to such meeting and waive notice.  All decisions by the Managers at any meeting must be unanimous to have any force or effect.  Managers may participate in a meeting of the Managers by means of conference telephone, email or other similar communications equipment by means of which all persons participating in the meeting can immediately communicate with all other persons participating, and participation by such means shall be deemed to constitute presence in person at a meeting of the Managers.

(b)  <u>Action by Managers without a Meeting</u>.  Action required or permitted to be taken at a meeting of the Managers may be taken without a meeting if the action is evidenced by a unanimous written consent of the Managers describing the action taken signed by all Managers or confirmed by email and filed by the Managers with the Company records.

(c)  <u>Waiver of Notice by a Manager</u>.  When any notice is required to be given to any Manager, a waiver thereof in writing signed by the Manager entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

## 4.3.  <u>Extraordinary Transactions</u>.

(a)  Notwithstanding anything to the contrary in this Agreement, the Extraordinary Transactions listed in <u>Section 4.3(b)</u> below shall require the unanimous written consent of all of the Members.  Upon receipt of the required approval of any Extraordinary Transaction, the Managers shall have all power and authority necessary or desirable to carry out the purposes of such Extraordinary Transaction, including without limitation the power and authority to execute, acknowledge and deliver all agreements, contracts, assignments, deeds, notes, mortgages, bills of sale, stock powers, instruments and other documents necessary or convenient for the carrying out of the purposes of such Extraordinary Transaction, all without requiring the signature of any other Member thereon, and to make all expenditures relating thereto.

(b)  As used herein, an "**Extraordinary Transaction**" is defined to mean each of the following actions or decisions, each of which is deemed "not in the ordinary course of the business":

(i)  Approve an Operating Budget (as defined in <u>Section 4.4</u>) for the Company for each Fiscal Year;

(ii)  Establish a reserve for Business Expenses of an amount in excess of ten percent (10%) of the total amount of Business Expenses contemplated in the Operating Budget;

(iii)  Accept an additional Capital Contribution from any Member(s) of the Company;

(iv)  Obligate the Company to incur any indebtedness or act as guarantor or surety under any loan, promissory note, mortgage, pledge, security agreement, financing statement or other financing arrangement; or

(v)  Authorize the Company to enter into an agreement, contract, arrangement or other transaction with any Affiliate of the Company or any Member's Immediate Family Member in which the material terms and conditions are on terms more favorable than those otherwise contained in an arm's length transaction between third parties.

(vi)     Amend the Certificate or this Agreement, including making any modifications to the Equity Interests or Voting Interests following the date of this Agreement;

(vii)    Approve the Company's purchase or redemption of an Interest in the Company (provided that, for such purposes, the unanimous consent of the disinterested Members shall be sufficient);

(viii)   Approve the sale, merger or consolidation of the Company with any other entities;

(ix)     Approve the sale of all or substantially all of the Company's assets to a third party; or

(x)      File a voluntary petition in bankruptcy; make an assignment for the benefit of creditors; seek, consent to, or acquiesce in the appointment of a trustee, receiver, or liquidator of the Company or all or any substantial part of the Company's assets; or file any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, rule or regulation.

**4.4.     Operating Budget.**  As soon as practicable, after the execution of this Agreement, and annually thereafter, the Members shall develop and approve an operating budget for the ensuing Fiscal Year (the "**Operating Budget**") in accordance with Section 4.3(b)(i), which shall provide for, among other things, the Company's Business Expenses, as well as casualty, general liability, director and officer and any other insurance coverage deemed appropriate or necessary by the Managers in amounts sufficient to reasonably protect the interests of the Members, the Managers, and/or the officers of the Company. The Managers shall utilize the Operating Budget in the operation of the Business and in purchases and expenditures (including, but not limited to, Business Expenses) for the operating requirements of the Business. In addition to its use of the Operating Budget, the Managers shall have full authority and discretion to utilize any and all reserves for Business Expenses in its operation of the Business, including, but not limited to, the reserve funded and approved by the Members in accordance with Section 4.3(b)(ii).

**4.5.     Action by Written Consent.**  Any action by the Members may be taken in the form of a written consent, unanimous or otherwise, rather than at a meeting of the Members; provided, that such consent contains the requisite approval of the Members as required under the Act or this Agreement for such matter.  The Managers shall maintain a permanent record of all actions taken by the Members.

**4.6.     Meetings of Members.**  No meetings of the Members need be held. However, there shall be, within fifteen (15) days of a written demand by any Member, a meeting of the Members to consider the affairs of the Company and to take any action permitted to be taken by the Act, this Agreement, or the Certificate.  Such a meeting may be held in person or by telecommunications equipment.  For purposes of this Section 4.6, notice of a written demand for a meeting by e-mail, facsimile, first class mail, overnight mail or delivery service, or hand-

delivery shall be sufficient.  Unless this Agreement provides otherwise, at a meeting of the Members, the presence in person or by proxy of all of the Members shall constitute a quorum for the transaction of business.  A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.  The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum, if any action taken (other than adjournment) is approved by the requisite percentage of Voting Interests specified by this Agreement; provided, however, that if this Agreement does not specify a requisite percentage of Voting Interests for an action to be taken by the Members, then said action shall require the requisite percentage of Voting Interests specified by the Act.  Except as otherwise provided in this Agreement, the vote of holders of a Majority of the Voting Interests held by all of the Members present at a meeting in person or by proxy shall be required to approve any matter to be decided upon by the Members.

      4.7.   **<u>Standard of Care of the Managers</u>.**  The Managers shall not be liable to the Company or any Member for any matter or item, unless such matter or item is attributable to gross negligence, willful misconduct or fraud on the part of the Managers.

      4.8.   **<u>Indemnification</u>.**  The Company shall indemnify, defend and hold harmless the Managers and each duly appointed officer, including Members who are officers of the Company, against any claim or liability incurred in connection with its actions on behalf of the Company to the fullest extent permitted by the Act or other applicable law.  No Capital Account of any Member may be drawn upon to support such indemnification and no Member shall have any liability beyond the amount of his or its Capital Account.  Neither the Company nor any Member shall have any claim against the Managers by reason of any act or omission, or by reason of any determination by any taxing authority that the treatment of any item on any Company tax return was improper, provided that the Managers acted in good faith in connection with such matters.  The Company shall not indemnify the Managers, any officer or other person in connection with (i) a proceeding by or in the right of the Company in which the person was judged liable to the Company or (ii) in connection with any other proceeding charging improper personal benefit to such person, whether or not involving action on behalf of the Company, in which the person was adjudged liable on the basis that personal benefit was improperly received by him.

      4.9.   **<u>Reliance by Third Parties</u>.**  Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managers.  Any corporation, trust, partnership, or other business entity called upon to Transfer any property to or from the name or account of the Company shall be entitled to rely on instructions or assignments signed by the Managers without inquiry as to the authority of the Person signing or purporting to sign such instructions or assignments and without inquiry as to the validity of the Transfer.

## ARTICLE 5
## LIABILITY AND RIGHTS OF MEMBERS

**5.1.   No Personal Liability.**  The Members shall in no event be liable personally for any of the debts or losses of the Company beyond the amount of such Member's Capital Account.  No Member shall have any obligation to contribute any sums of money or other property to the Company (other than the agreed upon contributions provided for herein) on account of any deficit or negative balance in his or its Capital Account.

**5.2.   No Participation in Management.**  Except as otherwise provided herein, or in any employment agreement between the Company and a Member, the Members (other than the Managers), shall not participate in the management or control of Company business, nor shall the Members transact any business for the Company, nor shall the Members have the power to act or bind the Company, said powers being vested exclusively in the Managers.

## ARTICLE 6
## MEMBER OBLIGATIONS AND MEMBER AFFILIATE RELATIONSHIPS

**6.1.   Member Obligations.**

(a)  Baker has agreed to provide or engage its Affiliate(s) to provide certain food product inventory developed under the "Bubba's Q" brand to the Company.  In addition, Al Baker, individually, has agreed to serve as a brand ambassador and on-air television personality for the Company, to provide or cause to be provided by Baker sales contacts to the Company, and to provide or cause to be provided by Baker certain marketing, promotion, product development, sales, and advertising services and support to the Company.

(b)   RP shall provide or engage its Affiliate(s) to provide certain product packaging, labeling, distribution, quality assurance audit, United States Department of Agriculture approval, co-packer management and related services (the "**Co-Packer Services**"). RP shall also perform or engage its Affiliate(s) to perform certain services for the Company, which may include, but not be limited to, e-commerce product order fulfillment, order processing, customer service, point-of-service development, sales support services, and revenue collection services, but expressly excluding any marketing and/or promotional services, which shall be performed by and be the sole responsibility of the Company (the "**RP Services**").  The provision of the Co-Packer Services and the RP Services to the Company by RP and/or its Affiliate(s) shall be subject to the terms and conditions set forth in Section 6.4, below.

(c)   Daymond John, individually, has agreed to serve as a brand ambassador and on-air television personality for the Company, to provide or cause to be provided by Daymond sales contacts to the Company, and to provide or cause to be provided by Daymond certain marketing, promotion, product development, sales, and advertising services and support to the Company.

(d)    The Company shall indemnify the Members in connection with each Member's provision of services on behalf of the Company as outlined in this <u>Section 6.1</u>, including Daymond John, individually, with respect to his personal services as set forth in Section 6.1(c) and Al Baker, individually, with respect to his personal services set forth in Section 6.1(a), within the scope of such services as set forth in this <u>Section 6.1</u>, respectively; provided, however, that the Company shall not indemnify any Member (or Al Baker or Daymond John, individually, to the extent applicable) for monetary damages resulting from any act of fraud, gross negligence, or willful misconduct on the part of any Member (or Al Baker or Daymond John, individually, to the extent applicable).

**6.2.** **Relationship to JABEZBAKER, LLC.**    Baker hereby represents and warrants that JABEZBAKER, LLC, an Affiliate of Baker, is the sole owner of certain existing patents, as set forth in <u>Exhibit C</u> hereto ("**Patents**"), attendant to and in connection with the Business, and that the Patents shall remain the sole and exclusive property of JABEZBAKER, LLC, subject to the terms and conditions set forth herein and in <u>Section 6.3</u> below.    The Members agree and acknowledge that Baker shall cause JABEZBAKER, LLC to enter an exclusive license agreement between the Company and JABEZBAKER, LLC allowing for the Company's exclusive use of the Patents, upon terms that are mutually acceptable to the Company and JABEZBAKER, LLC (the "**License Agreement**"), which License Agreement shall include, but not be limited to, the right to use the Patents on an exclusive basis subject to the following royalty fees, which shall be paid monthly to JABEZBAKER, LLC, by the Company:

(a)    Royalty fee of $1.00 per pound for ecommerce sales of Bubba's Q De-Boned Baby Back Rib Steak;

(b)    Royalty fee of one percent (1%) of sales of Bubba's Q De-Boned Baby Back Rib Steak through retail and food service venues; and

(c)    Royalty fee of $0.50 per case for all cases of Bubba's Q De-Boned Baby Back Rib Steak sold through television infomercials, promotions, and offers, including, but not limited to, sales to QVC, Inc. and Home Shopping Network (a/k/a HSN).

**6.3.** **Assignment of Patents.**    The Members acknowledge and agree that immediately upon the determination of the Company's accountant that the Company has generated an aggregate of thirty million dollars ($30,000,000) of Gross Receipts, Baker shall cause JABEZBAKER, LLC to irrevocably and unconditionally grant, convey, transfer, and assign to a newly formed Delaware limited liability company ("**NewCo**") all of its right, title, and interest in the Patents (the "**Patent Assignment**"), in consideration for the continuing right of JABEZBAKER, LLC to receive fees equivalent in value to the royalty fees set forth in <u>Sections 6.2(a), 6.2(b), and 6.2(c)</u>, above, for such Patent Assignment.  Each Member of the Company or Permitted Transferee thereof, if applicable, shall receive an ownership interest in NewCo that is consistent with such Member's Equity Interest in the Company at the time of the Patent Assignment.

**6.4.** **Relationship to RP Affiliate(s).** The Members acknowledge and agree that RP shall cause Rastelli Brothers, Inc., an Affiliate of RP, to enter into an agreement with the Company upon terms that are mutually acceptable to the Company and Rastelli Brothers, Inc., to provide the Co-Packer Services (the "**Co-Packer Agreement**"). The Members further acknowledge and agree that RP shall also perform or engage its Affiliate(s) to perform the RP Services. In consideration for the RP Services and for the Co-Packer Agreement, in addition to any profits paid or distributions made to RP elsewhere under this Agreement as a Member, RP shall be entitled to an additional fee in an amount equal to (a) the actual cost of products provided to the Company plus (b) a proportional amount of facility overhead for the facility where the Co-Packer Agreement is being performed, which amount shall be proportional to the volume of products provided to the Company under the Co-Packer Agreement and (c) an amount equal to twelve percent (12%) of the expenses and costs associated with providing the RP Services plus a fee of $.38 per pound of all sales of products provided to the Company.

**6.5.** **Assignment of Baker Intangibles.** Baker represents and warrants that Bubba's-Q, Inc., an Affiliate of Baker, is the sole owner of that certain trade mark filing made in the State of Ohio for the name "Bubba's Q World Famous," QueenAnn, Inc., an Affiliate of Baker, is the sole owner of that certain service mark filing made in the State of Ohio for the name "De-Boned Baby Back Rib Steak," copies of which filings are attached hereto as **Exhibit D**, and Baker and/or its Affiliates are the sole owner of certain goodwill, brand names, service marks and intellectual property attendant to and in connection with the Business (collectively, the "**Baker Intangibles**", and together with the Patents to be known as the "**Existing Intangible Rights**"). Notwithstanding anything contained herein to the contrary, the Members acknowledge that the Baker Intangibles are not protected by any federal trademarks as of the date of this Agreement. The Members hereby agree and acknowledge that contemporaneous with the execution of this Agreement, Baker shall cause QueenAnn, Inc., Bubba's-Q, Inc., and any and all other Affiliates of Baker, including, without limitation, any Baker Intangibles owned by Baker or Baker family members, to irrevocable and unconditionally grant, convey, transfer and assign to the Company or NewCo (as defined above), as the Managers may determine, all of their rights, title and interest in the Baker Intangibles (the "**Intangibles Assignment**"). In consideration for the Intangibles Assignment, the Company and/or NewCo (as applicable) shall file for and attempt to obtain federal trademarks with respect to the Baker Intangibles and the "Bubba's Q" related brand, as soon as reasonably practicable (the "Trademark Filings"). The Trademark Filings, if obtained, shall be made in the name of and be owned by the Company or NewCo (as applicable). Any filings, registrations, trademarks, services and/or patents for or relating to the Existing Intangible Rights, made hereinafter shall be made in the name of and shall be owned by the Company or NewCo, as applicable. Notwithstanding the foregoing, the ownership and assignment of the Patents shall be handled in accordance with Sections 6.2 and 6.3 of this Agreement. Notwithstanding anything contained herein to the contrary, the Members further intend and agree that in addition to the Existing Intangible Rights being contributed to the Company, the website, http://bubbasbonelessribs.com, and any other now existing or future created websites related to the Business, shall be contributed to and owned by the Company or NewCo (as applicable) as of the date of this Agreement.

## ARTICLE 7
## TAX, ACCOUNTING, AND FISCAL MATTERS

**7.1.    Fiscal Year.**  The fiscal year of the Company ("**Fiscal Year**") shall be the calendar year.

**7.2.    Method of Accounting.**  The Members shall select a method of accounting for the Company as deemed necessary or advisable and shall keep, or cause to be kept, full and accurate records of all transactions of the Company in accordance with sound accounting principles consistently applied.

**7.3.    Financial Books and Records.**  All accounting records shall, at all times, be maintained at such location specified by the Managers, and such records shall be open to inspection by any of the Members upon advance notice during reasonable business hours.

**7.4.    Tax Matters Member.**  The "**Tax Matters Partner**" of the Company pursuant to Section 6231(a)(7) of the Code shall be RP.  Any Member who is designated Tax Matters Partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code.  Any Member who is designated Tax Matters Partner shall inform each other Member of all significant matters that may come to its attention in his capacity as Tax Matters Partner by giving notice thereof on or before the fifth (5th) Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.  The Company shall reimburse the Tax Matters Partner for any costs incurred representing the interests of the Members in respect of Company tax matters.

**7.5.    Tax Returns.**  The Managers shall cause all tax returns for the Company to be prepared and timely filed with the appropriate taxing authorities and shall provide copies of all such returns to the Members as soon as available.

**7.6.    Tax Elections.**  The Managers may, in their reasonable discretion make, or petition the relevant taxing authority to revoke, any tax election which is available to the Company, including, without limitation, an election under Section 754 of the Code.

## ARTICLE 8
## TRANSFERABILITY OF INTERESTS

**8.1.    Restriction of Transfer Generally; Exception.**  No Member shall Transfer all or any part of its Interest in the Company except in compliance with this Article 8. Except as provided in Section 8.2 and Section 8.3 hereof, any Transfer of a Member's Interest in the Company shall require the unanimous written consent of the Members.  Any Transfer not expressly permitted under the terms of this Agreement shall be void and of no effect.

**8.2.    Permitted Transfers.**  Any Member may give, assign, sell, or Transfer all or part of such Member's Interest in the Company to an entity that is under the Control of, or

common Control with the Member or to the trustee of a trust that qualifies as a "Grantor Trust" pursuant to Sections 671-679 of the Code having as its sole beneficiaries the Member and/or one or more of the Member's Immediate Family Members (each such entity or trustee being referred to herein as a "**Permitted Transferee**", and each such Transfer being referred to herein as a "**Permitted Transfer**"); provided, however, that a Member shall provide written notice to the Company and the other Members not less than ten (10) days prior to a Permitted Transfer.

    8.3.    <u>Right of First Offer / Right of First Refusal</u>.

    (a)    With respect to any bona fide arm's length offer received or solicited from a Person other than a Permitted Transferee (a "**Prospective Purchaser**") to acquire all or any portion of a Member's Interest in the Company (the "**Offer**"), upon receipt thereof, such Member (the "**Selling Member**") shall notify the Company and the Members in writing of the terms of such Offer within ten (10) days of the receipt thereof, including the identity of the Prospective Purchaser the amount of the Member's Interest in the Company that is the subject of the Offer (the "**Offered Interests**") and the term and conditions of the Offer, and shall provide such information and documentation relating to the Offer as the Company and the Members may require.  An Offer that includes the Prospective Purchaser securing financing to complete the Transfer shall qualify as a bona fide arm's length written offer only if it is accompanied by a binding commitment from a bank, commercial lender or other financial institution to provide the required financing.

    (b)    If the remaining Member(s) desire(s) to purchase all, but not less than all, of the Offered Interests, the Member(s) shall, within thirty (30) days of receiving the Offer, send the Selling Member a written notice of its election to purchase the Offered Interests from the Selling Member under the terms and conditions specified in the Offer (the "**Member Purchase Notice**").  If more than one (1) of the remaining Members elects to purchase the Offered Interests, by delivering a Member Purchase Notice, such Members shall each receive a portion of the Offered Interests equal to their proportionate Interest in the Company vis-a-vis each other.  If no Member delivers a Member Purchase Notice within its specified thirty (30) day period, the Company shall then have thirty (30) days, beginning on the first day after the expiration of the Members' thirty (30) day period, to provide the Selling Member with a written notice of its intent to purchase the Offered Interests (the "**Company Purchase Notice**").

    (c)    The Member Purchase Notice or Company Purchase Notice shall, when taken in conjunction with the Offer, be deemed to constitute a valid, legally binding and enforceable agreement for the Transfer of the Offered Interests as is set forth in the Member Purchase Notice or Company Purchase Notice on the terms of the Offer.

    (d)    If the Company or the remaining Members elect to purchase the Offered Interests, the closing of such Transfer shall take place no later than sixty (60) days following the expiration of the period provided in <u>Section 8.3(b)</u> above.

    (e)    If neither the Company nor the remaining Member(s) elect to purchase the Offered Interests, then for a period of thirty (30) days commencing upon the

expiration of the period provided in Section 8.3(b) above, the Selling Member may Transfer all of the Offered Interests to the Prospective Purchaser upon the terms specified in the Offer; provided, however, that any material change in the terms of the Offer prior to closing shall constitute a new Offer subject to the right of first offer and/or right of first refusal option of the Members and the Company described in this Section 8.3.  Any Offered Interests not sold within the thirty (30) day period commencing upon the expiration of the period provided in Section 8.3(b) above pursuant to the terms specified in the Offer shall continue to be subject to the terms and conditions of this Agreement, including, without limitation, the requirements of this Section 8.3.

(f)     In the event of any completed Transfer to any Prospective Purchaser in accordance with this Section 8.3, the Company may request in writing that the Selling Member provide the Company with copies of the fully executed documents transferring the Offered Interests to the Prospective Purchaser within five (5) days of any such written request.

(g)     If any proposed Transfer under this Section 8.3 involves consideration other than cash, any Person having rights under this Section shall have the right to elect to pay, in lieu of such non-cash consideration, cash in an amount equal to the fair market value of such non-cash consideration.

### 8.4.    Effect on Transfer.

(a)     In addition to compliance with Section 8.1 above, no assignee or transferee (including, but not limited to, a Permitted Transferee) of all or part of an Interest in the Company shall have the right to become admitted as a Member, unless and until:

(i)     the assignee or transferee has executed an instrument reasonably satisfactory to the Members accepting and adopting the provisions of this Agreement;

(ii)     the assignee or transferee has paid all reasonable expenses incurred by the Company in connection with the admission of such assignee or transferee as a Member;

(iii)     if requested by the Managers, the assignee or transferee has delivered to the Company an opinion of counsel reasonably satisfactory to the Managers that such Transfer is exempt from the registration requirements of all applicable federal and state securities laws;

(iv)     the assignee or transferee has executed and delivered to the Managers such other documents and instruments as are necessary or appropriate, in the Managers' discretion, in connection with the assignee or transferee becoming a Member; and

(v)     such assignment or Transfer shall be reflected in a revised Exhibit A to this Agreement.

(b)      A Permitted Transferee or a Person who is an assignee of an Interest in the Company may be admitted to the Company as a Member and may receive an Interest in the Company without making a contribution or being obligated to make a contribution to the Company.

**8.5.**     **Members' Representatives**.  If a Member who is an individual dies or a court of competent jurisdiction adjudges the individual to be incompetent to manage the person or property of the individual, the executor, administrator, guardian, conservator or other legal representative of the Member may exercise all of the rights of the Member for the purpose of settling the estate or administering the property of the Member, including the power under this Agreement of an assignee to become a Member.  If a Member is a corporation, limited liability company, trust or other entity and is dissolved or terminated or is administered under the power of a trustee or receiver, the powers of that Member may be exercised by its legal representative or successor.

## ARTICLE 9
## REDEMPTION OF INTERESTS

**9.1.**     **Optional Redemption Upon a Proceeding**.  During the term of this Agreement, upon the occurrence of any Proceeding against any Member (a "**Redeemed Member**"), the Company shall have the option, but not the obligation, to purchase all, but not less than all, of the Redeemed Member's Interest in the Company (the "**Redeemed Interest**") for a redemption price equal to the Fair Market Value (as defined below) for the Redeemed Interest. Any such option may be exercised by the Company pursuant to written notice to the Redeemed Member within thirty (30) days following the occurrence of a Proceeding against the Redeemed Member.  Upon the Redeemed Member's receipt of a notice by the Company of its intention to exercise such purchase option, the Redeemed Member shall be obligated to sell and deliver to the Company the Redeemed Interest in the Company as of the Proceeding, for Fair Market Value subject to the terms and conditions set forth in Section 9.4.  If all Proceedings with respect to the Redeemed Member terminate and the Redeemed Member retains record and beneficial ownership of some or all of his, her, or its Interest in the Company, the Company shall become obligated to purchase, and the Redeemed Member, or the personal representative of his estate if deceased, as applicable, shall become obligated to sell and deliver to the Company, all of the Redeemed Interests owned by the Redeemed Member upon the termination of the Proceedings against the Redeemed Member.

**9.2.**   **Optional Redemption Upon Termination.**   Upon the dissolution or termination of any member that is an entity (each, a "**Termination Event**," and such Member shall be referred to as a "**Terminated Member**"), the Company shall have the right, but not the obligation, to purchase all, but not less than all, of the Interests in the Company owned by the Terminated Member at the time of the Termination Event (the "**Terminated Interest**") at a redemption price equal to the Fair Market Value (as defined below) for the Terminated Interest. Notwithstanding anything to the contrary in this Agreement, the decision of the Company to exercise this option shall require the approval of all of the disinterested Members.   If the Company desires to purchase the Terminated Interest, it shall deliver written notice to the Terminated Member or his or her personal representative, as applicable, within thirty (30) days following the Termination Event.

**9.3.**   **Redemption Price.**   The redemption price for any Interest in the Company redeemed under Section 9.1 or Section 9.2 above shall be the total "Fair Market Value" for the Redeemed Interest or Terminated Interest, as the case may be.   Except as otherwise provided in this Agreement, "**Fair Market Value**" shall be determined by an appraisal of the Company performed by a firm mutually agreed to by the purchasing party or parties and the Redeemed Member or Terminated Member, or their successors and representatives, in writing.   If such parties are unable to agree upon the identity of an appraiser, the purchasing party and the Redeemed Member (or Terminated Member, as the case may be) shall each choose a Qualified Appraiser.   For purposes of this Section 9.3, the term "**Qualified Appraiser**" shall mean an independent, certified business appraiser, licensed in the State of Delaware and with at least five (5) years of experience.   Each of the two (2) Qualified Appraisers so chosen shall deliver its determination of the Fair Market Value to the purchasing party or parties, the Redeemed Member (or Terminated Member), and the Company, within thirty (30) days of its selection.   If the lower of the two (2) appraisals is not equal to at least ninety percent (90%) of the higher appraisal, then the higher appraisal shall determine the Fair Market Value of the Redeemed Interest.   If the lower of the two (2) appraisals is at least ninety percent (90%) of the higher appraisal, then the Fair Market Value of the Redeemed Interest or Terminated Interest shall be determined by averaging the two appraisals obtained by the parties.

**9.4.**   **Closing.**   Any closing of the Company's purchase of a Redeemed Interest or Terminated Interest under this Article 9 (each a "**Closing**") shall occur within sixty (60) days following the date of exercise of the purchase option or within thirty (30) days of the determination of Fair Market Value of the Redeemed Interest or Terminated Interest pursuant to Section 9.3, whichever is later.   The terms of payment for the redemption of Equity Interests in the Company pursuant to the options granted in this Article 9 shall be negotiated and mutually agreed upon by the parties.   At Closing, the Company shall enter into such documents and agreements and the Redeemed Member or Terminated Member shall supply such documentation deemed by legal counsel to the Company necessary to evidence the redemption and as may be required by applicable law.

## ARTICLE 10
## DISSOLUTION AND LIQUIDATION

**10.1.  Dissolution.**  The Company shall be dissolved and commence winding up and liquidation upon the occurrence of any of the following:

(a)  Upon the written consent of all of the Members to effect such dissolution; or

(b)  Upon entry of a decree of judicial dissolution pursuant to the Act.

**10.2.  Liquidation.**

(a)  Upon the dissolution of the Company and at the election of the Managers, all Company assets shall be sold and reduced to cash and/or distributed in-kind to the Members within ninety (90) days following dissolution of the Company.  All Company assets shall be distributed in payment of the liabilities of the Company and to the Members in the following order:

(i)  First, to the payment of the debts and liabilities of the Company and the expenses of liquidation, including sales commission to any selling agent;

(ii)  Second, to the funding of any reserves which the Managers deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company.  At the expiration of such period as the Managers shall deem advisable, the balance thereof, if any, shall be distributed in the manner provided in this Section, and in the order named.  Such reserves shall not be unreasonable and shall be in accordance with acceptable accounting and business standards.

(iii)  Third, to the Members in accordance with their Capital Accounts, to the extent the sums are positive, and any amount in excess of their Capital Accounts shall be distributed in proportion to their Equity Interests.

(b)  A reasonable time, as determined by the Managers, shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors in order of legal priority so as to enable the Members to minimize any losses attendant upon liquidation.

## ARTICLE 11
## CONFIDENTIALITY

**11.1.  Confidentiality Generally.**  Each of the Members shall, during the term of this Agreement and at all times thereafter, maintain in confidence all confidential and proprietary information and data of the Company and of the other Members and their Affiliates, (each, a "disclosing party") disclosed to it (the "**Confidential Information**").  Each of the Members further agrees that it shall not use the Confidential Information during the term of this

Agreement or at any time thereafter for any purpose other than the performance of its obligations or the exercise of its rights under this Agreement.  The Company and each Member shall take all reasonable measures necessary to prevent any unauthorized disclosure of the Confidential Information by any of their employees, agents or consultants.

      **11.2.**   **Permitted Disclosures.**  Nothing herein shall prevent the Company, any Member, or any employee, agent or consultant of the Company or of any Member (the "receiving party") from using, disclosing, or authorizing the disclosure of any information such Person receives in the course of the business of the Company which:

          (a)     becomes publicly available other than through default hereunder by the receiving party;

          (b)     is lawfully acquired by the receiving party from a source not under any obligation to the disclosing party regarding disclosure of such information;

          (c)     is properly in the possession of the receiving party in written or other recorded form at the time of its disclosure hereunder;

          (d)     is non-confidentially disclosed to any third party by or with the permission of the disclosing party; or

          (e)     is independently developed without the use of any Confidential Information.

      **11.3.**   **Remedies; Survival of Covenants.**  Each Member acknowledges and agrees that any breach of the provisions of <u>Section 11.1</u> of this Agreement is likely to result in irreparable injury to the Company, the other Members and their respective members, shareholders, partners, officers, affiliates, employees, and agents, and that the remedy at law alone will be an inadequate remedy for such breach, and that in addition to any other remedy they may have, the Company and the other Members, or their respective members, shareholders, partners, officers, affiliates, employees and agents shall be entitled to specific performance of <u>Section 11.1</u> of this Agreement by such Member and to seek both temporary and permanent injunctive relief (to the extent permitted by law) without bond and without liability should such relief be denied, modified, or vacated.  Neither the right to obtain such relief nor the obtaining of such relief shall be exclusive or preclude the Company, the other Members or their respective members, shareholders, partners, officers, employees, and agents from any other remedy.  The provisions of this <u>Section 11.3</u> shall survive the termination of this Agreement to the extent applicable after the termination hereof.

## ARTICLE 12
## MEDIATION OF DISPUTES

      In the event of any dispute between the Members or between the Company and one or more Members, the parties agree to use commercially reasonable efforts to resolve the

dispute through Mediation in a mutually acceptable manner. For this purpose, the parties in dispute shall accept a mutually acceptable mediator. If the parties in dispute cannot agree upon a mediator, then the matter shall be decided upon by a panel of three (3) mediators, with each party selecting a mediator and the mediators selecting a third, neutral mediator. The parties in interest shall share equally all initial costs of mediation. The mediators shall hold meetings on the question, matter, or dispute and shall provide opportunity to the parties to be present and to be fully heard thereat by counsel or otherwise. Discovery by the parties shall be permitted prior to such meetings. In the event that the mediation is unsuccessful, the parties shall have the right to pursue legal action under the laws of the State of Delaware.

## ARTICLE 13
## INDEPENDENT LEGAL REPRESENTATIONS

Each Member acknowledges that, prior to entering into this Agreement, such Member has been advised and has had an opportunity to obtain independent counsel to represent such Member in connection with the formation of the Company and entering into this Agreement, including the potential income tax consequences thereof. Each Member acknowledges and understands that Hyland Levin LLP (**"Hyland Levin"**) has represented RP and the Company with regard to the preparation of this Agreement and the formation of the Company. Each Member further acknowledges and understands that Hyland Levin is not representing any Member(s) other than RP with regard to the preparation of this Agreement and the formation of the Company, notwithstanding any prior or current representation of any such Member in other matters.

## ARTICLE 14
## MISCELLANEOUS

**14.1.** **Binding Effect.** Except as otherwise provided in this Agreement to the contrary, this Agreement shall be binding upon and inure to the benefit of the Members and their successors and assigns.

**14.2.** **Integration.** This Agreement constitutes the sole agreement among the Members with respect to the subject matter hereof and shall supersede all oral agreements and prior writings with respect to the subject matter hereof.

**14.3.** **Governing Law.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without reference to conflict of laws principles.

**14.4.** **Severability.** The invalidity or unenforceability of any particular provision of this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**14.5.** **Gender and Number.** As used in this Agreement, the masculine gender shall include the feminine and the neuter, and vice versa and the singular shall include the plural.

14.6. **Headings.**   The headings herein have been included for convenience of reference only and shall not be considered in interpreting this Agreement.

14.7. **Dissociation.**  Each Member does hereby waive any right to dissociate or the right to take any other action which might otherwise be available to such Member for the purpose of severing its relationship with the Company, or such Member's Equity Interest in the Company from the Equity Interests in the Company of the other Members until the dissolution of the Company as provided in Article 10 hereof.

14.8. **Notices.**   Unless otherwise specified, all notices required to be given pursuant to this Agreement shall be given personally or be sent by hand delivery, certified mail, return receipt requested or overnight express delivery service to the addresses specified on Exhibit A or, for a Member who shall become a Member after the execution hereof, on the joinder or other agreement executed by such Member (or any superseding addresses specified by proper notice) with all postage or other charges of conveyance prepaid and shall be effective upon the earlier of the actual receipt thereof or the second day (excluding weekends and Federal holidays) after the proper sending thereof.

14.9. **Execution of Documents.**  The Members agree that they shall execute any amendments or other documents relating to the Certificate as required by the Act and any other instrument necessary to carry out the terms of this Agreement and the actions contemplated hereby.

14.10. **Counterparts.**   This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same Agreement.

14.11. **Amendment**.  The Certificate and this Agreement may only be amended by the written approval of all of the Members.

*[Remainder of this page intentionally left blank.  Signatures appear on the following page.]*

**IN WITNESS WHEREOF,** and intending to be legally bound, the Members have executed this Agreement as of the date first written above.

FOFBAKERS HOLDING COMPANY, LLC,
an Ohio limited liability company

By: _James A. Baker_
Name: James A. Baker
Title: CEO/President

RASTELLI PARTNERS, LLC,
a New Jersey limited liability company

By: _____
    Name:   Raymond M. Rastelli, Jr.
    Title:    President

DF VENTURES, LLC,
a New York limited liability company

By: _____
    Name:  Daymond John
    Title:

**IN WITNESS WHEREOF,** and intending to be legally bound, the Members have executed this Agreement as of the date first written above.

FOFBAKERS HOLDING COMPANY, LLC,
an Ohio limited liability company

By:_____
Name:
Title:

RASTELLI PARTNERS, LLC,
a New Jersey limited liability company

By: _____
Name:    Raymond M. Rastelli, Jr.
Title:    President

DF VENTURES, LLC,
a New York limited liability company

By: _____
Name:  Daymond John
Title:

**IN WITNESS WHEREOF**, and intending to be legally bound, the Members have executed this Agreement as of the date first written above.

FOFBAKERS HOLDING COMPANY, LLC,
an Ohio limited liability company

By:_____
Name:
Title:

RASTELLI PARTNERS, LLC,
a New Jersey limited liability company

By: _____
     Name:   Raymond M. Rastelli, Jr.
     Title:    President

DF VENTURES, LLC,
a New York limited liability company

By:_____
     Name:  Daymond John
     Title:

## EXHIBIT A

### Members

| Member Name & Address | Voting Interest | Equity Interest |
|---|---|---|
| FOFBakers Holding Company, LLC | 51% | 45% |
| Rastelli Partners, LLC | 32% | 35% |
| DF Ventures, LLC | 17% | 20% |
| TOTAL: | 100% | 100% |

## EXHIBIT B

### Initial Capital Contributions

Baker will contribute the Existing Intangible Rights and intellectual property, including the website (as defined in Article 6 of the Agreement), as well as certain goodwill and know-how to the Company.

RP will contribute certain goodwill and know-how to the Company.

Daymond will contribute $52,500 in cash to the Company to be distributed to Baker pursuant to Section 3.5 of the Agreement and the intellectual property in connection with the website, and has contributed $47,500 expended on research and development ($22,500), trade show ($15,000) and start-up expenses ($10,000) that have directly benefitted the Company.

Based on the mutually agreed upon relative value of the aforesaid contributions and the respective undertakings between the Members as set forth in this Agreement, the parties agree and acknowledge that the Members' initial Equity Interests in the Company shall be as follows:

| Member | Initial Capital Contribution |
|---|---|
| FOFBakers Holding Company, LLC | Intangibles valued at $225,000 |
| Rastelli Partners, LLC | Intangibles valued at $175,000 |
| DF Ventures, LLC | Intangibles and Cash valued at $100,000 |
| TOTAL: | $500,000 |

**EXHIBIT C**

Patents Attached



US007666075B1

(12) **United States Patent**
Baker et al.

(10) Patent No.: **US 7,666,075 B1**
(45) Date of Patent: **Feb. 23, 2010**

(54) RIB MEAT PRODUCT AND PROCESS FOR PREPARING SAME

(76) Inventors: **James Albert London Baker**, 2784 Trinity Ct., Avon, OH (US) 44011; **Brittani Bo Baker**, 27559 Remington Cir., Westlake, OH (US) 44145

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 532 days.

(21) Appl. No.: 11/595,268

(22) Filed: **Nov. 9, 2006**

(51) Int. Cl.
*A22C 17/04* (2006.01)
(52) U.S. Cl. ...................................... 452/135
(58) Field of Classification Search ........ 452/135–140, 452/174, 198
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,137,605 A | * | 2/1979 | van Rij et al. | ................. 452/138 |
| 4,186,216 A | * | 1/1980 | Roth | ........................... 452/140 |
| 4,217,679 A | * | 8/1980 | Gordon | ....................... 452/140 |
| 5,104,351 A | | 4/1992 | van den Nieuwelaar et al. | |
| 5,197,918 A | | 3/1993 | Klaassen | |
| 5,273,483 A | * | 12/1993 | Gagliardi, Jr. | ............... 452/135 |
| 5,464,368 A | | 11/1995 | White et al. | |
| 5,525,103 A | | 6/1996 | White et al. | |
| 5,667,435 A | | 9/1997 | Baughman et al. | |
| 5,775,986 A | | 7/1998 | Law et al. | |
| 5,823,867 A | * | 10/1998 | Roth et al. | ................... 452/138 |
| 5,868,613 A | | 2/1999 | Heidke et al. | |
| 5,976,004 A | * | 11/1999 | Hazenbroek | ................. 452/136 |
| 6,527,636 B2 | * | 3/2003 | Mickelsen | ................. 452/149 |
| 6,648,744 B2 | | 11/2003 | Bell et al. | |
| 6,716,097 B2 | | 4/2004 | Freund et al. | |
| 7,008,313 B2 | * | 3/2006 | Gagliardi, Jr. | ............... 452/135 |
| 7,022,007 B2 | | 4/2006 | Naehring | |
| 7,198,564 B2 | * | 4/2007 | Hino et al. | ................... 452/135 |
| 2006/0035005 A1 | | 2/2006 | McMindes et al. | |

FOREIGN PATENT DOCUMENTS

EP       1053684      11/2002

* cited by examiner

*Primary Examiner*—Thomas Price
(74) *Attorney, Agent, or Firm*—Curatolo Sidoti Co., LPA; Salvatore A. Sidoti; Joseph G. Curatolo

(57) **ABSTRACT**

A cooked and de-boned substantially intact slab of rib meat is provided. A process for preparing a de-boned rib meat product from a pork or beef rib cut is also provided. The process for preparing the rib meat product involves cooking a length of rib meat having rib bones embedded therein at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat.

10 Claims, 5 Drawing Sheets





FIG 1



FIG 2



FIG 3



FIG 4A



FIG 4B

US 7,666,075 B1

**1**

## RIB MEAT PRODUCT AND PROCESS FOR PREPARING SAME

### TECHNICAL FIELD

Generally provided is a cooked and de-boned meat product and a process for preparing the meat product. More particularly, provided is a cooked and de-boned rib meat product and a process for preparing the rib meat product. The process of preparation results in a ready-to-eat substantially intact beef or pork rib meat steak, which does not include any rib bones.

### BACKGROUND

Pork and beef carcasses are typically butchered into several cuts or portions, which may be used to prepare spare ribs and back ribs. Spare ribs may be further divided into the traditional breast bone spare ribs or St. Louis style spare ribs. St. Louis style spare ribs generally comprise the upper part of a rib separated from the breast bone or brisket bone. St. Louis style spare ribs are generally very meaty and include minimal fat.

Back rib cuts are generally prepared by cutting the loin sections between the back ribs and the semispinalis muscle adjacent to the back ribs to form a loin cut and a back rib cut. The back rib meat cut, also known as a baby back rib cut, includes rib bones and related intercostal meat. Each back rib cut is intact and includes portions of at least eight ribs. See *Institutional Meat Purchaser Specification Item No. 422* (June, 1997). Back rib cuts are generally sold as a single intact rib section, which may be prepared and consumed with various sauces. The demand for the baby back rib cuts has increased dramatically in recent years due to the increase in the number of barbeque-themed restaurants. However, because back rib cuts typically contain only intercostal meat between the rib bones, conventional back rib cuts do not include a substantial amount of meat.

In recent years, corporations owning barbeque-themed restaurants have become increasingly interested in barbeque style food products that can retain the interest of repeat business. Consuming barbeque style ribs in a social situation, however, has always been a delicate undertaking. Traditionally, barbeque style ribs have carried the distinction of being an untidy food item, and as a result, are left off of many fine dining menus. Enjoying barbeque style ribs is often difficult, as eating them can be time consuming, embarrassing, and messy. As is often the custom, barbeque ribs are eaten without utensils, utilizing one's own hands to assist in separating the meat from the rib bones and introducing the meat into one's mouth.

As a result of this direct contact of the meat with the hands, the thick consistency of barbeque sauce has the potential to coat one's hands and is difficult to remove without the assistance of a moist towelette or inserting one's own fingers into their mouth to assist in removing the excess barbeque sauce.

Embarrassment can also occur due to the shape of the rib bones themselves. A single barbeque style rib possesses the shape of an elongated cylinder, encased in meat and covered with barbeque sauce. When taken to one's mouth to eat, if not eaten with care, the rib can displace sauce onto the consumer's face, which can cause great embarrassment.

There are also health risks associated with the consumption of ribs. Because of the irregular shapes and hardness of the rib bones, the risk of injury to the inside of one's mouth is also a concern. Furthermore, the potential for choking on a portion of a rib bone causes people to avoid consuming ribs.

**2**

Additionally, a meat cut that includes both rib bones and associated meat makes it more difficult for a person to consume all available meat, because the person must work around and between the bones. Therefore, consuming barbeque style ribs has the tendency to be tedious and laborious, due to the requirement of tearing the meat from the bones and eating meat from around the rib bones themselves.

There have been attempts to produce boneless pork and beef back rib products. One such method of producing boneless rib meat includes first separating the rib meat from the bones, creating a paste-like meat intermediate product, and restructuring the paste-like intermediate product into a form that attempts to resemble the appearance of a natural slab of ribs. These types of processed or restructured rib products are commonly offered by fast food restaurant chains and in the frozen foods sections of retail grocery stores. Obviously, these boneless pork or beef products that lack the natural appearance and consistency of an unprocessed slab of rib meat.

Heretofore, there has been no process for providing a ready-to-eat de-boned rib product that does not involve processing the native rib meat into piece or parts, and reforming or restructuring meat pieces into a slab-shaped product. Accordingly, there is still a need in the art for a barbeque style rib meat product that can be readily consumed and that overcomes the disadvantages associated with consuming traditional barbeque ribs having bones embedded therein. Such a de-boned rib meat product would avoid the stigma traditionally attached to dining on barbeque style ribs and is therefore more likely to result in repeat business for barbeque-themed restaurants, retail grocery outlets, and the like.

### SUMMARY

Provided is a de-boned substantially intact length of rib meat.

Also provided is a cooked and de-boned substantially intact length of rib meat.

Additionally provided is a process for preparing a length of de-boned rib meat comprising cooking a length of rib meat having at least one rib bone at least partially embedded therein at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and removing at least one of said rib bones from said length of rib meat.

Further provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one de-boned substantially intact length of rib meat contained within said package, and optionally a flavoring agent associated with said package.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side sectional view of a side of pork or beef with cut lines added to illustrate main portions including St. Louis style rib and back rib portions.

FIG. 2 is a perspective view of slab of rib meat including a plurality of rib bones embedded within the rib meat.

FIG. 3 is a perspective view of a cooked and de-boned continuous slab of rib meat.

FIG. 4A is a flowchart of one illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

FIG. 4B is a flowchart of another illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

US 7,666,075 B1

| 3 | 4 |

DETAILED DESCRIPTION

Disclosed is a process for the preparation of a de-boned beef or pork rib meat cut. Broadly, the rib meat cut is prepared by cooking a desired length of rib meat having at least one bone embedded within the rib meat and removing the at least one of the embedded rib bones from the rib meat. According to the process, the rib bones can be easily separated from the rib meat, while the maintaining a substantially intact length of rib meat. Thus, the process provides a cooked and de-boned substantially intact continuous length of rib meat. The rib meat product can be consumed using conventional utensils (fork and knife), without having to first separate the meat from the bones, or to navigate around the bones to remove all of the rib meat. By removing the bones from a barbeque style slab of rib meat, the tediousness, embarrassing, and messy nature of the act of consuming the ribs is avoided.

According to illustrative embodiments, the process for preparing the rib meat product involves cooking a length of rib meat having at least one rib bone embedded therein at a temperature and for a time sufficient to enable the removal of at least one the rib bones from the length of rib meat, while maintaining the continuous length of natural rib meat. At least one of the embedded rib bones is removed from the rib meat, thereby forming a substantially intact continuous length of rib meat.

As used throughout this specification, the term "cooking" shall refer to partially cooking, substantially cooking, or fully cooking a desired length of rib meat. A partially cooked length of rib meat retains certain qualities of raw pork or beef meat, but a higher internal temperature than that of raw meat is reached within the meat. A substantially cooked length of rib meat refers to meat that has been more than partially cooked and has reached an internal temperature where the rib meat begins to lose its reddish color. A fully cooked length of rib meat refers to a length of rib meat that has been cooked such that it can be readily consumed without a health risk. The term "cooked" refers to a length of rib meat that has been partially cooked, substantially cooked or fully cooked. It should be noted that partially cooking, substantially cooking, or fully cooking may provide sufficient cooking to produce rib meat retaining minimal attachment to the rib bones, thereby enabling the removal of the rib bones from the meat while maintaining a substantially intact continuous length of rib meat.

As used throughout this specification, the term "de-boned" shall refer to a desired length or section of rib meat, wherein at least one of the rib bones embedded in the rib meat has been removed. Thus, a de-boned length of rib meat refers to desired lengths of rib meat wherein one or more of the rib bones have been removed from the meat. According to certain illustrative embodiments, all of the rib bones in a desired length of rib meat have been removed to provide a boneless length of rib meat. It should be noted, however, that it may be desirable to leave one or more of the rib bones embedded within the length of rib meat at strategic positions. Therefore, the term "de-boned" may also refer to those lengths of rib meat in which at least one rib bone has been removed, but at least one rib bone remains embedded in the rib meat.

As used throughout this specification, the term "substantially intact" refers to a desired length or section of rib meat, wherein after removal of at least one of the rib bones embedded therein, the rib meat substantially retains its natural consistency, texture, and shape it held prior to the bones being removed. It should be noted that in removing the bones from the length or section of rib meat, the bones may retain some slight level of attachment to the meat wherein the bones

emerge from the length of rib meat with an amount of meat remaining attached on the bones. This situation is encompassed by the term "substantially intact."

The term "length of rib meat" refers to any desired section or portion of rib meat. It can be appreciated that a length of rib meat is not limited to a length of rib meat that spans a plurality of rib bones, but the length of rib meat may also comprise an individual (a single rib section) rib section wherein the one rib bone location in this rib meat section has been removed. A single rib meat section simply comprises the rib meat adjacent both sides of the removed rib bone and connecting meat.

FIG. 1 is a diagrammatical side sectional view of the side of pork or beef 10 with cut lines 12 added to illustrate the major cuts or portions of side 10 after butchering. Typically, side 10 is butchered about cut lines 12 into main cuts or portions including shoulder 14, loin 16, ham 18, and belly 20. Back ribs 22, also known as "baby back" ribs, originate from the blade and center section of the loin 16. Back ribs 18 contain meat between the ribs called finger meat and include at least 8 ribs.

Spare ribs 24 comprise the intact rib section removed from the belly 20 of the pork side. Spare ribs 24 may be further butchered or cut into St. Louis-style spare ribs and brisket or breast bone spare ribs. Spare ribs 24 are separated into St. Louis-style ribs and breast bone spare ribs by cutting about cut line 13 along costal cartilage connecting the breast bone spare ribs and the St. Louis-style ribs. Breast bone spare ribs are generally taken from the belly of the hog or cow.

FIG. 2 illustrates the traditional slab of rib meat 30 with rib bones 32 lodged among the intercostal meat 34. Despite St Louis-style ribs being illustrated in FIG. 2, this process is not limited to the preparation of a de-boned and substantially intact length of rib meat from a St. Louis rib cut, but may also include any rib cut including, without limitation, the traditional spare rib cut and baby back rib cut.

FIG. 3 is a perspective view of an illustrative embodiment of a cooked and substantially intact length of rib meat prepared in accordance with the process. As shown in FIG. 3, side 42 of the rib meat product 40 comprises a completely de-boned and substantially intact length of rib meat that is ready for consumption. Reference numeral 44 refers to the channel or slits in the rib meat where the rib bones had resided prior to being removed. The rib meat 40 retains its natural consistency, texture, form and shape it held prior to the bones being removed. The cooked and de-boned length of rib meat resembles a high-end boneless steak or filet of rib meat. Accordingly, the rib meat is more palatable and can be consumed in an easier and tidier fashion, which is contrary to most previous barbeque dining experiences.

The process for preparing a length of de-boned rib meat includes cooking a length of rib meat having at least one rib bone embedded therein at both a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat. At least one of the rib bones is removed from the length of rib meat. According to certain embodiments, all of the bones from the length of rib meat are removed to produce a boneless slab of rib meat.

The rib meat is cooked under certain time-temperature regimens to enable the removal of the rib bones from the rib meat without damaging the continuous length of rib meat. According to certain illustrative embodiments, the rib meat is cooked pursuant to at least two time-temperature regimens. By way of illustration, but not in limitation, the process includes cooking the length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib

US 7,666,075 B1

<table>
<tr><td>5</td><td>6</td></tr>
</table>

meat at a second temperature for a second period of time. Cooking the rib meat in accordance with these time-temperature regimens permits the easy removal of at least one of the rib bones from the length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a sufficient amount of time to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a period of time ranging from about 1 hour to about 6 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a period of time ranging from about 1 hour to about 5 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, the time-temperature regimens for cooking the rib meat include cooking a length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, followed by cooking the length of rib meat at a second temperature for a second period of time and removing at least one of the rib bones from the length of cooked rib meat.

According to other embodiments, the time-temperature regimens for cooking the rib meat includes cooking said length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes, and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, followed by cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat comprises cooking the length of rib meat at a first temperature of about 400 degrees Fahrenheit for a time period from about 1 to about 4 hours, followed by cooking the length of rib meat for a second temperature of about 300 degrees Fahrenheit for a time period from about 30 to about 90 minutes and removing at least one of the rib bones from the length of rib meat.

To facilitate the retention of moisture within the length of rib meat during the one or more of the various cooking regimens, the length of rib meat may be located within a moisture loss preventive environment. The moisture loss preventive environment is any suitable environment that acts to minimize, reduce, lessen or prevent loss of moisture of from the length of rib meat. For example, without limitation, to facilitate the retention of moisture in the rib meat, at least a portion of the length of rib meat may be enclosed or wrapped in a suitable moisture loss preventive material. Such materials

include plastic wrap, metal foil, such as aluminum foils, cooking bags, and other suitable containers. The step of enclosing or wrapping the length of rib meat in a moisture loss preventive material may also comprise hermetically sealing the length of rib meat in a suitable hermetic enclosure. The length of rib meat may be enclosed or wrapped in such moisture loss preventive material at any stage prior or during the cooking process. To be hermetically sealed, the slab of rib meat will cook within its own environment that is different from the oven enclosure. Sealing the slab of rib meat protects the slab from a cooking environment and maintains the moisture level within the slab of rib meat. A plastic sheet or plastic bag or any other suitable packaging (such as vacuum packaging) may be used to wrap the slab of rib meat as long as it provides a hermetic enclosure. It should be noted that the step of locating the length of rib meat within a moisture loss preventive environment is not limited to enclosing or wrapping the meat within a moisture loss preventive material. The length of rib meat may be positioned within the inner chamber or volume of suitable piece of equipment and further cooked, so long as the chamber or volume acts to minimize, reduce or even prevent moisture loss from the length of rib meat.

By way of illustration, the desired length of rib meat may be to enclosed within a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat, prior to the commencement of any cooking. Thus, according to certain embodiments, the process for preparing a de-boned length of rib meat includes enclosing the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat cooking at a first temperature for a first period of time and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature for a first period of time, and cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact

US 7,666,075 B1

7

continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, and cooking the length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

The various cooking regimens of the process may be carried out by cooking the length of rib meat in any suitable cooking apparatus. For example, and without limitation, cooking the length of rib meat may be carried out by cooking in a conventional oven, cooking in a convection oven, smoking, steaming, roasting, boiling, broiling, cooking in a slow cooker, halogen lamp cooking, or any combinations thereof. According to a suitable embodiment, the cooking stages are carried out by smoking the length of rib meat. In other embodiments, a combination of smoking the length of rib meat and cooking by halogen lamps may be used to facilitate removal of the rib bones, yet maintaining the tenderness and juiciness of the rib meat to enable the separation of the rib bones from the rib meat.

The process for the preparation of the de-boned rib product also includes imparting a flavor to the length of rib meat. The step of imparting flavor to the length of rib meat may comprise at least one of seasoning the meat, marinating the meat, injection marinating the meat, dry rubbing the meat, basting the meat, smoking the meat, or combinations thereof.

Once the length of rib meat has been cooked to enable removal of the rib bones, the bones are removed. The rib bones may be removed from the rib meat by any suitable process known in the culinary art, so long as the desired length of rib meat remains substantially intact. For example, and not in limitation, the removal of at least one rib bones may be accomplished by manually removing the rib bones, using a non-automated hand-tool to remove the bones, by mechanically removing the rib bones with suitable power equipment, or by combinations thereof. It should be also noted that the rib bones may be removed prior to cooking the length of rib meat, so long as the process of removing the rib bones from the meat maintains a substantially intact length of rib meat.

If the cooked and de-boned length of rib meat is prepared in the retail restaurant setting, the product may be presented to the diner for consumption. If the cooked and de-boned length of rib meat is prepared and destined for resale at a retail grocery store, or other sales outlet, then the product can be suitably packaged. By way of illustration, suitable packaging includes vacuum packaging the length of cooked and de-boned rib meat. It is contemplated that the cooked and de-boned rib meat may also by suitable for sale as a frozen, heat and serve product that would be commercially available at a grocery outlet. In this case, the cooked and de-boned rib meat is frozen and packaged in a suitable package for resale.

Also disclosed is a packaged ready-to-heat and serve de-boned rib meat product. The packaged rib product comprises a package and at least one de-boned substantially intact length of rib meat that is contained within the package. According to certain embodiments, a separate flavoring agent may be associated with the packaged rib product. It should be

8

noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

According to certain embodiments, also provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one cooked and de-boned substantially intact continuous length of rib meat contained within the package, and optionally a flavoring agent associated with the package. It should be noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

For the embodiments of the packaged rib meat product that includes a flavoring agent, the flavoring agent may include an agent in the form of dry rubs, sauces, bastes, marinades, injection flavorings, or combinations thereof.

FIG. 4A depicts a flow chart for an illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural consistency, texture and shape of a slab of rib meat had the bones not been removed from the rib meat.

At step 50, a slab of ribs is presented for processing. As described herein, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or any other rib cut. According to step 60, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact form and blend of flavorings is unlimited and is up to the preparer of the slab of rib meat.

At step 70, the flavored or unflavored slab of rib meat is then located within a moisture loss preventive environment. Locating the slab of ribs in such an environment maintains a suitable moisture level within the slab of rib meat.

Following the optional flavoring 60 and locating 70 steps, if these steps are carried out, the length of rib meat is cooked 80 at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat. Following cooking step 80, the rib bones are separated from the slab of rib meat, leaving a substantially intact continuous length of rib meat.

After the bones have been removed from the rib meat in step 90, the boneless steak or filet of rib meat may be immediately consumed 100 or packaged for future sale 110. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

FIG. 4B depicts a flow chart for another illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural consistency, texture and shape of a slab of rib meat had the bones not been removed from the rib meat.

At step 120, a slab of ribs is presented for processing. As described in connection with the flowchart of the illustrative embodiment shown in FIG. 4A, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or other rib cut. According to step 130, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact blend of flavoring is unlimited and is up to the preparer of the slab of rib meat.

US 7,666,075 B1

9

Following the seasoning stage, at step 140, the length of rib meat is exposed to a first cooking regimen which comprises exposing the length of rib meat to a flavored smoke at a temperature of at least 100 degrees Fahrenheit for a period of time between two hours and six hours. To "smoke" a slab of rib meat comprises burning flavored wood (for example, but not limited to Apple, Cherry, Hickory, Peach or Mesquite woods) within a confined area so that the slab of rib meat absorbs the aroma of the smoke and therefore imparts additional flavor to the slab of rib meat.

Following the "smoking" step 140, the slab of rib meat is then removed from the smoker 150 and optionally seasoned with various barbeque sauce flavors. The meat can be either basted with a semi-viscous fluid or "dry-rubbed" with a powder seasoning mix. In one embodiment, basting the rib meat is performed by covering the slab of rib meat with a fluid of high viscosity on the theory that the slab of rib meat will absorb additional flavor from the basting. Basting the meat allows the highly viscous fluid to penetrate the outer layer of the meat and permeate the lower layers of meat, providing additional flavor throughout the meat, and not only within the outermost layers of meat.

In another embodiment, the meat can also be seasoned with a "dry-rub". Dry rubs differ from basting sauces in that the rubs are powdery mixes lacking any form of moisture. Dry rub mixes can be made up of a multitude of seasonings into infinite number of mixes and only limited by the creativity of the preparer. The theory behind seasoning the slab of meat is the same behind the basting process. The powder seasoning mix will mix with the meats own juices secreted during cooking, allowing the mix to be absorbed into the lower layers of meat. However, in the seasoning process, both the basting step and dry rub step is purely optional and can be skipped at the desire of the preparer.

At step 160, the slab of rib meat is then enclosed within a moisture loss preventive environment. According to the embodiment of the process depicted in the flowchart of FIG. 4B, the length of rib meat is enclosed in a cooking bag which is then sealed.

As shown at step 170, once the slab of rib meat is located within the moisture loss preventive environment, it is desirable that the slab of rib meat be cooked by convection oven cooking 170 for at least 60 minutes at a temperature of at least 200 degrees, depending on the individual oven and how many slabs are on each sheet tray. Thus, depending on the number of slabs on a tray, cooking time may be lengthened and/or the temperature be raised. Additionally, a single slab of rib meat may require less cooking time, and the temperature may need to be constant.

In another further embodiment, it is possible to wrap the slab of rib meat or seal in a hermetic enclosure prior to the smoking of the slab of rib meat or prior to the first period of time in the suitable cooking device. Therefore, it is optional that the slab of rib meat need not be wrapped or sealed in between the first and second cooking stages. Accordingly, if wrapped prior to the smoking stage, the slab of rib meat can be inserted directly into the second cooking stage for its desired length of time.

Following the second period of cooking at step 170, the slab of rib meat can be removed from the cooking enclosure. At this time, according to step 180, the slab of rib meat can be removed from the moisture loss preventive environment and the rib bones are separated from the length of rib meat to produce a substantially intact de-boned continuous length of rib meat.

Each rib bone within the slab of rib meat is exposed to very small forces in during the removal process, so that its fiber

10

structure of the slab of rib meat is retained as much as possible, and the risk of damage to the meat is very low. What is left is a boneless slab of rib meat that is substantially intact.

The exact reason for the meat separating from the bone during the wrapped/cooking stage is not precisely known. Without being bound to any particular theory, locating the slab of rib meat within a moisture loss preventive environment protects the slab of rib meat within a cooking environment that maintains a high level of moisture level within the meat itself. This high level of moisture serves two purposes: first, retaining the moisture maintains the slab of rib meat's juiciness and tenderness, which prevents it from becoming dry and difficult to consume; second, the high level of moisture also acts as a solution to break down the natural attachments between the muscle (meat) and the bone. It is this breaking down of the bonds between the meat and bone that allows the bone to be removed from the slab of rib meat with little to no resistance and therefore leaves the slab of rib meat substantially intact.

After the bones have been removed in step 180, the boneless length of rib meat can then be immediately consumed 190 or packed either dry or with a marinade 200 for future sale. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

The disclosed process prepares a pork or beef meat cut to become a more attractive and economically beneficial product to achieve an end product that is more in demand. The boneless slab of rib meat can be consumed with utensils, in the manner similar to how one would consume other boneless or bone-in pork or beef meat products like steaks or pork chops.

Thus, provided is a process for producing a boneless slab of rib meat that which results in a meaty and easy to consume boneless steak or filet of rib meat. This process involves a minimally invasive way to remove the rib bones from a slab of rib meat to provide a length of boneless rib meat. Accordingly, the process creates an edible boneless slab of rib meat, which can be consumed without having to maneuver around the rib bones themselves.

It will be understood that the embodiments described herein are merely illustrative and that a person skilled in the art may make many variations and modifications without departing from the spirit and scope of the invention. All such modifications and variations are intended to be included within the scope of the appended claims. It should be understood that the embodiments described herein are not only in the alternative, but can be combined.

We claim:

1. A cooked and de-boned substantially intact length of rib meat.

2. The rib meat of claim 1, comprising beef rib meat.

3. The rib meat of claim 1, comprising pork rib meat.

4. The rib meat of claim 3, comprising cooked and de-boned substantially intact continuous length rib meat from a traditional spare rib cut.

5. The rib meat of claim 3, comprising cooked and de-boned substantially intact continuous length rib meat from a St. Louis style spare rib cut.

6. The rib meat of claim 3, comprising cooked and de-boned substantially intact continuous length from a back rib cut.

7. The rib meat of claim 3, wherein said substantially intact length of rib meat is boneless.

US 7,666,075 B1

11

8. A packaged rib meat product comprising:

a package;

at least one de-boned substantially intact length of rib meat contained within said package; and

a separate flavoring agent associated with said product.

9. The packaged rib meat product of claim 8, wherein said product is a ready-to-heat and serve product and comprises at

12

least one cooked and de-boned substantially intact length of rib meat contained within said package.

10. The packaged rib meat product of claim 8, wherein said flavoring agent is selected from the group consisting of dry rubs, sauces, bastes, marinades, injection flavorings, and combinations thereof.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.     : 7,666,075 B1
APPLICATION NO. : 11/595268
DATED        : February 23, 2010
INVENTOR(S)   : Baker et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 638 days.

Signed and Sealed this

Seventh Day of December, 2010

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*



US007959500B1

(12) **United States Patent**
Baker et al.

(10) Patent No.: **US 7,959,500 B1**
(45) Date of Patent: **Jun. 14, 2011**

(54) **PROCESS FOR PREPARING RIB MEAT PRODUCT**

(76) Inventors: **James A. Baker**, Avon, OH (US);
**Brittani Baker**, Westlake, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 12/691,450

(22) Filed: Jan. 21, 2010

**Related U.S. Application Data**

(62) Division of application No. 11/595,268, filed on Nov. 9, 2006, now Pat. No. 7,666,075.

(51) Int. Cl.
A22C 17/00 (2006.01)

(52) U.S. Cl. ...................................... 452/135

(58) Field of Classification Search ................. 452/2–6, 452/102–105, 125, 137, 198
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,137,605 A | 2/1979 | van Rij et al. |
| 4,186,216 A | 1/1980 | Roth |
| 4,217,679 A | 8/1980 | Gordon |
| 5,104,351 A | 4/1992 | van den Nieuwelaar et al. |

| | | | |
|---|---|---|---|
| 5,197,918 A | 3/1993 | Klaassen |
| 5,273,483 A | 12/1993 | Gagliardi, Jr. |
| 5,464,368 A | 11/1995 | White et al. |
| 5,525,103 A | 6/1996 | White et al. |
| 5,667,435 A | 9/1997 | Baughman et al. |
| 5,775,986 A | 7/1998 | Law et al. |
| 5,823,867 A | 10/1998 | Roth et al. |
| 5,868,613 A | 2/1999 | Heidke et al. |
| 5,976,004 A | 11/1999 | Hazenbroek |
| 6,527,636 B2 | 3/2003 | Mickelsen |
| 6,648,744 B2 | 11/2003 | Bell et al. |
| 6,716,097 B2 | 4/2004 | Freund et al. |
| 7,008,313 B2 | 3/2006 | Gagliardi, Jr. |
| 7,022,007 B2 | 4/2006 | Naehring |
| 7,198,564 B2 | 4/2007 | Hino et al. |
| 2006/0035005 A1 | 2/2006 | McMindes et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1053684 | 11/2002 |

*Primary Examiner* — Thomas Price
(74) *Attorney, Agent, or Firm* — Curatolo Sidoti Co., LPA; Salvatore A. Sidoti

(57) **ABSTRACT**

A cooked and de-boned substantially intact slab of rib meat is provided. A process for preparing a de-boned rib meat product from a pork or beef rib cut is also provided. The process for preparing the rib meat product involves cooking a length of rib meat having rib bones embedded therein at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat.

**23 Claims, 5 Drawing Sheets**





FIG 1



FIG 2



FIG 3

U.S. Patent         Jun. 14, 2011         Sheet 4 of 5         US 7,959,500 B1



FIG 4A

U.S. Patent          Jun. 14, 2011          Sheet 5 of 5          US 7,959,500 B1



FIG 4B

US 7,959,500 B1

1

## PROCESS FOR PREPARING RIB MEAT PRODUCT

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a divisional application of copending application U.S. Ser. No. 11/595,268 filed on Nov. 9, 2006, which is incorporated by reference in its entirety.

### TECHNICAL FIELD

Generally provided is a cooked and de-boned meat product and a process for preparing the meat product. More particularly, provided is a cooked and de-boned rib meat product and a process for preparing the rib meat product. The process of preparation results in a ready-to-eat substantially intact beef or pork rib meat steak, which does not include any rib bones.

### BACKGROUND

Pork and beef carcasses are typically butchered into several cuts or portions, which may be used to prepare spare ribs and back ribs. Spare ribs may be further divided into the traditional breast bone spare ribs or St. Louis style spare ribs. St. Louis style spare ribs generally comprise the upper part of a rib separated from the breast bone or brisket bone. St. Louis style spare ribs are generally very meaty and include minimal fat.

Back rib cuts are generally prepared by cutting the loin sections between the back ribs and the semispinalis muscle adjacent to the back ribs to form a loin cut and a back rib cut. The back rib meat cut, also known as a baby back rib cut, includes rib bones and related intercostal meat. Each back rib cut is intact and includes portions of at least eight ribs. See *Institutional Meat Purchaser Specification Item No. 422* (June, 1997). Back rib cuts are generally sold as a single intact rib section, which may be prepared and consumed with various sauces. The demand for the baby back rib cuts has increased dramatically in recent years due to the increase in the number of barbeque-themed restaurants. However, because back rib cuts typically contain only intercostal meat between the rib bones, conventional back rib cuts do not include a substantial amount of meat.

In recent years, corporations owning barbeque-themed restaurants have become increasingly interested in barbeque style food products that can retain the interest of repeat business. Consuming barbeque style ribs in a social situation, however, has always been a delicate undertaking. Traditionally, barbeque style ribs have carried the distinction of being an untidy food item, and as a result, are left off of many fine dining menus. Enjoying barbeque style ribs is often difficult, as eating them can be time consuming, embarrassing, and messy. As is often the custom, barbeque ribs are eaten without utensils, utilizing one's own hands to assist in separating the meat from the rib bones and introducing the meat into one's mouth.

As a result of this direct contact of the meat with the hands, the thick consistency of barbeque sauce has the potential to coat one's hands and is difficult to remove without the assistance of a moist towelettes or inserting by one's own fingers into their mouth to assist in removing the excess barbeque sauce.

Embarrassment can also occur due to the shape of the rib bones themselves. A single barbeque style rib possesses the shape of an elongated cylinder, encased in meat and covered with barbeque sauce. When taken to one's mouth to eat, if not

2

eaten with care, the rib can displace sauce onto the consumer's face, which can cause great embarrassment.

There are also health risks associated with the consumption of ribs. Because of the irregular shapes and hardness of the rib bones, the risk of injury to the inside of one's mouth is also a concern. Furthermore, the potential for choking on a portion of a rib bone causes people to avoid consuming ribs.

Additionally, a meat cut that includes both rib bones and associated meat makes it more difficult for a person to consume all available meat, because the person must work around and between the bones. Therefore, consuming barbeque style ribs has the tendency to be tedious and laborious, due to the requirement of tearing the meat from the bones and eating meat from around the rib bones themselves.

There have been attempts to produce boneless pork and beef back rib products. One such method of producing boneless rib meat includes first separating the rib meat from the bones, creating a paste-like meat intermediate product, and restructuring the paste-like intermediate product into a form that attempts to resemble the appearance of a natural slab of ribs. These types of processed or restructured rib products are commonly offered by fast food restaurant chains and in the frozen foods sections of retail grocery stores. Obviously, these boneless pork or beef products that lack the natural appearance and consistency of an unprocessed slab of rib meat.

Heretofore, there has been no process for providing a ready-to-eat de-boned rib product that does not involve processing the native rib meat into piece or parts, and reforming or restructuring meat pieces into a slab-shaped product. Accordingly, there is still a need in the art for a barbeque style rib meat product that can be readily consumed and that overcomes the disadvantages associated with consuming traditional barbeque ribs having bones embedded therein. Such a de-boned rib meat product would avoid the stigma traditionally attached to dining on barbeque style ribs and is therefore more likely to result in repeat business for barbeque-themed restaurants, retail grocery outlets, and the like.

### SUMMARY

Provided is a de-boned substantially intact length of rib meat.

Also provided is a cooked and de-boned substantially intact length of rib meat.

Additionally provided is a process for preparing a length of de-boned rib meat comprising cooking a length of rib meat having at least one rib bone at least partially embedded therein at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and removing at least one of said rib bones from said length of rib meat.

Further provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one de-boned substantially intact length of rib meat contained within said package, and optionally a flavoring agent associated with said package.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side sectional view of a side of pork or beef with cut lines added to illustrate main portions including St. Louis style rib and back rib portions.

FIG. 2 is a perspective view of slab of rib meat including a plurality of rib bones embedded within the rib meat.

US 7,959,500 B1

3

FIG. 3 is a perspective view of a cooked and de-boned continuous slab of rib meat.

FIG. 4A is a flowchart of one illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

FIG. 4B is a flowchart of another illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

DETAILED DESCRIPTION

Disclosed is a process for the preparation of a de-boned beef or pork rib meat cut. Broadly, the rib meat cut is prepared by cooking a desired length of rib meat having at least one bone embedded within the rib meat and removing the at least one of the embedded rib bones from the rib meat. According to the process, the rib bones can be easily separated from the rib meat, while the maintaining a substantially intact length of rib meat. Thus, the process provides a cooked and de-boned substantially intact continuous length of rib meat. The rib meat product can be consumed using conventional utensils (fork and knife), without having to first separate the meat from the bones, or to navigate around the bones to remove all of the rib meat. By removing the bones from a barbeque style slab of rib meat, the tediousness, embarrassing, and messy nature of the act of consuming the ribs is avoided.

According to illustrative embodiments, the process for preparing the rib meat product involves cooking a length of rib meat having at least one rib bone embedded therein at a temperature and for a time sufficient to enable the removal of at least one the rib bones from the length of rib meat, while maintaining the continuous length of natural rib meat. At least one of the embedded rib bones is removed from the rib meat, thereby forming a substantially intact continuous length of rib meat.

As used throughout this specification, the term "cooking" shall refer to partially cooking, substantially cooking, or fully cooking a desired length of rib meat. A partially cooked length of rib meat retains certain qualities of raw pork or beef meat, but a higher internal temperature than that of raw meat is reached within the meat. A substantially cooked length of rib meat refers to meat that has been more than partially cooked and has reached an internal temperature where the rib meat begins to lose its reddish color. A fully cooked length of rib meat refers to a length of rib meat that has been cooked such that it can be readily consumed without a health risk. The term "cooked" refers to a length of rib meat that has been partially cooked, substantially cooked or fully cooked. It should be noted that cooking, substantially cooking, or fully cooking may provide sufficient cooking to produce rib meat retaining minimal attachment to the rib bones, thereby enabling the removal of the rib bones from the meat while maintaining a substantially intact continuous length of rib meat.

As used throughout this specification, the term "de-boned" shall refer to a desired length or section of rib meat, wherein at least one of the rib bones embedded in the rib meat has been removed. Thus, a de-boned length of rib meat refers to desired lengths of rib meat wherein one or more of the rib bones have been removed from the meat. According to certain illustrative embodiments, all of the rib bones in a desired length of rib meat have been removed to provide a boneless length of rib meat. It should be noted, however, that it may be desirable to leave one or more of the rib bones embedded within the length of rib meat at strategic positions. Therefore, the term "de-boned" may also refer to those lengths of rib meat in which at

4

least one rib bone has been removed, but at least one rib bone remains embedded in the rib meat.

As used throughout this specification, the term "substantially intact" refers to a desired length or section of rib meat, wherein after removal of at least one of the rib bones embedded therein, the rib meat substantially retains its natural consistency, texture, and shape it held prior to the bones being removed. It should be noted that in removing the bones from the length or section of rib meat, the bones may retain some slight level of attachment to the meat wherein the bones emerge from the length of rib meat with an amount of meat remaining attached on the bones. This situation is encompassed by the term "substantially intact."

The term "length of rib meat" refers to any desired section or portion of rib meat. It can be appreciated that a length of rib meat is not limited to a length of rib meat that spans a plurality of rib bones, but the length of rib meat may also comprise an individual (a single rib section) rib section wherein the one rib bone location in this rib meat section has been removed. A single rib meat section simply comprises the rib meat adjacent both sides of the removed rib bone and connecting meat.

FIG. 1 is a diagrammatical side sectional view of the side of pork or beef 10 with cut lines 12 added to illustrate the major cuts or portions of side 10 after butchering. Typically, side 10 is butchered about cut lines 12 into main cuts or portions including shoulder 14, loin 16, ham 18, and belly 20. Back ribs 22, also known as "baby back" ribs, originate from the blade and center section of the loin 16. Back ribs 18 contain meat between the ribs called finger meat and include at least 8 ribs.

Spare ribs 24 comprise the intact rib section removed from the belly 20 of the pork side. Spare ribs 24 may be further butchered or cut into St. Louis-style spare ribs and brisket or breast bone spare ribs. Spare ribs 24 are separated into St. Louis-style ribs and breast bone spare ribs by cutting about cut line 13 along costal cartilage connecting the breast bone spare ribs and the St. Louis-style ribs. Breast bone spare ribs are generally taken from the belly of the hog or cow.

FIG. 2 illustrates the traditional slab of rib meat 30 with ribs bones 32 lodged among the intercostal meat 34. Despite St Louis-style ribs being illustrated in FIG. 2, this process is not limited to the preparation of a de-boned and substantially intact length of rib meat from a St. Louis-style rib cut, but may also include any rib cut including, without limitation, the traditional spare rib cut and baby back rib cut.

FIG. 3 is a perspective view of an illustrative embodiment of a cooked and substantially intact length of rib meat prepared in accordance with the process. As shown in FIG. 3, side 42 of the rib meat product 40 comprises a completely de-boned and substantially intact length of rib meat that is ready for consumption. Reference numeral 44 refers to the channel or slits in the rib meat where the rib bones had resided prior to being removed. The rib meat 40 retains its natural consistency, texture, form and shape it held prior to the bones being removed. The cooked and de-boned length of rib meat resembles a high-end boneless steak or filet of rib meat. Accordingly, the rib meat is more palatable and can be consumed in an easier and tidier fashion, which is contrary to most previous barbeque dining experiences.

The process for preparing a length of de-boned rib meat includes cooking a length of rib meat having at least one rib bone embedded therein at both a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat. At least one of the rib bones is removed from the length of rib meat. According to certain embodi-

US 7,959,500 B1

5

ments, all of the bones from the length of rib meat are removed to produce a boneless slab of rib meat.

The rib meat is cooked under certain time-temperature regimens to enable the removal of the rib bones from the rib meat without damaging the continuous length of rib meat. According, to certain illustrative embodiments, the rib meat is cooked pursuant to at least two time-temperature regimens. By way of illustration, but not in limitation, the process includes cooking the length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib meat at a second temperature for a second period of time. Cooking the rib meat in accordance with these time-temperature regimens permits the easy removal of at least one of the rib bones from the length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a sufficient amount of time to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a period of time ranging from about 1 hour to about 6 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 Fahrenheit for a period of time ranging from about 1 hour to about 5 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, the time-temperature regimens for cooking the rib meat include cooking a length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, followed by cooking the length of rib meat at a second temperature for a second period of time and removing at least one of the rib bones from the length of cooked rib meat.

According to other embodiments, the time-temperature regimens for cooking the rib meat includes cooking said length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes, and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, followed by cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat comprises cooking the length of rib meat at a first temperature of about 400 degrees Fahrenheit for a time period from about 1 to about 4 hours, followed by cooking the length of rib meat for a second temperature of about 300 degrees Fahrenheit for a time period from 30 to about 90 minutes and removing at least one of the rib bones from the length of rib meat.

6

To facilitate the retention of moisture within the length of rib meat during the one or more of the various cooking regimens, the length of rib meat may be located within a moisture loss preventive environment. The moisture loss preventive environment is any suitable environment that acts to minimize, reduce, lessen or prevent loss of moisture of from the length of rib meat. For example, without limitation, to facilitate the retention of moisture in the rib meat, at least a portion of the length of rib meat may be enclosed or wrapped in a suitable moisture loss preventive material. Such materials include plastic wrap, metal foil, such as aluminum foils, cooking bags, and other suitable containers. The step of enclosing or wrapping the length of rib meat in a moisture loss preventive material may also comprise hermetically sealing the length of rib meat in a suitable hermetic enclosure. The length of rib meat may be enclosed or wrapped in such moisture loss preventive material at any stage prior or during the cooking process. To be hermetically sealed, the slab of rib meat will cook within its own environment that is different from the oven enclosure. Sealing the slab of rib meat protects the slab from a cooking environment and maintains the moisture level within the slab of rib meat. A plastic sheet or plastic bag, or any other suitable packaging (such as vacuum packaging) may be used to wrap the slab of rib meat as long as it provides a hermetic enclosure. It should be noted that the step of locating the length of rib meat within a moisture loss preventive environment is not limited to enclosing or wrapping the meat within a moisture loss preventive material. The length of rib meat may be positioned within the inner chamber or volume of suitable piece of equipment and further cooked, so long as the chamber or volume acts to minimize, reduce or even prevent moisture loss from the length of rib meat.

By way of illustration, the desired length of rib meat may be to enclosed within a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat, prior to the commencement of any cooking. Thus, according to certain embodiments, the process for preparing a de-boned length of rib meat includes enclosing the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat cooking at a first temperature for a first period of time and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cook-

US 7,959,500 B1

7

ing stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature for a first period of time, and cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, and cooking the length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

The various cooking regimens of the process may be carried out by cooking the length of rib meat in any suitable cooking apparatus. For example, and without limitation, cooking the length of rib meat may be carried out by cooking in a conventional oven, cooking in a convection oven, smoking, steaming, roasting, boiling, broiling, cooking in a slow cooker, halogen lamp cooking, or any combinations thereof. According a suitable embodiment, the cooking stages are carried out by smoking the length of rib meat. In other embodiments, a combination of smoking the length of rib meat and cooking by halogen lamps may be used to facilitate removal of the rib bones, yet maintaining the tenderness and juiciness of the rib meat to enable the separation of the rib bones from the rib meat.

The process for the preparation of the de-boned rib product also includes imparting a flavor to the length of rib meat. The step of imparting flavor to the length of rib meat may comprise at least one of seasoning the meat, marinating the meat, injection marinating the meat, dry rubbing the meat, basting the meat, smoking the meat, or combinations thereof.

Once the length of rib meat has been cooked to enable removal of the rib bones, the bones are removed. The rib bones may be removed from the rib meat by any suitable process known in the culinary art, so long as the desired length of rib meat remains substantially intact. For example, and not in limitation, the removal of at least one rib bones may be accomplished by manually removing the rib bones, using a non-automated hand-tool to remove the bones, by mechanically removing the rib bones with suitable power equipment, or by combinations thereof. It should be also noted that the rib bones may be removed prior to cooking the length of rib meat, so long as the process of removing the rib bones from the meat maintains a substantially intact length of rib meat.

If the cooked and de-boned length of rib meat is prepared in the retail restaurant setting, the product may be presented to the diner for consumption. If the cooked and de-boned length of rib meat is prepared and destined for resale at a retail grocery store, or other sales outlet, then the product can be suitably packaged. By way of illustration, suitable packaging includes vacuum packaging the length of cooked and de-

8

boned rib meat. It is contemplated that the cooked and de-boned rib meat may also be suitable for sale as a frozen, heat and serve product that would be commercially available at a grocery outlet. In this case, the cooked and de-boned rib meat is frozen and packaged in a suitable package for resale.

Also disclosed is a packaged ready-to-heat and serve de-boned rib meat product. The packaged rib meat product comprises a package and at least one de-boned substantially intact length of rib meat that is contained within the package. According to certain embodiments, a separate flavoring agent may be associated with the packaged rib product. It should be noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

According to certain embodiments, also provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one cooked and de-boned substantially intact continuous length of rib meat contained within the package, and optionally a flavoring agent associated with the package. It should be noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

For the embodiments of the packaged rib meat product that includes a flavoring agent, the flavoring agent may include an agent in the form of dry rubs, sauces, bastes, marinades, injection flavorings, or combinations thereof.

FIG. 4A depicts a flow chart for an illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural consistency, texture and shape of a slab of rib meat had the bones not been removed from the rib meat.

At step 50, a slab of ribs is presented for processing. As described herein, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or any other rib cut. According to step 60, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact form and blend of flavorings is unlimited and is up to the preparer of the slab of rib meat.

At step 70, the flavored or unflavored slab of rib meat is then located within a moisture loss preventive environment. Locating the slab of ribs in such an environment maintains a suitable moisture level within the slab of rib meat.

Following the optional flavoring 60 and locating 70 steps, if these steps are carried out, the length of rib meat is cooked 80 at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat. Following cooking step 80, the rib bones are separated from the slab of rib meat, leaving a substantially intact continuous length of rib meat.

After the bones have been removed from the rib meat in step 90, the boneless steak or filet of rib meat may be immediately consumed 100 or packaged for future sale 110. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

FIG. 4B depicts a flow chart for another illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural

US 7,959,500 B1

9

consistency, texture and shape of a slab of rib meat had the bones not been removed from the rib meat.

At step 120, a slab of ribs is presented for processing. As described in connection with the flowchart of the illustrative embodiment shown in FIG. 4A, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or other rib cut. According to step 130, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact blend of flavoring is unlimited and is up to the preparer of the slab of rib meat.

Following the seasoning stage, at step 140, the length of rib meat is exposed to a first cooking regimen which comprises exposing the length of rib meat to a flavored smoke at a temperature of at least 100 degrees Fahrenheit for a period of time between two hours and six hours. To "smoke" a slab of rib meat comprises burning flavored wood (for example, but not limited to Apple, Cherry, Hickory, Peach or Mesquite woods) within a confined area so that the slab of rib meat absorbs the aroma of the smoke and therefore imparts additional flavor to the slab of rib meat.

Following the "smoking" step 140, the slab of rib meat is then removed from the smoker 150 and optionally seasoned with various barbeque sauce flavors. The meat can be either basted with a semi-viscous fluid or "dry-rubbed" with a powder seasoning mix. In one embodiment, basting the rib meat is performed by covering the slab of rib meat with a fluid of high viscosity on the theory that the slab of rib meat will absorb additional flavor from the basting. Basting the meat allows the highly viscous fluid to penetrate the outer layer of the meat and permeate the lower layers of meat, providing additional flavor throughout the meat, and not only within the outermost layers of meat.

In another embodiment, the meat can also be seasoned with a "dry-rub". Dry rubs differ from basting sauces in that the rubs are powdery mixes lacking any form of moisture. Dry rub mixes can be made up of a multitude of seasonings into infinite number of mixes and only limited by the creativity of the preparer. The theory behind seasoning the slab of meat is the same behind the basting process. The powder seasoning mix will mix with the meats own juices secreted during cooking, allowing the mix to be absorbed into the lower layers of meat. However, in the seasoning process, both the basting step and dry rub step is purely optional and can be skipped at the desire of the preparer.

At step 160, the slab of rib meat is then enclosed within a moisture loss preventive environment. According to the embodiment of the process depicted in the flowchart of FIG. 4B, the length of rib meat is enclosed in a cooking bag, which is then sealed.

As shown at step 170, once the slab of rib meat is located within the moisture loss preventive environment, it is desirable that the slab of rib meat be cooked by convection oven cooking 170 for at least 60 minutes at a temperature of at least 200 degrees, depending on the individual oven and how many slabs are on each sheet tray. Thus, depending on the number of slabs on a tray, cooking time may be lengthened and/or the temperature be raised. Additionally, a single slab of rib meat may require less cooking time, and the temperature may need to be constant.

In another further embodiment, it is possible to wrap the slab of rib meat or seal in a hermetic enclosure prior to the smoking of the slab of rib meat or prior to the first period of time in the suitable cooking device. Therefore, it is optional that the slab of rib meat need not be wrapped or sealed in between the first and second cooking stages. Accordingly, if

10

wrapped prior to the smoking stage, the slab of rib meat can be inserted directly into the second cooking stage for its desired length of time.

Following the second period of cooking, at step 170, the slab of rib meat can be removed from the cooking enclosure. At this time, according to step 180, the slab of rib meat can be removed from the moisture loss preventive environment and the rib bones are separated from the length of rib meat to produce a substantially intact de-boned continuous length of rib meat.

Each rib bone within the slab of rib meat is exposed to very small forces in during the removal process, so that its fiber structure of the slab of rib meat is retained as much as possible, and the risk of damage to the meat is very low. What is left is a boneless slab of rib meat that is substantially intact.

The exact reason for the meat separating from the bone during the wrapped/cooking stage is not precisely known. Without being bound to any particular theory, locating the slab of rib meat within a moisture loss preventive environment protects the slab of rib meat within a cooking environment that maintains a high level of moisture level within the meat itself. This high level of moisture serves two purposes: first, retaining the moisture maintains the slab of rib meat's juiciness and tenderness, which prevents it from becoming dry and difficult to consume; second, the high level of moisture also acts as a solution to break down the natural attachments between the muscle (meat) and the bone. It is this breaking down of the bonds between the meat and bone that allows the bone to be removed from the slab of rib meat with little to no resistance and therefore leaves the slab of rib meat substantially intact.

After the bones have been removed in step 180, the boneless length of rib meat can then be immediately consumed 190 or packed either dry or with a marinade 200 for future sale. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

The disclosed process prepares a pork or beef meat cut to become a more attractive and economically beneficial product to achieve an end product that is more in demand. The boneless slab of rib meat can be consumed with utensils, in the manner similar to how one would consume other boneless or bone-in pork or beef meat products like steaks or pork chops.

Thus, provided is a process for producing, a boneless slab of rib meat that which results in a meaty and easy to consume boneless steak or filet of rib meat. This process involves a minimally invasive way to remove the rib bones from a slab of rib meat to provide a length of boneless rib meat. Accordingly, the process creates an edible boneless slab of rib meat, which can be consumed without having to maneuver around the rib bones themselves.

It will be understood that the embodiments described herein are merely illustrative and that a person skilled in the art may make many variations and modifications without departing from the spirit and scope of the invention. All such modifications and variations are intended to be included within the scope of the appended claims. It should be understood that the embodiments described herein are not only in the alternative, but can be combined.

US 7,959,500 B1

11                                              12

We claim:

1. A process for preparing a length of de-boned rib meat comprising:

   cooking a length of rib meat having at least one rib bone at least partially embedded therein at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and

   removing at least one of said rib bones from said length of rib meat.

2. The process of claim 1, comprising:

   cooking said length of rib meat at a first temperature for a first period of time;

   locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

   cooking said length of rib meat at a second temperature for a second period of time; and

   removing at least one of said rib bones from said length of rib meat.

3. The process of claim 2, comprising:

   cooking said length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours;

   locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

   cooking said length of rib meat at a second temperature for a second period of time; and

   removing at least one of said rib bones from said length of rib meat.

4. The process of claim 2, comprising:

   cooking said length of rib meat at a first temperature for a first period of time;

   locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

   cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes; and

   removing at least one of said rib bones from said length of rib meat.

5. The process of claim 2, wherein:

   cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours;

   locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

   cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes;

   removing at least one of said rib bones from said length of rib meat.

6. The process of claim 2, wherein said locating said length of rib meat comprises hermetically sealing said length of rib meat.

7. The process of claim 6, wherein said locating comprises wrapping said length of rib meat with plastic wrap, metal foil, or enclosing within a cooking bag.

8. The process of claim 1, comprising:

   locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

   cooking said length of rib meat at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and

   removing at least one of said rib bones from said length of rib meat.

9. The process of claim 8, wherein said locating said length of rib meat comprises hermetically sealing said length of rib meat.

10. The process of claim 9, wherein said locating comprises wrapping said length of rib meat with plastic wrap, metal foil, or enclosing within a cooking bag.

11. The process of claim 1, comprising:

   locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

   cooking said length of rib meat at a first temperature for a first period of time;

   cooking said length of rib meat at a second temperature for a second period of time; and

   removing at least one of said rib bones from said length of rib meat.

12. The process of claim 11, comprising:

   locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

   cooking said length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours;

   cooking said length of rib meat at a second temperature for a second period of time; and

   removing at least one of said rib bones from said length of rib meat.

13. The process of claim 11, comprising:

   locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

   cooking said length of rib meat at a first temperature for a first period of time;

   cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes; and

   removing at least one of said rib bones from said length of rib meat.

14. The process of claim 11, wherein:

   locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

   cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours;

   cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and

   removing at least one of said rib bones from said length of rib meat.

15. The process of claim 1, further comprising imparting a flavor to said length of rib meat.

16. The process of claim 15, wherein said imparting a flavor comprises said at least one of seasoning, marinating, injection marinating, dry rubbing, basting, or smoking.

17. The process of claim 1, wherein said cooking said length of rib meat comprises cooking in a conventional oven, cooking in a convection oven, smoking, steaming, roasting, boiling, broiling, cooking in a slow cooker, halogen lamp cooking, and combinations thereof.

18. The process of claim 17, comprising:

   smoking said length of rib meat at a first temperature for a first period of time; and

US 7,959,500 B1

| 13 | 14 |

cooking said length of rib meat at a second temperature for a second period of time.

19. The process of claim 17, comprising

cooking said length of rib meat at a first temperature for a first period of time; and

halogen lamp cooking said length of rib meat at a second temperature and for a second period of time.

20. The process of claim 17, comprising

smoking said length of rib meat at a first temperature and for a first period of time; and

halogen lamp cooking said length of rib meat at a second temperature and for second period of time.

21. The process of claim 1, comprising removing said at least one rib bone manually, with a hand-tool, mechanically, or combinations thereof.

22. The process of claim 1, comprising packaging said cooked and de-boned length of rib meat.

23. The process of claim 1, comprising freezing and packaging said length of cooked and de-boned rib meat.

* * * * *

## EXHIBIT D

**Ohio Service Mark Filings Attached**



| DATE:<br>09/17/2010 | DOCUMENT ID<br>201025900735 | DESCRIPTION<br>TRADE MARK/ORIGINAL FILING (TMO) | FILING<br>125.00 | EXPED<br>100.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |

## Receipt
This is not a bill. Please do not remit payment.

WILLIAM DAVID MOORE
815 SUPERIOR AVENUE, EAST
SUITE 1717 SUPERIOR BLDG.
CLEVELAND, OH 44114

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, Jennifer Brunner

1963461

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**BUBBA'S-Q WORLD FAMOUS**

and, that said business records show the filing and recording of:

Document(s)                                                          Document No(s):

**TRADE MARK/ORIGINAL FILING**                                       201025900735
    Class:   MEATS AND PROCESSED FOODS
    Registrant's State of Inc.:  OH
    Date of First Use:        11/12/1993               BUBBA'S-Q, INC.
    Date of First Use in Ohio:  11/12/1993            820 CENTER ROAD
    Expiration Date:       09/16/2020          AVON, OH 44011

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 16th day of September,
A.D. 2010.

United States of America
State of Ohio
Office of the Secretary of State

Ohio Secretary of State



| DATE:<br>10/08/2010 | DOCUMENT ID<br>201028100165 | DESCRIPTION<br>SERVICE MARK/ORIGINAL FILING<br>(SMO) | FILING<br>125.00 | EXPED<br>100.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |

### Receipt
This is not a bill. Please do not remit payment.

WILLIAM D MOORE
815 SUPERIOR AVENUE EAST
SUITE 1717
CLEVELAND, OH 44114

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, Jennifer Brunner

1968129

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**"DE-BONED BABY BACK RIB STEAK"**

and, that said business records show the filing and recording of:

Document(s)                                                    Document No(s):

**SERVICE MARK/ORIGINAL FILING**                               201028100165
   Class:  PROVIDING FOOD AND DRINK
   Registrant's State of Inc.:  OH           QUEENANN, INC.
   Date of First Use:          09/08/2010    820 CENTER ROAD
   Date of First Use in Ohio:  09/08/2010    AVON, OH 44011
   Expiration Date:            10/07/2020

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 7th day of October, A.D.
2010.

United States of America
State of Ohio
Office of the Secretary of State

Ohio Secretary of State