UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DF VENTURES, LLC, and DAYMOND JOHN, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Index No. 1:23-cv-03126** |
| | ) | |
| FOFBAKERS HOLDING COMPANY, LLC, | ) | |
| JABEZBAKER, LLC, JAMES A. BAKER a/k/a AL | ) | |
| BAKER, *individually*,  BRITTANI BO BAKER, | ) | |
| *individually*, and SABRINA BAKER, *individually*, | | |
| | | |
| **Defendants.** | | |

## PLAINTIFFS DF VENTURES, LLC AND DAYMOND JOHN'S POST-HEARING BRIEF

**GORDON REES SCULLY MANSUKHANI, LLP**
One Battery Park Plaza, 28th Floor
New York, New York 10004
Mercedes Colwin, Esq.
Brittany L. Primavera, Esq.
Lindsey Blackwell, Esq.
Hannah Kucine, Esq.
Telephone: (212) 269-5500
mcolwin@grsm.com
bprimavera@grsm.com
lblackwell@grsm.com
hkucine@grsm.com
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  PROPOSED FINDINGS OF FACT ................................................................... 5

III. CONCLUSIONS OF LAW ............................................................................... 24

   A.  Defendants Breached their Contracts with Plaintiffs ............................................24

      1.  Defendants Disparaged Plaintiffs in Violation of the Settlement
          Agreement .........................................................................................................24

      2.  Defendants Breached the Confidentiality Provision of the
          Operating Agreement .......................................................................................29

   B.  Injunctive Relief is the Proper Remedy for Defendants' Breaches ......................31

   C.  Defendant Brittani Baker Perjured Herself at the Hearing ...................................36

IV.  CONCLUSION ................................................................................................... 38

# TABLE OF AUTHORITIES

### Cases

2017 U.S. Dist. LEXIS 99462 (June 27, 2017)............................................................................ 33

*Chemetall US Inc. v. LaFlamme*, No. 16-780, 2016 U.S. Dist. LEXIS 29644, at *53-54
   (D.N.J. Mar. 8, 2016)............................................................................................................ 32

*Great Caesars Ghost LLC v. Unachukwu*, No. CIV 19-5408, 2020 WL 2394052 at *4 (D.N.J.
   May 12, 2020) ....................................................................................................................... 34

*Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998)........ 32

*Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)... 32

*Ride the Ducks of Phila., LLC v. Duck Boat Tours, Inc.*, 138 Fed. Appx. 431, 434 (3d Cir.
   2005) ..................................................................................................................................... 32

*ThermoLife Int'l LLC v. Connors*, No. CIV. 2:13-4399 KM, 2014 WL 1050789 (D.N.J. Mar.
   17, 2014)................................................................................................................................ 34

*USA Techs., Inc. v. Tirpak*, No. 12-2399, 2012 U.S. Dist. LEXIS 72318, at *22-24 (E.D. Pa.
   May 24, 2012) ....................................................................................................................... 33

Pursuant to this Honorable Court's order issued on the final day of the hearing (the "Hearing") on this matter, Plaintiffs DF Ventures LLC ("DF Ventures") and Daymond John ("Mr. John") (together, "Plaintiffs") respectfully submit this Post-Hearing Brief.

## I.     INTRODUCTION

Al Baker, Brittani Baker, Sabrina Baker, FOFBakers Holding Company, LLC, and Jabezbaker, LLC (collectively, the "Bakers" or the "Defendants") have made this Honorable Court's decision easy. At every turn throughout the Hearing, they have openly admitted to making the public posts in question, and have spoken about their desire to continue spreading false, negative, and unsupported allegations against Plaintiffs. In fact, they have consistently seemed proud of their conduct. When asked about their intent in making these posts, Brittani and Al Baker both affirmed that they wanted their message to be viewed as widely as possible, with an emphatic desire to "share their story" on as many platforms, and to as many people, as possible. After nearly a decade in business with Mr. John, the Bakers have made a conscious decision to forego all reasonable means of communications with their partner, choosing instead to impugn his reputation to a worldwide audience with the inarguable intent to do as much damage to Mr. John as possible. This must not continue.

Mr. John entered into business with Defendants after being introduced to their product on the television show *Shark Tank*. Like all *Shark Tank*-related businesses in which Mr. John invests, his involvement in the venture was carefully outlined to Defendants: Mr. John would provide much-needed funding to help the business survive, use his impeccable public image to help generate customers, and assist in developing business relationships so that the brand could sustainably grow. With this in mind, Defendants knowingly and willingly initiated a business relationship with Mr. John. While Mr. John worked to actively promote the business and secure industry relationships, Defendants eventually introduced Mr. John to Rastelli Partners LLC, Rastelli Brothers, Inc., d/b/a Rastelli Foods Group, Raymond Rastelli Jr., and Raymond Rastelli III (collectively, the "Rastelli Parties") (collectively with Plaintiffs and Defendants, the "Parties") as co-packers who could help manage business operations. Plaintiffs, Defendants, and the Rastelli Parties entered into an operating agreement (the "Operating Agreement") to memorialize the separation of obligations between the parties and create a limited liability corporation ("LLC") through which the business would function. The Operating Agreement makes clear that Mr. John is the *only* non-managing member of the LLC, tasks the managing members alone (Al Baker and Ray Rastelli, Jr.) with overseeing the finances and operations of the business, and explicitly prohibits all members from disclosing confidential information to prevent irreparable harm to the business.

Though Plaintiffs, Defendants, and the Rastelli Parties managed to sell well over ten million dollars of boneless ribs between the years of 2015-2019, leading to hundreds of thousands of dollars in profit for the Bakers, Defendants were not satisfied. Due to the Bakers' actions taken when expressing this dissatisfaction, a dispute (the "Prior Dispute") arose between Defendants and the Rastelli Parties in this very Court, and Plaintiffs eventually intervened. The Prior Dispute resulted in a Settlement Agreement ("Settlement Agreement") with Addendum and amendment to the Operating Agreement (collectively, the "Settlement Documents") that, *inter alia*, resolved and released all prior disputes between the Parties, altered the terms of Defendants' payment arrangement in such a way that Defendants believed would be more favorable to them and bound all Parties, including Al Baker, Brittani Baker, and Sabrina Baker, individually, to a non-disparagement provision that was essential to ensuring that the Parties could continue working together.

Despite this long history, Defendants have again decided that they wish to renegotiate the terms of their agreement with the Plaintiffs and the Rastellis, but are not using reasonable or legitimate means to do so. Instead of using their business – and common – sense to understand the impact that Covid-19 had on supply chains and the sale of the product, the Bakers decided to formulate and publicize a salacious conspiracy theory about Plaintiffs and the Rastelli Parties. Over a period of weeks, the Bakers have gone on a campaign of systematic reputational destruction against

Mr. John and the Rastellis. The Bakers have carefully constructed each social media post to cause as much damage as possible, with claims ranging from Plaintiffs and the Rastelli Parties attempting to steal the Bakers' family business, to allegations of financial misrepresentation, to insinuations that Mr. John is a thief responsible for millions of dollars of income being kept from the Bakers. Where members of the public commented on these posts calling for Mr. John to lose his job on Shark Tank or speaking engagements, for the public to stop supporting any business connected to Mr. John, or even for Mr. John to go to prison, Brittani Baker responded with emphasis, agreement, and enthusiasm. As this Honorable Court has previously noted, the Bakers' campaign against Mr. John and the Rastelli Parties has been "a calculated and deliberate attack on the Plaintiffs' reputation and goodwill that is unusual in its vehemence and persistence." Absent a Court order, Defendants have indicated they have no desire to slow down or cease this campaign, and have gone so far as to admit they plan on expanding their reach to new platforms and shows where they can discuss their allegations with an even wider audience.

It is inarguable that Defendants knowingly and maliciously breached two valid, enforceable contracts between themselves and Plaintiffs. Defendants have provided – by their own admission – no evidence whatsoever to support their false and farfetched theories beyond their own feelings, which, by Al Baker's own admission, are grounded in "trust issues" rather than reality. Furthermore, though

there are no monetary damages that could come close to resolving the reputational damage that has been done to Mr. John, Defendants have made clear that they are incapable of paying any monetary judgment due to their precarious financial situation.

As such, injunctive relief must be granted both to remove the damaging content from Defendants' social media platforms as well as prevent Defendants from making any further public disparaging comments regarding Plaintiffs.

## II.   <u>PROPOSED FINDINGS OF FACT</u>

1.   Mr. John considers himself to be an example of the American Dream. Excerpted Combined Hearing Transcript, ("Tr."), attached hereto as Exhibit A, at 17:6-7.

2.   After growing up in a poor neighborhood with limited means, Mr. John created his own clothing company at nineteen years of age. Tr. at 16:10-18.

3.   Once Mr. John was financially able, he began to invest in others' businesses, eventually becoming a "Shark" on the show *Shark Tank*, so that he could continue to make meaningful investments in burgeoning entrepreneurs. Tr. 1 at 16:10-25.

4.   Mr. John is not involved in the day-to-day operations of any of the businesses he's invested in on Shark Tank. *Id.* at 18:2.

5.     Instead, he advises these businesses, promotes them on social media, and helps them broker deals with businesses that can help them expand. *Id.* at 18:3-13.

6.     In addition to his business investments, Mr. John has devoted considerable time and energy to speaking engagements where he speaks about entrepreneurship, including for major public companies and two former United States presidents. Mr. John also spends significant time working for charitable causes and has written a children's book to help teach kids about financial literacy. *Id.* at 17:8-17; Pl. Comp., ECF No. 1.

7.     Mr. John's reputation means everything to him. *Id.* at 37:3-4.

8.     Mr. John has been building his reputation and brand for about thirty-five years, has made hundreds of investments in different companies, and has had thousands of people working globally to help him create "a brand of honesty and trust and empowerment." *Id.* at 36:21-25, 37:1-2.

9.     No amount of money in the world could get Mr. John's reputation back if it were taken from him. *Id.* at 37:19-25.

10.     The Bakers presented their business, Bubba's Q Boneless Ribs, on *Shark Tank*, and agreed to a deal with Mr. John while appearing on the show contingent on securing a licensing deal with a major meat processor.

11.     Mr. John eventually reduced his equity interest from 30% to 20% to accommodate the new structure with the Rastelli Parties. *See* DJ-1.

12.     The products sold by the business include a rack of ribs that is de-boned but kept whole pursuant to a patented process as well as a variety of sauces.

13.     For Defendants' business specifically, Mr. John has attended trade shows, done interviews, waived his speaking fee for an engagement to generate goodwill, procured customers, spoken to multiple business contacts, funded trips, posted on social media, done interviews, and assigned a team to help them with social media and making connections. *Id.* at 20:7-20.

14.     One such team member who has been assigned to assist with the Bubba's Q brand is Larry Fox, who is a minority member in DF Ventures LLC and acted as a project manager for Bubba's Q. *Id.* at 55:4-17.

15.     Mr. Fox assisted Mr. John with promoting the Bubba's Q brand to cruise lines, grocery stores, and other companies. *Id.* at 56:21-23.

16.     Mr. John and Mr. Fox attended trade shows to help promote the product, with Mr. John using his business connections to secure booth space at a major trade show in Las Vegas. *Id.* at 56:24-25, 57:1-5.

17.     Mr. John dedicated an entire chapter in his book, *Rise and Grind*, to the Bakers because he wanted to help promote the Bakers and their Bubba's Q product to "millions" of people. *Id.* at 25:22-25, 26:1-5.

18.     Further, Mr. John used his influence to secure Bubba's Q and the Bakers a spot on the *Beyond the Tank* program, which provides viewers with updates on businesses that have appeared on *Shark Tank*. *Id.* at 26:7- 20.

19.     Mr. John believes he has contributed millions of dollars of his own intellectual property and energy into the Bubba's Q brand. *Id.* at 40:25, 41:1-10.

20.     Bubba's Q's use of Mr. John's intellectual property exists in perpetuity because Mr. John has appeared on television and written a book about the brand that will never go away. *Id.* at 46:6-17.

21.     At the outset of Mr. John's relationship with the Bakers, Mr. John and Mr. Fox attempted to help the Bakers find a co-packer that could help the company meet growing demand when the Bubba's Q Shark Tank episode aired. *Id.* at 56:1- 20.

22.     Mr. John specifically introduced the Bakers to multiple co-packers, including the largest co-packer and meat company in all of Canada. *Id.* at 56:14-15.

23.     The failure to secure a co-packer was detrimental to the Bubba's Q business. *Id.* at 61:4-11.

24.     Al Baker took responsibility for finding a co-packer for the business, and understood that Mr. John was going to walk away from the business altogether if Al Baker did not secure a co-packer. *Id.* at 62:15-21.

25.     In or around 2015, the Bakers introduced Mr. John to the Rastelli Parties, whom the Bakers wanted to bring into the business as co-packers. *Id.* at 21:12-15; 62:22-25; 373:16-23.

26.     Mr. John, the Bakers, and the Rastelli Parties created an entity called FOFBakers LLC (the "Company") to memorialize their business relationship. *Id.* at 21:16-22.

27.     The Bakers were represented by counsel for the entirety of the Operating Agreement's months-long negotiation process. *Id.* at 65:17-25, 66:1-8.

28.     The Operating Agreement for the Company defines Al Baker and Ray Rastelli, Jr. as managing members of the LLC. *See* DJ-1.

29.     Mr. John is the sole non-managing member of the LLC. Tr. at 22:22-25, 23:1-2; 372:9-10.

30.     Mr. John is not involved in the day-to-day operations of the Company, does not have access to the finances or business accounts of the Company, and is not able to participate in the management or control of the Company's business. *Id.* at 25:11-19; 67:24-25, 68:1-4, 371:21-25, 372:1-5.

31.     Only the managing members of the Company are responsible for daily operations, financial reporting, accounting, and running the business. *Id.* at 66:21-25, 67:1-2; 372:6-8.

32.    Instead, the Operating Agreement defines Mr. John as a brand ambassador – the "face of the brand" whose role would be to make business connections, provide marketing assistance, and promote the business on social media. *Id.* at 23:6-10; 68:17-25; 69:1-2.

33.    Since signing the Operating Agreement, Mr. John continued working as brand ambassador for the Company while also dedicating his team to helping initiate potential sales relationships, both with potential customers and platforms. *Id.* at 63:5-25, 64:12.

34.    As such, though Mr. John and his team brought multiple partnerships and platforms to the Company, after introductory phases the managers were responsible for "closing deals." *Id.* at 93:10-25, 94:1-11.

35.    The Operating Agreement contains a confidentiality provision that restricts all Company members from divulging proprietary data, information, or trade secrets. *Id.* at 69:11-21.

36.    The clause provides protection against giving other competitors an edge by learning the Company's "secret sauce," and allowed the business to operate without fear of damaging the brand or the Parties. *Id.* at 23:11-24; 70:1-25.

37.    The confidentiality clause specifically indicates that the Parties agreed violation of the clause would cause irreparable harm, for which injunctive relief would be the proper remedy. *Id.* at 71:21-25, 72:1-18.

38.    Around 2019, the Rastelli Parties brought an action against Defendants due to an ongoing business dispute (the "Prior Dispute") related to communications between the Parties. *Id.* at 72:22-25, 73:1-25, 170:1-3.

39.    Specifically, the Rastelli Parties brought the suit because they believed Al Baker was not fulfilling his role as manager of the Company, not being responsive, and not acting in the Company's best interest. *Id.*

40.    When the matter was brought to Court, an arbitrator ruled in the Rastelli Parties' favor as to all management issues. *Id.* at 74:5-8.

41.    After the arbitrator's ruling, Plaintiffs intervened in the remaining litigation. *Id.* at 74:16-21.

42.    The matter was then brought to mediation, in which the Parties all participated and were represented by counsel. *Id.* at 75:2-10.

43.    The Bakers had approximately four attorneys throughout the course of the mediation. *Id.* at 76:13-21.

44.    Magistrate Judge Joel Schneider was the assigned mediator at the mediation. *Id.* at 75:11-16, 171:22-25.

45.    To resolve the Prior Dispute, the Parties signed the Settlement Agreement. *Id.* at 26:21-25, 27:1-2.

46.    The Bakers were represented by counsel at the time the Settlement Agreement was finalized and signed. *Id.* at 76:22-25, 77:1.

47.     There is no evidence on the Settlement Agreement that Al Baker believed at the time of signing that he did not agree with the terms of the agreement, was signing under duress or otherwise being forced to sign the agreement, as he so claims. *Id.* at 178:6-14.

48.     Brittani Baker was a party to the Settlement Documents. *Id.* at 601:24-25, 602:1-3.

49.     The Settlement Agreement provided for the Bakers to receive a sum of $33,333 upfront and $100,000 divided into monthly installments, and altered their financial payments from the Company to involve a royalty of four percent on the first five million dollars in gross sales, with three percent on gross sales thereafter. *Id.* at 79:12-21.

50.     Mr. John's obligations and responsibilities to the Company remained the same after the Prior Dispute, and Brittani Baker understood his role to be a brand ambassador, help with marketing, and use his name and social media presence to help the business grow. *Id.* at 603:16-24.

51.     There is a non-disparagement provision in the Settlement Agreement to prevent any of the Parties from talking negatively about one another, as this would cause harm to the Parties or the brand. *Id.* at 27:15-25, 28:1-3.

52.     The provision states,

"Each party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker, and Sabrina Baker forever agree not to solicit, disrupt, interfere

with, disparage and/or defame any other party and such other party's employees, vendors, and customers, current and/or prospective, and those of any entity any such other party operates, has control of, or has any interest in. Each party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker, and Sabrina Baker forever agree not to make any written or verbal remarks or statements, even in the form of an opinion, about any other party to anyone including, but not limited to, any such other party's employees, vendors, and customers, current and/or prospective, and those of any entity any such other party operates, has control of, or has any interest in that are in any way negative, disparaging, or false or which could adversely impact the reputation, goodwill, credibility or value of any such other party or entity or could discourage current and/or prospective customers from buying products from them."

*Id.* at 77:15-25, 78:1-8.

53.    To Mr. Fox, this provision represented the Parties agreeing to "leave the past in the past" and move forward without speaking negatively about each other in an effort to have a harmonious business operation. *Id.* at 78:20-25, 79:1-11.

54.    The Settlement Agreement also indicates that a separate payment arrangement between the Rastelli Parties and Plaintiffs would be determined at a later date. *Id.* at 80:11-15.

55.    This clause was included due to the timing of the mediation to ensure that a resolution could be reached when the Parties were all together. *Id.* at 80:24-25, 81:1-20.

56.    After the mediation, the Rastelli Parties and Plaintiffs agreed that DF Ventures, LLC would receive a 1.7777 percent royalty on gross sales up to five

million dollars, and then a 1.3333 percent royalty on gross sales thereafter. *Id.* at 80:17-23.

57.    These percentages were exactly pro rata to the royalty percentages that Defendants' agreed to in the Settlement Agreement, based upon the ownership percentages in the Operating Agreement. *Id.* at 82:5-20.

58.    DF Ventures, LLC has received approximately $47,000 from the Rastelli Parties since the signing of the 2019 Settlement Agreement, while the Defendants have received in excess of two hundred and seventy-five thousand dollars. *Id.* at 82:1-4; Exs. ROOP 1-35; Pl. Compl., ECF No. 1, at Ex. G.

59.    Since the beginning of the Covid-19 pandemic, supply chain disruptions have severely impacted the amount of product the Company has to sell. Tr. at 94:12-16.

60.    Throughout 2022, supply of the product dropped such that sales went down. *Id.* at 499:5-17.

61.    As prior inventory levels became depleted, Plaintiffs were able to use their contacts to introduce a new supplier to the Company managers. *Id.* at 123:20-25.

62.     Plaintiffs received the recommendation for this new supplier through Mr. Fox's contact at Company X. *Id.* at 130:3-11.[12]

63.     Plaintiffs also worked with Defendants and the Rastelli Parties to investigate whether a sale of the company was possible during this time, but after extensive efforts, it became apparent that there was no interest. *Id.* at 113:3-25.

64.     Further, Mr. John has not received a formal or informal request from any of the managing members of FOFBakers LLC to do any further photo shoots, interviews, or other promotion than that which he has already completed for the Company. *Id.* at 48:13-19.

65.     Brittani Baker has made over fifty posts to multiple social media accounts about Mr. John and the Rastelli Parties since May 15, 2023. *Id.* at 185:14-17, 193:12-13.

66.     The social media accounts controlled by Brittani Baker include the TikTok account @bubbasqfoodtrucks, the Instagram account @bubbasqfoodtrucks, the Instagram account @bubbasq60, and the Instagram account @brittanibobaker. *Id.* at 192:21-25; 193:1-11.

---

[1] At various times throughout the hearing, the company referred to as Company X was also referred to as Company A. For the sake of clarity, this Brief only uses the pseudonym Company X.
[2] At no time did Company X express any interest in buying the Bakers' patent. Tr. at 129:23-25, 130:1-2.

67.     These posts make certain allegations about Mr. John and the Rastelli Parties' business dealings with Defendants. *Id.* at 179:11-18; 180:11-23; 181:8-10; 182:18-20; 184:4-10.

68.     The allegations made by Brittani Baker in these posts include: showing a picture of Mr. John with the word "thief" written on it; stating that "[her] family is so confident that fraud and illegal activity is taking place;" stating that she has "evidence on how the Rastellis and Daymond John were manipulating the numbers for their benefit;" stating "we know where it went [the $18 million dollars], to Daymond John, Larry Fox, Ray Rastelli, Jr. and Ray Rastelli, III;" and that "Daymond John and Rastelli Foods are trying to steal [her] family's business." *Id.* at 179:11-18; 180:11-23; 181:8-10; 182:18-20; 184:4-10.

69.     Al Baker agrees that these statements are negative. *Id.* at 180:24-25; 181:1-7; 182:13-17; 185:7-11.

70.     The videos also show business documents, including a spreadsheet prepared by the Rastelli Parties for all Company members regarding internal economics and metrics as well as an internal email from Ray Rastelli III detailing sales and marketing strategies and specific potential customers or vendors. *Id.* at 83:12-23; 85:2-11.

71.     These documents can be considered confidential to the Company. *Id.* at 83:24-25, 84:1; 85:12-14.

72.     Disclosing these documents could be harmful to the Company because they give the general public, including competitors, the ability to see what's "going on under the hood" of the business in terms of financial or operational details. *Id.* at 84:4-11, 85:18-25.

73.     Members of the public have made thousands of comments on Brittani Baker's videos, including, "I used to like Shark Tank, but now I hate their guts, especially Daymond John. Scam artists who don't help you but drain you financially. Facts;" "Daymond John, Shark Tank, unacceptable. Get them their money back;" "there's so much predatory behavior;" "Crook;" "Keep it coming. Sounds like Daymond should be sued at least and in prison probably. Something he's done must be criminal;" "Daymond John, crook;" "I knew he was a crook. I wish they would put him off the show;" "at Shark Tank, I'll never watch again, #crook. #scum;" and "Send your story to every TV station, news reporter, bloggers, meat bloggers, restaurant bloggers. Make it as much noise as possible. @Daymond John;" "Hooray. Keep Daymond John losing speaking engagements. I hope this cancels his useless ass forever;" "Now we can see how Daymond is now a billionaire, stealing;" "They really should kick Daymond John off the show;" and "I definitely unfollowed him and will never support a business venture he's attached to again." *Id.* at 30:24-25, 31:1-18, 32 1-21, 34:15-24.

74.     Brittani Baker responded to some of these comments saying "thank you for your support, "thank you," and "!!!!!" *Id.* at 31:19-23; 32:22-25; 33:1-4, 35:1-4.

75.     When Brittani Baker wrote a series of exclamation points in response to comments, her intent was to interact with the comments, emphasize the comments, and thank the commenters for their support. *Id.* at 201:5-10.

76.     In particular, Brittani Baker responded to the comment "Keep it coming. Sounds like Daymond should be sued at the least and in prison probably. Something he's done must be criminal" with the message "Thank you for your support," because she was pleased with the comment and supported the message's content. *Id.* at 198:19-25, 199:1-7.

77.     Brittani Baker agrees that someone saying that Mr. John is a criminal and should be in prison is negative. *Id.* at 199:14-17.

78.     However, Brittani Baker would not agree that calling someone a thief, crook, scumbag, or scam artist is negative, even if someone stood on the roof of a building and yelled "Brittani Baker is a thief." *Id.* at 203:9-25, 204:1-25, 205:1-22.[3]

79.     Brittani Baker responded "thank you" to a comment on her post that stated "I definitely unfollowed [Daymond John] and will never support a business venture he's attached to again," because she appreciated that the commenter would never want to work with a business that Mr. John supports. *Id.* at 202:11-23.

---

[3] Brittani Baker's responses to this line of questioning "really affect[ed] [her] credibility, according to this Honorable Court. 206:8-10.

18

80.     Brittani Baker responded "Exactly" to a comment stating, "So Daymond had never met Rastelli, but then when he did, they joined forces and played you? Am I getting that right?" *Id.* at 220:5-10.

81.     Brittani Baker's posts have been viewed over three million times.[4] *Id.* at 185:18-20.

82.     The Bakers want the information contained in these posts to be "out there." *Id.* at 186:19-22.

83.     The Bakers have no intention of stopping the posts. *Id.* at 187:11-13.

84.     Brittani Baker wants her message in these posts to be broadcast as much as conceivably possible, and to "share [her] story with as many people as [she] possibly can." *Id.* at 195:24-25, 196:1-2.

85.     Brittani Baker wants her posts to be shared with as many people as possible, and for everyone who has access to the internet to see them. *Id.* at 197:21-25, 198:1.

86.     Brittani Baker used hashtags such as #SharkTank, #DaymondJohn, and #foryoupage on her posts to increase the reach and visibility of her posts. *Id.* at 198:2-12.

---

[4] When videos get this many views on social media, the posts can be monetized, meaning that the poster can get paid between five and ten cents per view. Vol. 1 29:6-11. Posts with this many views can be incredibly impactful, as viewers speak to their family and colleagues about the videos they have seen and pass along the messages they have seen, whether they are positive or negative. Vol. 1 29:15-25, 30:1-7.

87.     Brittani Baker has no intention of stopping posting, commenting, or making videos about Plaintiffs. *Id.* at 206:13-16.

88.     Brittani Baker also re-routed the official Bubba's Q sales website to a different domain she owns. *Id.* at 87:2-25, 88:1-9.

89.     The new website no longer allows customers to purchase the Company's products, and instead contains the message, "Looking for boneless ribs? Sorry, they are not available right now. Unfortunately, working with Daymond John, Rastelli Foods, Larry Fox, Ray Jr., Ray Rastelli III, is a nightmare and I have to bring awareness to our story and fight for our product." *Id.* at 88:14-25, 89:1-3.

90.     The Rastelli Parties received an email on or around June 13, 2023 indicating that Brittani Baker attempted to adjust the ownership of the Bubba's Q sales website's Shopify account to herself. *Id.* at 353:12-125, 354:1-21.

91.     Additionally, Brittani Baker created a GoFundMe page that states, "We are the Bakers, a family-owned business that experienced the American dream turned into a nightmare. Our success on Shark Tank caught the attention of viewers everywhere, but little did we know the deception that awaited us from Daymond John and Rastelli foods." *Id.* at 221:9-17.

92.     The GoFundMe page also states, "We are seeking your support to fund our legal battle against these unethical practices." *Id.* at 222:8-9.

93.     During the week that Defendants started making these posts, Mr. John had a television show that had been greenlit by a major network cancelled, lost a speaking engagement, and had a potential brand activation partnership halted. *Id.* at 1 35:16.

94.     Mr. John is also aware that, due to the sheer number of views on the Bakers' posts, they have the potential to have greater impact on "[him]self, [his] earnings, and [his] family for the future, [his] reputation to walk into public companies as well as governments and various other things to represent them as an honest person who will deliver on [his] word and any of the type of good, inspirational things that [he] tr[ies] to put out so that people can inspire themselves and empower their families." *Id.* at 35:21-25, 36:1-3.

95.     Mr. John believes that the posts will also negatively impact his performance on Shark Tank, as entrepreneurs who have seen posts calling him a thief and saying he is stealing a family's business will not want to do business with him. *Id.* at 36:6-14.

96.     Further, as Mr. John's Shark Tank contract expires at the end of each season, he is concerned that the contract may not be renewed due to the Bakers' conduct. *Id.* at 52:2-17.

97.    The Bakers, according to their attorney, do not have any evidence of a breach of the Settlement Agreement by Plaintiffs beyond Brittani Baker's opinion. *Id.* at 523:6-13; 524:9-18; 525:1-15.

98.    Brittani Baker indicated that the Bakers' claims are grounded in their belief that Plaintiffs and the Rastelli Parties are not engaging in "fair business dealings" because they do not trust the financial information provided to them, but could not point to any documentary evidence that such information was, in fact, inaccurate. *Id.* at 693:23-25; 694:1-9.

99.    Brittani Baker further testified that the source of her knowledge regarding her allegations related to the "confidential" payment arrangement between Mr. John and the Rastelli Parties was that she and her family didn't know what the arrangement was. *Id.* at 694:10-18.

100.   Mr. Fox testified on the record as to the exact nature of the payment arrangement between DF Ventures LLC and the Rastelli Parties that was agreed upon after the Settlement Agreement, and such agreement has been placed into evidence. *Id.* at 80:17-23; 82:1-4.

101.   Al Baker does not have money to travel, and his only income consists of Social Security and a small NFL pension. *Id.* at 187:14-18; 188:6-11.

102.   Al Baker owned a restaurant, but it closed in 2019. *Id.* at 187:21-24.

103.    The Bakers also lost their house and had their car repossessed. *Id.* at 188:1-5, 450:23-25.

104.    FOFBakers Holding LLC has no assets, and Jabezbaker LLC does not have any assets beyond the Bakers' patent. *Id.* at 188:22-25; 189:1-6.

105.    The only money from FOFBakers Holding LLC that Al Baker could use to pay a debt are the royalty payments received through the Company. *Id.* at 189:19-25.

106.    Al Baker testified that the Bakers would not be able to pay a judgment of monetary damages. *Id.* at 450:14-18.

107.    Al Baker stated on the record that Sabrina Baker was not a member of FOFBakers Holding Company LLC, and that he did not recall Sabrina Baker being a member of that entity. *Id.* at 435:11-15.

108.    In a court filing related to the Prior Dispute, Sabrina Baker is listed as a member of FOFBakers Holding Company LLC. DJ-1.

109.    Brittani Baker stated on the record that, since the Court's June 16 Order, she had not "been on social media," "made any updates," "made any posts," or "done anything" on her accounts. Tr, at 629:14-22.

110.    Brittani Baker also stated that she had not made any changes to her website since she re-routed the website bubbasqbonelessribs.com to her domain bbqconsulting.com. *Id.* at 629:20-25, 630:1.

111.   Brittani Baker thereafter altered her story and testified that she had, in fact, changed the bios of her Instagram and TikTok pages after the Court's June 16 Order under the advice of her attorney, as they contained a "negative" comment. *Id.* at 703:6-14.

112.   A pop-up link on bbqconsulting.com prompting viewers to subscribe for email updates regarding the Bakers' "nightmare" did not exist on or around May 30, but existed as of June 29. *Compare* DJ 22 *and* DJ 28.

113.   Brittani Baker then testified that she wanted to use the subscription box to help her share her story if her social media posts were taken down. *Id.* at 702:21-25.

114.   Prior to the Court's June 16 Order, Brittani Baker had unfettered access to social media to post new videos updating her story and the creation of such subscription box was not necessary for her to update her followers until after the Court's June 16 Order.

### III.   <u>CONCLUSIONS OF LAW</u>

**A.   Defendants Breached their Contracts with Plaintiffs**

1.   **Defendants Disparaged Plaintiffs in Violation of the Settlement Agreement**

The non-disparagement provision of the 2019 Settlement Agreement states that all Parties:

"Forever agree not to make any written or verbal remarks or statements, even in the form of an opinion, about any other party to anyone including, but not limited to, any such other party's employees, vendors, and customers, current and/or prospective, and those of any entity any such other party operates, has control of, or has any interest in that are in any way negative, disparaging, or false or which could adversely impact the reputation, goodwill, credibility or value of any such other party or entity or could discourage current and/or prospective customers from buying products from them."

Proposed Statements of Fact ("PFOF") at ¶52. In the approximate one month timespan between mid-May and June 16, 2023, the Bakers made around fifty separate posts to various social media accounts detailing a conspiracy that Plaintiffs and the Rastelli Parties are attempting to steal their business, that working with Plaintiffs has been a nightmare, that Mr. John is a thief, that Plaintiffs and the Rastelli Parties have conspired to conceal income from the Bakers, and that Mr. John has otherwise used deceptive business practices in his dealings with the Bakers. PFOF at ¶68. Brittani Baker made clear that she wants her posts to be shared with as many people as possible, and for everyone who has access to the internet to see them. PFOF at ¶¶84-85. In addition to making these posts, the Bakers appeared for a live news interview on a Cleveland television station on June 15, 2023 to discuss this Hearing and further disseminate their claims against Plaintiffs.

At the same time, Brittani Baker also re-routed the official Bubba's Q sales website to a different domain she owns, which has the following heading: "Looking for boneless ribs? Sorry, they are not available right now. Unfortunately, working

with Daymond John, Rastelli Foods, Larry Fox, Ray Jr., Ray Rastelli III, is a nightmare and I have to bring awareness to our story and fight for our product. PFOF at ¶¶88-89. The new website does not allow customers to purchase Bubba's Q products. *Id.* Additionally, Brittani Baker is soliciting funds on a GoFundMe page that states, "We are the Bakers, a family-owned business that experienced the American dream turned into a nightmare. Our success on Shark Tank caught the attention of viewers everywhere, but little did we know the deception that awaited us from Daymond John and Rastelli foods." PFOF at ¶¶91-92. The GoFundMe page also states, "We are seeking your support to fund our legal battle against these unethical practices." *Id.*

By the plain language of the Settlement Agreement, Defendants have disparaged Plaintiffs. Defendants have not – and cannot – argue that their conduct constitutes anything but "negative, disparaging, or false" statements. In fact, Al Baker admitted that Brittani Baker's statements in these posts were negative. PFOF at ¶69. Brittani Baker began her testimony agreeing that calling someone a criminal and saying someone should be in prison is negative, but quickly switched her tune, insisting that calling someone a thief, crook, scumbag, or scam artist is not negative, even if someone stood on the roof of a building and yelled "Brittani Baker is a thief." PFOF at ¶¶77-78. The Bakers' own attorney instructed them to take down the "bio"

26

sections of the @bubbasqfoodtrucks TikTok and Instagram accounts specifically because they were negative. PFOF at ¶111.

It is also abundantly clear that these posts are adversely impacting Plaintiffs' "reputation, goodwill, credibility, or value." The thousands of comments on these posts – which have been viewed well over three and a half million times at the time of writing – include dozens upon dozens of particularly harsh and vitriolic attacks on Mr. John's character that are entirely in line with Brittani Baker's incitement. The comments include, but are not limited to, "I used to like Shark Tank, but now I hate their guts, especially Daymond John. Scam artists who don't help you but drain you financially. Facts;" "Daymond John, Shark Tank, unacceptable. Get them their money back;" "there's so much predatory behavior;" "Crook;" "Keep it coming. Sounds like Daymond should be sued at least and in prison probably. Something he's done must be criminal;" Daymond John, crook;" "I knew he was a crook. I wish they would put him off the show;" "at Shark Tank, I'll never watch again, #crook. #scum;" and "Send your story to every TV station, news reporter, bloggers, meat bloggers, restaurant bloggers. Make it as much noise as possible. @Daymond John;" "Hooray. Keep Daymond John losing speaking engagements. I hope this cancels his useless ass forever;" "They really should kick Daymond John off the show;" and "I definitely unfollowed him and will never support a business venture he's attached to again." PFOF at ¶73. Rather than correct her viewers or express any kind of

disagreement with these comments, Brittani Baker instead chose to thank these commenters for their support and emphasize their words. PFOF at ¶¶74. Such action is clear evidence that the Bakers' intent is to inflict incurable reputational damage.

The Settlement Agreement is a valid contract agreed upon by all Parties after a mediation before Magistrate Judge Schneider. PFOF at ¶44.Though the Bakers attempted throughout the Hearing to call the legitimacy of this agreement into question, the facts make clear that this contention is devoid of factual merit. The Bakers were represented by multiple attorneys throughout the mediation and settlement process, and were heavily involved in negotiating the terms of the Settlement Documents themselves. Brittani Baker admitted on the record that she was party to the Settlement Documents. Further, the Settlement Documents themselves are devoid of any indication that Al Baker felt he was signing under duress or that he did not agree to the terms memorialized in the documents. Al Baker's signatures on behalf of himself, his wife, his daughter, FOFBaker Holding Company, LLC, and Jabezbaker, LLC, are valid and binding. Despite Al Baker's false claim that Sabrina Baker is not involved with his family's LLCs, a filing in the Prior Dispute confirms that both Sabrina Baker and Brittani Baker are members of FOFBakers Holding Company, LLC, and are therefore bound by the agreement due to their membership in the LLC as well as individually.

Finally, the Bakers have not so much as begun to develop a cognizable theory to support their allegation that Plaintiffs have breached the Settlement Agreement. The record is so devoid of evidence of any breach by Plaintiffs that this Honorable Court asked Defendants' attorney why Plaintiffs were even involved, after he could not so much as point to a provision of the Settlement Agreement that Plaintiffs had breached. Any alleged issues the Bakers may have had related to financial accounting or management communications do not pertain to Plaintiffs, who, as non-managing members of the Company, did not have access to the Company's financial information and were prohibited from taking any action on behalf of the Company other than the brand ambassador duties specifically outlined in the Operating Agreement. Defendants simply have no argument that their obligations to Plaintiffs under the Settlement Documents should be excused.

2. **Defendants Breached the Confidentiality Provision of the Operating Agreement**

The Bakers' violation of the Operating Agreement's confidentiality provision is equally clear. The confidentiality mandates that:

> Each of the Members shall, during the term of this Agreement and at all times thereafter, maintain in confidence all confidential and proprietary information and data of the Company and of the other Members and their Affiliates, (each, a "disclosing party") disclosed to it (the "Confidential Information"). Each of the Members further agrees that it shall not use the Confidential Information during the term of this Agreement or at any time thereafter for any purpose other than the performance of its obligations or the exercise of its rights under this Agreement. The

29

> Company and each Member shall take all reasonable measures necessary to prevent any unauthorized disclosure of the Confidential Information by any of their employees, agents or consultants.

DJ-1. Brittani Baker's posts contain several internal communications, including emails and profit and loss reports, that disseminate exactly the type of proprietary information that this clause seeks to insulate from disclosure. For example, several of Brittani Baker's posts include a spreadsheet that was identified by witnesses, including Mr. Fox, as a monthly profit and loss calculation for the Company. The publication of this spreadsheet is harmful to the Company because it allows competitors to see "under the hood" of the business in terms of profits made from individual partnerships as well as costs incurred on a monthly basis. By that same token, Brittani Baker publicly displaying an internal email from Ray Rastelli, III was detrimental to the Company. For members of the general public, including competitors, to be able to analyze internal Company strategies, including potential partner outreach, gives others the opportunity to seek out these potential customers and potentially compete with the Company based upon this information. Furthermore, Brittani Baker's actions have clearly damaged the Company's business relationships, both with the entities specifically mentioned in the internal documents and with any other entities who could potentially do business with the Company, as these entities would be reasonable in re-thinking any partnership with business

partners who so freely display private information to their own detriment. It would be illogical to conclude otherwise.

Again, the Operating Agreement is a valid, enforceable contract to which all Parties are bound. The Bakers were represented by counsel for the entirety of the negotiation process related to the Operating Agreement. Moreover, the Bakers have failed once more to provide any documentary evidence whatsoever that Mr. John has breached the Operating Agreement such that their own obligations have been excused. To the contrary, Mr. John has gone above and beyond in promoting and supporting the Company. When product supply dwindled due to Covid-19, Mr. John directed his team to continue assisting the Company in any way possible, which included working with a private company over a period of months to determine whether the Company could be sold, as well as utilizing business contacts to secure a new product supplier so that the Company could replenish its supply and begin sales again. The Bakers' decision to take out their frustrations about the bumps in the road common to many businesses over the past few years on Mr. John is illogical, insulting, and devoid of factual backing.

**B.    Injunctive Relief is the Proper Remedy for Defendants' Breaches**

First and foremost, the specific language of the Operating Agreement affirms that the Parties understood any breach of this provision would result in irreparable harm, and that injunctive relief would be the proper remedy for any such breach. DJ-1. The language of this valid, enforceable contract should control.

Furthermore, it has been recognized in the Third Circuit that loss of business opportunities, trade, and goodwill result in irreparable harm. *Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."); *Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) ("Generally, the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm.").

Courts consistently find irreparable harm in situations where business reputation or disclosure of confidential information are at stake. *See, e.g., Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will."); *Chemetall US Inc. v. LaFlamme*, No. 16-780, 2016 U.S. Dist. LEXIS 29644, at *53-54 (D.N.J. Mar. 8, 2016) (holding "an imminent possibility of disclosure of confidential information is sufficient to support a finding of irreparable harm"); *Ride the Ducks of Phila., LLC v. Duck Boat Tours, Inc.*, 138 Fed. Appx. 431, 434 (3d Cir. 2005) (concluding that "the loss of market share may be an irreparable injury").

Moreover, where the non-disparagement clause of a contract is the subject of an alleged breach where injunctive relief is sought, it is widely held in this

Circuit that injunctive relief to correct the disparaging conduct is appropriate. For example, this very Court recently held in *Moreno v. Tringali* that, where the parties had signed a settlement agreement with a non-disparagement provision, a defendant's remarks on a website about the plaintiff stealing, scamming, and defrauding painted the plaintiff in a negative light in violation of the non-disparagement provision. 2017 U.S. Dist. LEXIS 99462 (June 27, 2017). The Court found that injunctive relief was an appropriate remedy, and ordered the defendant to remove the statements on his website and social media posts, permanently cease and desist from disparaging the plaintiffs, and enjoined the defendant from aiding or assisting others in making disparaging statements against the plaintiff. *Id.* Notably, the Court made clear that, where there is a valid, enforceable non-disparagement provision, the injunctive relief can be granted purely based on an analysis of whether the contract has been breached, rather than any analysis of whether the underlying statements were defamatory or malicious. *Id.* Multiple other claims for injunctive relief have been granted on the same basis.

Importantly, where a contractual obligation limits speech through a non-disparagement provision, there are no First Amendment implications to enforcing the contract by granting injunctive relief. *See USA Techs., Inc. v. Tirpak*, No. 12-2399, 2012 U.S. Dist. LEXIS 72318, at *22-24 (E.D. Pa. May 24, 2012) (holding that, because "the parties knowingly, intelligently, and voluntarily waived their rights to free speech through an unambiguous agreement negotiated by the parties" injunctive relief was appropriate in

response to a breach of the contract); *Great Caesars Ghost LLC v. Unachukwu*, No. CIV 19-5408, 2020 WL 2394052 at *4 (D.N.J. May 12, 2020) (explaining that, where injunctive relief is sought due to alleged breach of a contractual non-disparagement clause, injunctive enforcement of the contractual obligations does not cause significant enough harm to Defendants to warrant denial of the relief requested).

Moreover, injunctive relief "is particularly appropriate where the defendant has shown no inclination to discontinue an ongoing course of tortious activity." *ThermoLife Int'l LLC v. Connors*, No. CIV. 2:13-4399 KM, 2014 WL 1050789 (D.N.J. Mar. 17, 2014). The *ThermoLife* Court also made clear that whether a defendant is judgment-proof is a factor to consider when determining the need for injunctive relief. *Id.*

Here, all factors weigh in favor of injunctive relief. After negotiations before a Magistrate Judge in this very Court, during which all Parties were represented by counsel, the Parties agreed to the Settlement Agreement containing a broad non-disparagement provision. The Parties included this provision as a necessary guarantee that all involved were prepared to leave the Prior Dispute in the past and move forward as productive business partners without fear that they would act in ways that were harmful to one another. All Parties understood the meaning of this provision when it was signed, and understand the provision today.

Nevertheless, Defendants have engaged in a calculated campaign to destroy Mr. John's reputation through a series of negative, harmful, and untrue

social media posts that have reached millions of viewers. These posts, as described in more detail *supra*, have already had a tangible impact on Mr. John's business, including a cancelled speaking engagement, halted television program, and paused brand partnership activation. However, the true harm of these posts reverberating through the international online community remain to be seen. Mr. John is worried that his contract with Shark Tank will not be renewed, and even if he continues on with the show, businesses will not want to make deals with him because of the disparaging information about him. This disparaging information, at this juncture, is online for eternity, and Mr. John will continue to feel the consequences of these posts for the rest of his life absent a Court order mandating their removal. Mr. John has worked relentlessly for over three decades to build his reputation, which is the cornerstone of his successful career. Mr. John's ability to help entrepreneurs like the Bakers hinges on his ability to call on business relationships and provide access to partnerships based on his good name and reputation in the business community. The damage that has been done by the Bakers does not only have negative financial implications – it threatens to upend his livelihood and his legacy.

The Bakers' attempts to rely on the First Amendment to protect their false and disparaging speech is misguided, as they knowingly and willingly contracted to limit their own free speech in perpetuity. There are no constitutional concerns here – Plaintiffs seek injunctive relief based on Defendants' breaches of two separate agreements, so the analysis need not extend beyond breach of contract. Though Plaintiffs have already shown, and

will ultimately be able to show in more detail, the true extent to which the Defendants' statements are defamatory, this issue is not currently before the Court.

Finally, the Bakers themselves admit that they would not be able to pay any financial judgment. If this Court were to assess monetary damages alone for the breaches of the Operating Agreement and Settlement Documents, Plaintiffs would be without relief whatsoever, and would instead have to expend time and resources collecting from Defendants who have already stated on the record that they are judgment proof. This would also come at the expense of the Company – whereas injunctive relief would remove the disparaging content from the public sphere and prevent future posts such that the Parties could begin to heal and reassess their communications, any financial judgment would act as a continuing wedge between the Parties such that any future business relationship or resolution would be unworkable.

## C. Defendant Brittani Baker Perjured Herself at the Hearing

Finally, Brittani Baker's conduct throughout this Hearing warrants discussion. Specifically, it is clear that Brittani Baker perjured herself on the record in an attempt to conceal her social media activities. On June 16, this Honorable Court issued an Order granting temporary restraints to prevent Defendants from making any further social media posts or public statements about Plaintiffs and the Rastelli Parties until the Hearing concluded.

Thereafter, Plaintiffs noticed a change to bbqconsulting.com, the website to which Brittani Baker illicitly re-routed all traffic from the bubbasqbonelessribs.com sales website. A pop-up that had not been previously visible prior to the Court's June 16 Order appeared, inviting viewers to provide their email addresses to subscribe for updates related to the Bakers' "nightmare" working with Plaintiffs and the Rastelli Parties. Brittani Baker denied on the record making this change after the June 16 Order, even going so far as to say that the pop-up had been visible ever since she made the initial re-route change to the website, and that she had not made any changes to the website whatsoever since that time. However, a comparison between Plaintiffs' initial exhibit containing a screenshot of the website bbqconsulting.com from on or about May 30, 2023 and a recent screenshot of the website confirm that the pop-up was not present when Plaintiffs initially observed the bbqconsulting.com website. *Compare* DJ 22 *and* DJ 28. Though Defendants had ample opportunity to proffer documentary evidence of the date when the pop-up was added, they failed to do so. Considering the extent to which Brittani Baker destroyed her own credibility throughout the course of her testimony, her statement on the record that she added the pop-up prior to the Court's June 16 Order should not be credited.

Furthermore, Brittani Baker also stated on the record that she had not "been on social media," "made any updates," "made any posts," or "done anything" on her accounts. 629:14-22. However, Brittani Baker had made visible changes to both her

Instagram and TikTok accounts after June 16. When pressed further, Brittani Baker changed her story testified that she had, in fact, changed the bios of her Instagram and TikTok pages under the advice of her attorney, as they contained a "negative" comment. 703:6-14.

Such deliberate, provable falsehoods on the record should not be tolerated by this Honorable Court. Plaintiffs respectfully seek all available remedies for this misconduct, including, but not limited to, monetary sanctions and an adverse inference.

## IV.    <u>CONCLUSION</u>

The evidence presented at the Hearing demonstrates that Plaintiffs are entitled to permanent injunctive relief, in the form of: (1) compelling defendants to remove all social media posts related to Plaintiffs and/or their Affiliates from the websites or applications to which they were posted, including, but not limited to, Facebook, Twitter, Instagram, and TikTok; (2) compelling Defendants to remove all social media posts related to the L.A. Times article referenced in the Verified Complaint (the "Article") from the websites or applications to which they were posted, including, but not limited to, Facebook, Twitter, Instagram, and TikTok; (3) prohibiting Defendants from directly or indirectly making further disparaging or defamatory remarks against Plaintiffs and/or their Affiliates or disclosing or discussing any further Confidential Information pursuant to the Operating

Agreement or Settlement Agreement; (4) prohibiting Defendants from directly or indirectly participating in interviews with media outlets related to their relationship and dealings with Plaintiffs and/or their Affiliates; (5) prohibiting Defendants from continuing to directly or indirectly publicize, disseminate, refer to, re-post, or otherwise direct people to view the Article; and (6) prohibiting Defendants from continuing with their stated plan to host a radio or podcast show wherein they will directly or indirectly discuss their allegations against Plaintiffs and/or their Affiliates.  Plaintiffs, therefore, request that this Honorable Court grant Plaintiffs all requested relief, as well as any additional relief that this Honorable Court deems to be just and proper. Plaintiffs further reserve the right to make an application for attorneys' fees and costs upon determination that Plaintiffs are the prevailing party in this action.

DATED AND SUBMITTED this 13th day of July, 2023.

**GORDON & REES**

By: */s/Mercedes Colwin*
Mercedes Colwin, Esq.
Brittany Primavera, Esq.
Lindsey Blackwell, Esq.
Hannah Kucine, Esq.
1 Battery Park Plaza, 28th Floor
New York, New York 10004
(212) 269-5500
mcolwin@grsm.com
bprimavera@grsm.com
lblackwell@grsm.com
hkucine@grsm.com
*Counsel for Plaintiffs DF Ventures, LLC and Daymond John*

TO: All Parties *via* ECF

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **DF VENTURES, LLC, and DAYMOND JOHN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Index No. 1:23-cv-03126** |
| | ) | |
| **FOFBAKERS HOLDING COMPANY, LLC,** | ) | **CERTIFICATE OF SERVICE** |
| **JABEZBAKER, LLC, JAMES A. BAKER a/k/a AL** | ) | |
| **BAKER**, *individually*,  **BRITTANI BO BAKER,** | ) | |
| *individually*, **and SABRINA BAKER,** *individually*, | | |
| | | |
| **Defendants.** | | |

I, Hannah Kucine, Esq., do hereby certify that I caused Plaintiffs DF Ventures, LLC and

Daymond John's Post-Hearing Brief and this Certificate of Service to be electronically filed on

July 13, 2023, as well as true and accurate copies of these documents to be served via email and

regular mail upon Defendants' counsel, identified below:

> Law Offices of Alexander Schachtel, LLC
> Alexander Schachtel, Esq.
> 101 Hudson Street, Suite 2109
> Jersey City, NJ 07302
> xschachtel@gmail.com

> **GORDON & REES**
>
> By: */s/Hannah Kucine*
> Mercedes Colwin, Esq.
> Brittany Primavera, Esq.
> Lindsey Blackwell, Esq.
> Hannah Kucine, Esq.
> 1 Battery Park Plaza, 28th Floor
> New York, New York 10004
> (212) 269-5500
> mcolwin@grsm.com
> bprimavera@grsm.com
> lblackwell@grsm.com
> hkucine@grsm.com
> *Counsel for Plaintiffs DF Ventures,*
> *LLC and Daymond John*

1124311/38413564v.1

40