# EXHIBIT A

1  Q.  Good morning, Mr. John.  A lot has been written about your

2  background.

3      Can you tell us in your own words your background and how

4  you developed your reputation?

5  A.  Yeah.  I grew up in a very poor neighborhood and I created

6  a company, a clothing company, at the age of 19 years old.  As

7  far as bias and inclusive of a culture.  I failed that company

8  several times until the age of 28 years old, then I was able to

9  employ thousands of people over that period of time, do

10  thousands of deals globally.

11      I then started to invest in other people's dreams prior to

12  getting on the show called Shark Tank.  I would publish to

13  today, my last book, six books, talking about empowering other

14  people, the power of broke, how people can maximize their time

15  and life.  And my recent one is about empowering young kids and

16  families on how to have financial intelligence so that they

17  have a better chance at success.

18      I got casted onto a show called Shark Tank in 2007 when

19  nobody could find any money from the banks to help other

20  entrepreneurs invest in their dreams.  And that's how I'm here,

21  by usually being on a lot of the networks, talking about

22  entrepreneurship, empowering people.  And I recently have

23  something called Black Entrepreneurs Day where this year we

24  will invest up to $1 million -- not invest, sorry.  Give, grant

25  $1 million to small businesses.

1   Q.   Mr. John, how do you use your reputation in the

2   marketplace?

3   A.   My reputation is about trust.  My reputation is about

4   anybody can make it.  I am the only African American on major

5   network for the last 15 years that didn't come from music,

6   sports, or politics.  I am -- I am the example of the American

7   dream.

8        I speak for everybody from -- during the pandemic, I went

9   to speak for President Bush at his library, I speak for

10   President Obama, I speak regularly about entrepreneurship.

11   I do represent AARP, Chase, and various other brands and

12   public companies about trust and how people can invest in

13   themselves, as well as in brands to help build their network

14   and educate --

15             (Court reporter interruption.)

16             THE WITNESS:  I said something about building network

17   -- or their education or empower themselves.

18   BY MS. COLWIN:

19   Q.   You had mentioned just moments ago that you -- what

20   opportunities are provided to -- withdrawn.

21        You mentioned moments ago in your testimony that you

22   started with Shark Tank.  In any of the businesses that you've

23   invested in, have you ever been involved in the day-to-day

24   operations of those businesses?

25        And I'm talking strictly about the business that you

1   invested on Shark Tank?

2   A.   No, I'm not.

3   Q.   And with respect to the businesses that you invest in as a

4   result of Shark Tank, what types of opportunities do you give

5   to those businesses?

6   A.   I give them public access; I help them on social media; I

7   broker deals with other companies that can give them

8   distribution, you know, shell space, financing; I advise them,

9   I talk to retailers.

10       Whatever way that I can get them to not have to pay

11  everyday, you know, people and/or services and get their brand

12  out there and put a bullhorn on themselves or their brand to

13  extend it to all the customers out there.

14  Q.   In order to do what you do for these businesses on Shark

15  Tank, your reputation and your brand, what is essential to

16  them?

17  A.   It's trust.

18  Q.   An essential --

19  A.   Nobody will trust anybody.

20       I am sorry.  You broke up.

21  Q.   No, you said -- you answered my question, Mr. John.

22       The essential traits that's needed for you to help these

23  businesses, what is that?

24  A.   Yeah, trust.  Nobody would want to work with anybody who

25  is a thief or, you know, a bad person.

JOHN - DIRECT - COLWIN

1    Baker?

2    A.   I do.

3    Q.   And Brittani Baker and Al Baker came to make their

4    presentation as Bubba's Q boneless ribs on Shark Tank; is that

5    right?

6    A.   Correct.

7    Q.   And aside from the financial investment you made in

8    the Bakers' business, give us examples of what you did for

9    them?

10   A.   I went around to several businesses; I have waived any of

11   my speaking and public appearance fees to speak for people,

12   like Carl's Jr. for them, and Hardee's; I went and did a tour

13   to go around to all of those businesses; I attended trade

14   shows; I funded some trips and various other things of that

15   nature; put them on my social media; I've done interviews with

16   them, as well as put them in one of my books because I believed

17   in the product and in the brand.

18        I did as much as I could.  I assigned my team to help with

19   all of the social media and various other things and

20   connections and making calls on their behalf.

21   Q.   You said when you assigned this to a team member,

22   was that team member who was your project member, Larry

23   Fox?

24   A.   That is correct.

25   Q.   And Larry Fox is a minority member of DF Ventures; is that

1   right?

2   A.   That is correct.

3   Q.   And you mentioned just moments ago, Mr. John, that you

4   waived your speaking engagement fees; is that right?

5   A.   That is correct.

6   Q.   How much, the range of what you're paid for for speaking

7   engagements, what is that?

8   A.   75 to $100,000, but it can go up to about 150.  But the

9   daily also of what we would call activations, the day to show

10  up to various places and be the face of things, can range for

11  about 250,000 a day.

12  Q.   Do you know the Rastellis, Mr. John?

13  A.   Yes, I do.

14  Q.   Do you know -- how do you know them?

15  A.   Al Bubba Baker introduced me to them.

16  Q.   Now, does there come a time that there's a

17  partnership between DF Ventures, the Bakers, and the

18  Rastellis?

19  A.   Yes.

20  Q.   And there was a partnership that was created, was called

21  FOFBakers, LLC; is that correct?

22  A.   Yes.

23  Q.   And as part of the creation of FOFBakers, LLC, an

24  operating agreement was created amongst the three of you,

25  correct?

1          Is that right, an operating agreement --

2    A.   Yes.  An operating agreement was created, yes.

3          MS. COLWIN:  And, Your Honor, with your permission,

4    I'd just like to publish for identification DJ-1.

5          THE WITNESS:  You're frozen.

6          MS. COLWIN:  I'm frozen?

7          THE WITNESS:  Now I can hear you.

8          MS. COLWIN:  I just ask Your Honor --

9          THE COURT:  What is the document?

10         MS. COLWIN:  The document is the operating agreement,

11   Your Honor.

12         I wanted to --

13         THE COURT:  Any objection?

14         Yeah, it's going to be admitted into evidence.

15         Nobody has any objection, correct?

16         MR. DAHAN:  No objection, Your Honor.

17         MR. BAKER:  No objection, Your Honor.

18         THE COURT:  Okay.  It's admitted into evidence.

19         (EXHIBIT DJ-1 WAS RECEIVED IN EVIDENCE.)

20         MS. COLWIN:  Thank you, Your Honor.

21   BY MS. COLWIN:

22   Q.   Pursuant to the agreement, what is your position of

23   FOFBakers, LLC?

24   A.   I'm a minority shareholder.

25   Q.   Are you a managing member?

 1  A.   I am a --  I am not.  I am a spokesperson, for the most

 2  part.

 3  Q.   Now, your role at FOFBakers is identified in the operating

 4  agreement; is it not?

 5  A.   Yes.

 6  Q.   And according to the operating agreement, what was your

 7  role at FOFBakers in your terms?

 8  A.   To expand their brand social media wise, make connections

 9  for their brand, and be the face of the brand to extend the

10  brand out to the market.

11  Q.   Now, there's also confidentiality provision in this

12  operating agreement; is that right?

13  A.   Yes.

14  Q.   And in your experience as an entrepreneur, how important

15  are these confidentiality provisions?

16  A.   Extremely important.

17  Q.   Why do you say that, Mr. John?

18  A.   The confidentiality agreement allows us to operate as

19  partners and not give away trade secrets and various other

20  information to give other competitors the edge and/or to speak

21  negatively necessarily about each other, damaging the entire

22  business and whatever investments are being held in the

23  business, also damaging the brand of the business and/or each

24  individual.

25          MS. BRITTANI BAKER:  The brand of our business.

1    A.   It could hurt anybody's brand, especially if they're being

2    edited and words are being extracted and/or just projected out

3    there; it could hurt the trust of the brand or the trust of

4    myself; and it can also give competent -- or confidentiality

5    about the process or the strategies of the brand.  It's like

6    giving another team your playbook.

7    Q.   To your knowledge, who has the financial control of

8    FOFBakers, LLC?

9    A.   The managing director, which could be the Bakers and the

10   Rastellis.

11   Q.   Are you involved in any of the day-to-day operations on

12   the accounting side of FOFBakers?

13   A.   No, I'm not.

14   Q.   Are you a signatory in any of the business accounts for

15   FOFBakers?

16   A.   No, I'm not.

17   Q.   Are you able to move any of the finances for FOFBakers,

18   LLC?

19   A.   No, I'm not.

20   Q.   You've written several business books and you mentioned

21   that in the earlier testimony that you gave.

22        These books -- one of these books, Rise And Grind, you

23   mention the Bakers; is that right?

24   A.   Correct.  I dedicated a chapter to them.

25   Q.   Why did you include them in your book?

1   A.   I believe in the Bakers and I believe in the product and I

2   wanted to utilize my platform to get their story out, as well

3   as about them, into millions of hands and in an inspirational

4   form where people would not only believe in the product, but

5   believe in the people behind it.

6   Q.   Did you have influence -- withdraw.

7        What, if any, influence did you have in including the

8   Bakers in the Beyond the Tank and the Shark Tank

9   updates?

10  A.   All the influence.  I have about 40 investments at the

11  time on the Shark Tank.  And to give that platform of

12  millions and millions of viewers to see the story of the Bakers

13  and their story and getting them to be able to get to a

14  company to a level that they had failed prior to, now have

15  success and have product out there in the market and a

16  capable way of getting out to the market is an ongoing

17  commercial.

18       It's something that runs on CNBC -- Shark Tank runs on

19  CNBC 40 times a week and it's viewed by CEOs and various other

20  people.  So it's an ongoing commercial.

21  Q.   Did there come a time that you were made aware that the

22  managing members of FOFBakers, LLC, the Rastellis, and the

23  Bakers were in a business dispute?

24  A.   Yes.

25  Q.   And to your understanding, there was a resolution that

1   materialized in the settlement agreement; is that right?

2   A.   Yes.

3   Q.   And in the settlement agreement, there's a non --

4          MS. COLWIN:  And, Your Honor, I just would like to

5   note for the record -- and I'm assuming there's going to be no

6   objection to the admission -- DJ-2 is the settlement agreement

7   pertaining to FOFBakers.

8          THE COURT:  Any objection?

9          MR. DAHAN:  No objection, Your Honor.

10          MR. BAKER:  No objection, Your Honor.

11          THE COURT:  All right.  It's admitted into evidence.

12          (EXHIBIT DJ-2 WAS RECEIVED IN EVIDENCE.)

13          MS. COLWIN:  Thank you, Your Honor.

14   BY MS. COLWIN:

15   Q.   In the settlement agreement, Mr. John, there is a

16   non-disparagement obligation between the Bakers, the Rastellis,

17   and DF Ventures.

18       You're aware of that; is that right?

19   A.   I am, yes.

20   Q.   What is the importance of that non-disparagement

21   provision?

22   A.   Well, it's to make sure that you do not talk about the

23   partners and/or the brand in any forum so that it doesn't hurt

24   any of the individuals out in the market and/or hurt the brand

25   so that buyers would feel comfortable buying the brand from

 1  the store perspective, as well as the end customer, and that

 2  they would feel that the operators of the business are

 3  trustworthy.

 4  Q.  Are you aware of any social media posts that have been

 5  made regarding Bubba's Q to the present day?

 6  A.  I am, yes.

 7          MS. COLWIN:  And, Your Honor, we also in our

 8  introductory remarks, the Court has permitted this, so there's

 9  no objection, to show -- I'm going to show just the video clip.

10  It's going to be marked as DJ-3 to DJ-10.

11          I'd ask, with the permission of the Court, that these

12  be admitted into evidence.

13          And what I'd like to do is after they're published,

14  pursuant to your ruling, Your Honor, I'm going to ask Mr. John

15  just for a reaction and a response to those videos.

16          THE COURT:  All right.  They will be admitted into

17  evidence, DJ-3 through and including DJ-10, and you may show

18  them.

19          MS. COLWIN:  Thank you, Your Honor.

20          (EXHIBITS DJ-3 THROUGH DJ-10 WERE RECEIVED IN

21  EVIDENCE.)

22          (Exhibits played)

23  BY MS. COLWIN:

24  Q.  Mr. John, I've just played for you what's in evidence as

25  DJ-3 through DJ-10, and these were posts.

 1          That is Brittani Baker that was in those posts, correct?

 2     A.    Right.

 3     Q.    And in your experience, do you know how many people have

 4     viewed those posts, to your knowledge?

 5     A.    I'm told a couple of million.

 6     Q.    And in your experience of social media, what happens when

 7     a post has this many views?

 8     A.    That post can be monetized and will be monetized from a

 9     social media aspect.  It's the same as any form of a network.

10     If you have millions of views, then you could get paid

11     somewhere around five to maybe even $0.10 per view.

12          And commercials will run on there.  You do not have to

13     seek out the advertisers.  It's purely like a television

14     station.

15          And of course, those things go viral and they're shared

16     with people, and from that aspect of it, you know, it can be

17     very, very damaging or it can be rewarding, depending on what

18     side of the party it is.  Because most of the decision-makers

19     in businesses in this country probably are not on social media

20     in the 40's, 50's, 60's, 70's, and 80's, and what happens is

21     they listen to the younger community, whether it is their

22     grandchildren or children or secretaries or various other

23     people on social media that influences them.

24          So if they don't have any data or stats besides those

25     words, then if we're looking for business and they say, mommy,

1    daddy, grandma, grandpa, Daymond is a thief or Daymond is this

2    and that because this is what I heard, that has a lot of

3    weight.

4        So they could be monetized directly, they could make money

5    directly from the amount of number of views, and it also can be

6    extremely damaging to the party if they are making false

7    statements.

8    Q.   Mr. John, I'm going to then now, pursuant to the Court's

9    permission, put on --

10            MS. COLWIN:  Actually submit into evidence for the

11   Court's ruling for evidence DJ-11 to DJ-19.

12            Your Honor, as you know, these are ones that

13   there have been no objection to, we'd like admitted into

14   evidence.

15            THE COURT:  They will be admitted into evidence, DJ-11

16   through and including DJ-19.

17            MS. COLWIN:  Thank you, Your Honor.

18            (EXHIBITS DJ-11 THROUGH DJ-19 WERE RECEIVED IN

19   EVIDENCE.)

20   BY MS. COLWIN:

21   Q.   Mr. John, I'm going to ask you about some of the evidence

22   that Your Honor has admitted.  Starting with DJ-11, I'm going

23   to read you the comments.

24       DJ-11 starts:  "I used to like Shark Tank, but now I hate

25   their guts, especially Daymond John.  Scam artists who don't

1  help you but drain you financially.  Facts."

2      "Daymond John, Shark Tank, unacceptable.  Get them their

3  money back."

4      Now, there's -- in front of "Shark Tank," do you see that?

5  That's also asking Shark Tank to look at -- to look at this

6  comment; is that right?

7  A.   Yes.

8  Q.   There's so much --

9          (Court reporter interruption)

10         MS. COLWIN:  "There's so much predatory behavior" is

11 another comment.

12         "Crook" is another comment.

13 BY MS. COLWIN:

14 Q.  Mr. John, DJ-12, and I'll ask you some final questions at

15 the end.

16     DJ-12:  "Keep it coming.  Sounds like Daymond should be

17 sued at least and in prison probably.  Something he's done must

18 be criminal."

19     "BubbasQFoodTruck," that's the Bakers, correct?

20         MS. BRITTANI BAKER:  Correct.

21         MR. BAKER:  Correct.

22 BY MS. COLWIN:

23 Q.   It says:  "Thank you for your support."

24     Do you see that, Mr. John?

25 A.   I do.

1   Q.   DJ-13.  Comments:  "Daymond John, crook."

2        Another comment:  "I knew he was a crook.  I wish they

3   would put him off the show."

4        DJ-14:  "Shark Tank" -- again, it's asking Shark Tank --

5   posting Shark Tank.  "I'll never watch again.  #crook.  #scum."

6        What happens when you have a comment that has that in

7   front of it, the "@SharkTank" and then that message?

8   A.   Well, potentially it could jeopardize me getting kicked

9   off the show.  The show is a family show watched by mainly

10  families.  It is an ABC Disney product, the show.

11       Also even on the show, now it will reduce my ability to

12  negotiate effectively against other sharks if I am tagged in a

13  way that I am a criminal.

14       And when people are saying things such as "Put him in

15  prison" publicly, nobody would want to trust and do business

16  with anybody who is being called a crook and/or somebody who

17  should go to prison.

18  Q.   DJ-15, comment:  "Send your story to every TV

19  station, news reporter, bloggers, meat bloggers, restaurant

20  bloggers.  Make it as much noise as possible.  @Daymond

21  John."

22       BubbasQfoodtrucks, that's again the Bakers.  They're

23  saying:  "Thank you."

24       Is that right?

25  A.   Right.

1    Q.   Next comment:  "I lost all response(Sic) for Daymond John.

2    I can't watch Shark Tank anymore."

3        "BubbasQFoodTruck."  Again, that's a response by the

4    Bakers with an exclamation point, correct?

5    A.   Correct.

6    Q.   And behind some of these posts they're referencing the

7    board.  This is a board right behind me.  Do you see that?

8        Mr. John, can you see this board?  In some of those posts,

9    this board is behind the post.

10       Do you see that?

11   A.   Yeah.  I can see it now, yeah.

12   Q.   And it says right here:  "Daymond John" --

13           (Court reporter interruption)

14   Q.   In the profile of BubbasQfoodtrucks, Mr. John, it says at

15   the very top:  "Daymond John and Rastelli Foods are trying to

16   steal my family's business."

17       And then it has a link to a GoFundMe page.

18       And that particular board that we have as a demonstrative,

19   Mr. John, is behind some of that post that we just showed

20   that's in evidence, correct?

21   A.   Correct.

22   Q.   DJ-16:  "Time to blow up Twitter and include Shark Tank

23   as well.  No one wants bad publicity that's bad for their

24   brand."

25       And "BubbasQFoodTruck," we already heard from the Bakers,

 1    they acknowledge it's them.  There's several exclamation points

 2    there.

 3         "This seems like a case of fraud, breach of contract, and

 4    infringement and contributory and patent infringement and sue

 5    those personally responsible."

 6         "BubbasQfoodtrucks," again with multiple exclamation

 7    points after that.

 8         DJ-17.  Comment:  "Damn, I always looked up to Daymond

 9    John and always thought he was a standup guy and came from the

10    bottom.  18 million is insane to only get 685,000."

11         Comment:  "I wonder how many other people he has done this

12    to."

13         Comment:  "Daymond John, opens his comments again.  Keep

14    slamming him."

15         And last one:  "Hooray.  Keep Daymond John losing

16    speaking engagements.  I hope this cancels his useless ass

17    forever."

18         Last, DJ-18.  Comment:  "Now we can see how Daymond is now

19    a billionaire, stealing."

20         Comment:  "They really should have kicked Daymond John off

21    the show."

22         Comment:  "I learned a lesson, don't deal with dirt bags."

23         DJ-19.  Comment:  "I definitely unfollowed him and will

24    never support a business venture he's attached to again."

25         "BubbasQfoodtrucks," we already know on the record that's

1    the Bakers:  "Thank you."

2         Comment:  "I hope no one does business with him again."

3         "BubbasQfoodtrucks," again the Bakers, multiple

4    exclamation points.

5         Mr. John, I have stated on the record the comments that

6    are attached to these posts.  How have you suffered harm as a

7    result of defendants' statements and the comments that I just

8    read online?

9    A.   How have I?

10   Q.   Yes.

11   A.   Well, immediately during the week that these comments were

12   going out, I had a TV show that was being greenlit from a major

13   network that was cancelled.  The show itself was cancelled.  I

14   had lost speaking engagement, as well as a major brand that I

15   was doing an activation for said that they would want to stop

16   all discussions as this stuff was going out.

17        But I have no other idea on how this stuff will affect me

18   for the future.  As I said, I have and I always -- I've spoken

19   for -- I represented several of the Presidents of this United

20   States and a lot of large brands.  And this stuff going out, if

21   it's hit millions of people, imagine if 2 million people each

22   told ten people, I have no idea how this would affect myself,

23   earnings, and my family for the future, my reputation to walk

24   into public companies as well as governments and various other

25   things to represent them as an honest person who will deliver

1   on my word and any of the type of good, inspirational things

2   that I try to put out so that people can inspire themselves and

3   empower their families.

4   Q.   You're filming Shark Tank this week; is that right?

5   A.   That is correct.

6   Q.   What do you believe might happen as a result of these

7   disparaging and negative comments about you that call you

8   thief, crook, that --

9   A.   Well, I believe that any offer that I give will -- some of

10  it will have to have second thoughts because fresh on their

11  minds is somebody who they are saying is a thief, who tries to

12  take their patents and their family business and their company,

13  and I wouldn't want to trust anybody either if that's what I

14  believe.

15       You know, it's takes me over 30 years to build this

16  reputation, it takes just one person to just go out there and

17  not care at all and break contracts and just go out and talk as

18  bad as they want about me with no factual evidence to give to

19  courts and break other agreements and just try to break me

20  down.

21  Q.   How many years have you worked at building your reputation

22  and brand?

23  A.   About 35 years I've been doing this.  And on -- you know,

24  from a business level, hundreds of investments in companies.

25  And I paid, you know, thousands of people and have worked

1   globally around the globe creating a brand of honesty and trust

2   and empowerment.

3   Q.   What does your reputation mean to you, Mr. John?

4   A.   My reputation means everything.  I've probably stated many

5   times I will never leave my kids inherency, I will only leave

6   them a legacy.  I am what they call the American dream.  When

7   someone watches me on TV, on Shark Tank, no matter what

8   color or gender they are, they know that because I don't

9   have a high education or wasn't able to play sports or act or

10  sing, that my ability to be an honest, fair person and

11  hardworking people that will wake up before everybody and

12  go to sleep after everybody is what any and every family can

13  do.

14      Shark Tank is the top show watched on network, targeted

15  towards adults that will watch, families, kids 5 to 15 and

16  parents and kids together.  It's very influential for families.

17  And that is my brand, to leave a legacy out there of honesty,

18  trust, and empowerment.

19  Q.   Is there any money in the world that can get you to get

20  back your reputation once it's taken?

21  A.   There is no money in the world that can take 35 years of

22  coming from lower, very hard circumstances to get to this point

23  and not to have any of these type of challenges my entire life.

24  I don't know if I will be on this planet another 35 years and

25  this is all that I will have.

1   so I do not have any questions.

2          THE COURT:  Thank you.  All right.  Ms. Brittani

3   Baker, you may ask questions.

4          MS. BRITTANI BAKER:  Thank you.

5          C R O S S - E X A M I N A T I O N

6   BY MS. BRITTANY BAKER:

7   Q.   Since Daymond John says he's our brand ambassador,

8   I was just wondering, I was going to ask him the same thing,

9   when was the last time he's done anything to promote our

10  brand?

11  A.   I have no idea.  I've talked about you in the press in a

12  positive manner over the last -- probably all the way up to

13  maybe even a year ago because people ask me on stage and on

14  public what are the brands that you love the most, and you are

15  included in those brands.

16       It's unfortunate that because of your negative posts prior

17  to that about Walmart and various other things that -- and

18  Al Bubba Baker asking me never to contact any of you from

19  your or your family, how can I make any other positive

20  posts about that or posts at all if you are asking me not to do

21  that?

22  Q.   So then why do you stay involved with a company if he

23  asked you not to talk to us?

24       Why wouldn't you --

25  A.   I have millions of dollars of my intellectual property and

JOHN - CROSS - MS. BAKER                    41

1   my energy put into this brand.

2       Am I supposed to stay out of the brand totally if you guys

3   have said as operating managers to not contact anybody in your

4   organization?

5   Q.   Millions of dollars?  We've seen no type of accounting.

6   You guys didn't talk about any number at any time.

7   A.   I have millions of dollars worth of my intellectual

8   property in the brand.  If you would have had a spokesperson to

9   do the things that I did, it would have cost you about 3 or

10  $4 million, so --

11  Q.   My question is, I don't understand why you would stay

12  involved --

13          MS. COLWIN:  Your Honor, she's cutting off the

14  witness.  She's being argumentative.

15          I understand she's pro se, but this is truly

16  inappropriate.

17          THE COURT:  Ms. Baker, you need to let him answer the

18  question and finish his answer.  You can't argue with him.

19  Just please ask questions.

20          MS. BRITTANI BAKER:  Yes, Your Honor.

21          THE WITNESS:  We've come to a settlement

22  and an agreement, right, and the product is still -- all of

23  the investment has already been in the product already

24  prior to that, of all the trade shows and walking around and

25  the book and the update on the tank and waiving fees and

JOHN - CROSS - MS. BAKER                    46

1    the brand due to advertising and marketing.  That is the

2    strategy.

3    Q.  I just have two more questions.

4        So your job responsibilities as a brand ambassador have

5    stopped?

6    A.  My intellectual property of what you have of me being on

7    television and in books will never stop because that is already

8    content that you put out the same way that you are putting out

9    the other content you're doing right now.  It will never go

10   away.  I did not give you any kind of limitations or the

11   company any kind of limitations.

12       Normally my brand feels that millions of dollars, somebody

13   has a lot of limitations.  They can only use it for a year;

14   they can only use it on certain type of channels.  You have no

15   restrictions from that.  That is an ability to use my

16   intellectual property for the rest of the existence of the

17   company.

18   Q.  So we don't get any new promotions, we just use your

19   intellectual properties from the past?

20   A.  Did the managing --

21            MS. COLWIN:  Objection, Your Honor.

22            THE WITNESS:  Did the managing partners at all contact

23   me with any kind of strategic idea or concept or photo shoot or

24   scheduling anything to use my intellectual property or did you

25   take any or -- or any of the managing partners take any kind of

JOHN - CROSS - MS. BAKER                    48

 1          THE WITNESS:  You didn't have a request for --
 2          THE COURT:  Hold on, Mr. John.  Hold on.
 3          What's the objection?
 4          MS. COLWIN:  Your Honor, she asked the same question
 5   now twice.  This is the same question.
 6          He already responded.  It's the same question she just
 7   posed.
 8          THE COURT:  Well, I'm hoping for a similar
 9   response than the one that we got.  I'm not suggesting it was a
10   bad response, I just would like a simpler response to the
11   question.
12          Anything further?
13          THE WITNESS:  I had mentioned many times in
14   publications, and I did not get at all any formal request from
15   anybody from management to do any further photo shoots,
16   interviews, anything else.
17          No formal requests.  No requests at all, formal or
18   informal, have been made for me to do any further part of my
19   job or obligation.
20   BY MS. BRITTANI BAKER:
21   Q.   How can we make a request if you don't talk to us?
22   A.   Your managing partners can shoot me an email.  And you are
23   managing partners with the Rastellis, and you can send an email
24   and that request would be honored.
25   Q.   When I called you, did you say, "My life is easier without

JOHN - CROSS - MS. BAKER                                52

1            THE WITNESS:  One year at a time.

2            THE COURT:  And when does the current one-year

3    expire?

4            THE WITNESS:  After this season.

5            THE COURT:  Okay.  So you have no commitment for

6    future seasons; is that correct?  You personally?

7            THE WITNESS:  That is correct.  That is correct.

8            THE COURT:  Has anyone told you from Sony or ABC or

9    CNBC that they don't want you to do it anymore because of these

10   postings?

11           THE WITNESS:  They've had concerns about it.  If you

12   look at various other sharks, primarily -- well, there was a

13   shark on season number 1 or 2 named Kevin Harrington, they did

14   not resign his contract.

15           You know, it is a Disney format.  It is a family show.

16   They don't have to give you any reason to renew or not to renew

17   your contract.  They will just not renew it.

18           THE COURT:  To your knowledge, have any of the other

19   sharks ever been the subject of any controversy on social

20   media?

21           THE WITNESS:  Yes, but they've not been the

22   controversy of any form of what the basics of their integrity

23   is theft, so they have been -- one of my sharks have gotten

24   into an accident, others have gotten into marital problems,

25   some have had political debates, but there has never been one,

1    BY MS. PRIMAVERA:

2    Q.   Mr. Fox, are you an attorney?

3    A.   Yes, I am.  I practiced for over 30 years.

4    Q.   What is your relationship to DF Ventures?

5    A.   I'm a minority member.

6    Q.   Who else is a member of DF Ventures?

7    A.   Daymond John.

8    Q.   And what is Mr. John's role in DF Ventures?

9    A.   Daymond is a managing member.

10   Q.   How did you come to know the Bakers?

11   A.   Over the course of any Shark Tank show or season, I become

12   aware of certain deals that have come across Daymond's table

13   that he is bringing forward, so I probably learned about it

14   early on and then eventually Daymond introduced me to

15   Mr. Baker.

16   Q.   Were you acting as a project manager in that role?

17   A.   Absolutely.

18   Q.   We heard Mr. John's testimony a couple minutes ago about

19   his team's work to help the Bakers' business.

20        Can you detail a little more specifically what you and

21   Daymond were involved with?

22   A.   We tried to handle anything and help in any way we

23   possibly could.  I mean, from the very beginning we ran into a

24   problem with a co-packer, that the original co-packer that was

25   in place couldn't handle the volume and the capacity.  Because

1   you have to understand, when entrepreneurs appear on Shark

2   Tank, there's an immediate demand.  So at that point, they

3   believe in the first week, the demand is over $400,000 in

4   orders and the co-packer wasn't able to handle that

5   capacity.

6        So a lot of the early-stage things that we were involved

7   with were helping Mr. Baker vet co-packers.  Mr. Baker had some

8   co-packers that he was interested in.  We actually -- I mean, I

9   remember Mr. Baker and myself, we both went down to North

10  Carolina for multiple days to vet one co-packer, and that was a

11  two- to- three-month process; we went to another one that

12  Daymond and I procured on Long Island, which is a two- to-

13  three-month process.

14       Eventually, Daymond introduced us to the largest co-packer

15  and meat company in all of Canada, so the Baker family and I,

16  we all flew up there.  We had multiple meetings.  And again,

17  it's not just a one-day meeting, you have to go through the

18  whole process of, you know, meeting them, but also yield

19  products being sent back and forth, discussions on pricing.  So

20  that was another three to four months.

21       But other things that Daymond did early on and I helped

22  with was -- you know, we had cruise lines that were interested

23  in the product, grocery stores, you know, different companies.

24  And we also organized trade shows to get the product out there.

25  You know, one major trade show in Las Vegas we all attended.

1  Daymond actually got booth space, which is not easy to get

2  booth space short-term, but we had that; shipped the product

3  out there; developed artwork, you know, to associate with the

4  booth; had employees there.  Daymond came, he walked the show;

5  the Bakers, we flew them out there.

6      Again, it was anything to do to promote the product and

7  the brand name, the brand image out there.  Also it was online

8  business, you have to get Daymond -- we had to get supplies,

9  coolers, dry ice.  There's so many different things and so many

10 different hats we were wearing at that time.

11     But like I said, any way to help the brand develop and

12 take steps forward, Daymond and I were there for that.

13 Q.  And does that include 2019 to present or were there

14 further actions to promote the brand other than what you just

15 described?

16 A.  Certainly.  I mean, all across it one of the things that

17 we did was to try to procure sales opportunities or business

18 opportunities that would better the venture.

19     We'd help promote them on online platforms, sales

20 platforms, bring grocery stores to the table, cruise lines,

21 professional sports teams.

22     We'd often participate in group sales' calls where

23 Daymond's team would produce a matrix on a spreadsheet in an

24 Excel file that would list all the potential companies and

25 contacts that we had, along the same with what Mr. Baker had;

1  week when business started after Shark Tank, we had nothing but
2  business failures and delays because there wasn't an adequate
3  co-packer.
4      As I mentioned, it was a very small company that was not
5  used to a demand of, say, $400,000 at a time; they weren't used
6  to supplying major grocery stores or cruise lines.  So as
7  Daymond was bringing certain relationships to the forefront, it
8  was actually a little bit embarrassing because there was no
9  way to move forward because there was no way to supply these
10  types of companies to move forward in some type of joint
11  venture.
12      So that's, again, why over the course of the next year to
13  year and a quarter, you know, the regular conversations between
14  all of us, and particularly between Al and myself, were how do
15  we find a co-packer.  And we probably went through 14 to 18
16  different names, took -- you know, narrowed it down eventually
17  to the visits that I discussed earlier.
18      But to try to finally hone in on that to find out how we
19  could find it to the next level because we were kind of
20  hamstrung and stalled at that point.
21  Q.  And was there an episode of Beyond the Tank filmed that
22  addressed this issue?
23  A.  Absolutely, yes.
24  Q.  Okay.  Can you discuss what was generally said on the
25  show, to the best of your recollection?

FOX - DIRECT - PRIMAVERA                          62

1   A.   Absolutely.  Just to give a little background, so Shark

2   Tank had a spinoff show that they premiered called "Beyond the

3   Tank," and we were actually fortunate that, when asked, Daymond

4   wanted to feature, you know, the Bakers and their venture

5   together.  So we were actually on the first episode.  That

6   episode is actually featured in a 20- to- 22-minute segment

7   strictly with Al and Daymond in person.

8        Daymond flew out to Avon, Ohio to meet with the Bakers,

9   and they had detailed, deep discussions about the obstacles

10  that we were confronted with, and the major focus was a

11  co-packer.  Daymond made it very clear on the episode on film

12  that, listen, we struggled, I brought all these relationships

13  to the table, it's been embarrassing for me, there's no way to

14  move forward.

15       Mr. Baker took accountability and said, "Listen, the

16  co-packer that we have in place, that's me, that's on me, I

17  take responsibility."  And Daymond pretty much gave an

18  ultimatum on the show and said, "I'm willing to cut my losses

19  and walk from this deal unless you're able to bring the

20  co-packer to the forefront immediately so that we could move

21  this business forward."

22  Q.   And was a co-packer ultimately secured?

23  A.   Yes, it was.

24  Q.   And who was that co-packer?

25  A.   Al introduced us eventually to the Rastellis.

FOX – DIRECT – PRIMAVERA                            63

1  Q.  After meeting the Rastellis, what, if anything, did

2  Daymond do to facilitate that relationship?

3  A.  Again, I mentioned a little bit earlier, we were involved

4  in many different roles.

5       First of all, Daymond is a brand ambassador, so coming

6  out with branding and marketing strategies.  You know,

7  Daymond talked a little bit about putting the Bakers in a

8  chapter of his book; he did numerous magazine articles;

9  television interviews; social media posts; we helped again with

10  regard to sales.  I mean, Daymond dedicated several members

11  of his internal team to try to bring sales leads to the

12  forefront and hand them off to the Rastellis and Mr. Baker to

13  kind of add into the system of a potential, you know, vendor of

14  record.

15       So, again, there were monthly sales' calls again with

16  multiple members of Daymond's team that would list and go

17  through every contact that we thought we could bring to the

18  forefront.  Status updates.  And then with regard to any

19  initiatives that Mr. Baker or the Rastellis were working with,

20  how we could deploy Daymond's resources if there could be help.

21  And those sales' sheets, we actually, to be helpful to the

22  team, would, you know, update those sheets, send them out,

23  have notes on how Daymond and the team could help.  You

24  know, and the ones that Al was doing on his own, based upon

25  Al's work on those calls, they would all be updated and

1    circulated for the team so we could all synergize off each

2    other.

3        Daymond was also able to bring sales platforms.  As I

4    mentioned early, Zulily and shop.com were two online platforms

5    that we did work with.  Daymond, through his connection at ABC

6    TV, there's a show in the morning called Good Morning America

7    where they actually have certain segments where they sell

8    products and introduce the public to the products and they

9    actually have a launch right there that they could log right on

10   and sell, so we were able to do that for the venture and it had

11   a high level of sales when we were able to get it on that

12   platform.

13       But again, we wore many different hats that any way

14   Daymond could use his marketing branding, brand ambassadorship,

15   or we could help out by making a phone call.

16       To give you a corny analogy, our role was to shake hands

17   and kiss babies and make people feel happy about advancing the

18   product, you know, to become a major brand.  So anything we

19   could do to help with that branding message or make

20   introductions, we were able to do.

21   Q.   Understood.  Did there come a time when Daymond, the

22   Rastellis, and the Bakers entered into an agreement?

23   A.   Absolutely.

24       MS. PRIMAVERA:  Your Honor, can I show the witness

25   what was previously entered into evidence as DJ-1?  It's the

 1   operating agreement.

 2              THE COURT:  Of course.  Of course.

 3              MS. PRIMAVERA:  Thank you.

 4   BY MS. PRIMAVERA:

 5   Q.   Mr. Fox, can you take a minute to look at that document.

 6   Do you know what this document is?

 7   A.   Absolutely.  This is the company, FOFBakers, LLC, which is

 8   our group company.  It's the operating agreement for the

 9   company.

10   Q.   Okay.  And are you familiar with the terms of this

11   operating agreement?

12   A.   Yes, I am.

13   Q.   How are you familiar?

14   A.   I mean, from the get-go I was involved in, you know,

15   helping to negotiate and, you know, comments and being involved

16   from the very beginning stage.

17        I mean, this agreement probably was a four- to- five-month

18   process, from what I remember.  Each of the three members were

19   all represented by individual counsel, so over a five-month

20   period there were so many iterations and red lines and

21   conference calls that I was intricately involved with with

22   regard to the DSI and its negotiations.

23   Q.   Were the Bakers represented by counsel throughout the

24   entirety of the negotiations of this agreement?

25   A.   Absolutely.  There was a gentleman that was introduced

 1   early on, his name was John Patrick, and I believe the name of

 2   the firm was the Reminger law firm out of Ohio.

 3        And actually, John kicked off the process because he

 4   created the entire term sheet as a blueprint for what the

 5   operating agreement would be, and he was involved in every step

 6   of the negotiation.

 7   Q.   Up until the agreement was put in final form?

 8   A.   Yes.

 9   Q.   Okay.  And do you recall when it was put and memorialized

10   in final form?

11   A.   November 2015.

12   Q.   Is this a document that's kept in the ordinary course of

13   business?

14   A.   Yes, it is.

15   Q.   Did Daymond ever have direct access to FOFBakers'

16   financial documents, which is the LLC that was created as a

17   result of this operating agreement?

18   A.   Absolutely not.

19   Q.   Did you?

20   A.   Absolutely not.

21   Q.   All right.  Pursuant to this operating agreement you're

22   looking at now, who was responsible, if you know, for the

23   company's financial reporting and accounting?

24   A.   I mean, under the agreement there are two managers that

25   are responsible for the daily operations, financial reporting,

 1   accounting, and running the business, and that was Al Baker and

 2   Ray Rastelli, Jr.

 3   Q.   The managers?

 4   A.   Yes.

 5   Q.   Is Daymond a manager?

 6   A.   Absolutely not.

 7   Q.   I'd like to direct your attention to Section 4.1(d) of the

 8   agreement, if you don't mind flipping to that for me.  It's on

 9   page 10 of the operating agreement.  And just take a minute to

10   review it to yourself, please.

11        Did you have a minute to look at this?

12   A.   Yes, I did.

13   Q.   Now, 4.1(d), the title of this clause is "Defining

14   Managers' Roles," correct?

15   A.   Yes.

16   Q.   Okay.  Within this clause, does any of this information

17   pertain to Mr. John?

18   A.   No.

19   Q.   Can you please turn to page 15 of the operating agreement.

20   It's Section 5.2.  And just read it to yourself, please.  Let

21   me know when you're finished.

22   A.   I'm finished.

23   Q.   What is your understanding of this provision?

24   A.   My understanding is that the managers obviously are

25   operating and running the company, but any other member does

 1   not participate in the management or control of the company.

 2        DF Ventures, slash, Daymond is the sole non-managing

 3   member.  So as a member, he's not able to participate in the

 4   management or control of the company's business.

 5   Q.   Does Mr. John have the power to act or bind FOFBakers?

 6   A.   Absolutely not.

 7   Q.   Where is that absolutely vested?

 8   A.   That's exclusively vested with the managers of the company

 9   and Al Baker and Ray Rastelli.

10   Q.   Can you please turn to Section 6.1(c).  That's page 3 of

11   the operating agreement.  And just take a minute to review that

12   section for me, please.

13   A.   Yes.

14   Q.   Is this a provision that sets forth Daymond's specific

15   responsibilities as it relates to the operating agreement?

16   A.   Yes, it does.

17   Q.   All right.  And what do you understand those

18   responsibilities to be pursuant to this clause in the operating

19   agreement?

20   A.   I mean, I discussed a little bit earlier, Daymond was

21   tasked with the responsibility of being a brand ambassador, to

22   be a television personality; to help and assist with marketing

23   and promotion utilizing his Rolodex; you know, to bring

24   potential opportunities forward; and in my silly analogy as I

25   mentioned before, you know, kissing babies and shaking hands

1  and just bringing general love and attention to the company in

2  any way he could in a positive way.

3  Q.  Is there anywhere else in the agreement that Mr. John's

4  specific role is regulated or only this clause?

5  A.  I think this is the only clause in the agreement that

6  specifically speaks to what his role is.

7  Q.  Thank you.  Could you turn to article 11 of the operating

8  agreement?  It's pages 23 and 24.  Can you take a moment just

9  to read over that.

10  A.  Okay.

11  Q.  Can you describe in your own words what this clause

12  is?

13  A.  I mean, this is a confidentiality clause that, you know,

14  restricts any of the members to the agreement from divulging

15  any specific proprietary data, information, trade secrets, to

16  make them public, it prohibits us from making them public.

17  Q.  And to my knowledge, based on your participation in the

18  creation of the operating agreement which you testified to

19  earlier, what's the underlying reason as you recall pertaining

20  to why this was included in the operating agreement, this

21  confidentiality clause?

22  A.  I think it would be twofold.  It serves as a protection of

23  the overall company in FOFBakers, LLC.  Again, there's a lot of

24  specificity in what everyone's bringing to the table.  There's

25  the actual product, the patent, the processes of the deboning,

1  there's the procuring the actual underlying product, there's

2  marketing strategies, there's customer lists, there's pricing

3  strategies.  So a lot of this, again -- sorry I'm silly with my

4  examples.  But, you know, it's like in the days when McDonalds

5  made the Big Mac, they don't want to give you the recipe for

6  their secret sauce so it could be knocked off and duplicated,

7  so they're very proprietary to that.  Well, not just their

8  secret, but when it came to our venture, there's a lot of

9  multiple and different levels of confidential information that

10  protects FOFBakers in the marketplace so the product can't be

11  duplicated, knocked off, or just with regards to competing

12  companies to understand who our customers are, pricing

13  strategies, who we use to market and brand the company, you

14  know, how we utilize Daymond's economic terms and things like

15  that.

16      And then on an individual level, each individual member

17  kind of brought a different skillset to this entity.  Again,

18  Mr. Baker brought his patents and the development of the

19  product; you know, the Rastellis brought to the table obviously

20  their business acumen and history in this business of

21  understanding the meat market, procuring, distribution,

22  customer lists, contacts; and Daymond brought a vast list of

23  not just -- you know, just companies, but CEOs, who the right

24  people to call, marketing and branding strategies, you know,

25  certain initiatives on how you get that brand recognition out

1    there.

2        And those are all relevant to the individual members to

3    protect their individual brands also.  So it's kind of both --

4    Q.   Okay.  And so how would the dissemination of the document

5    you just referenced in the marketplace affect the company, if

6    at all?

7    A.   I mean, just as I discussed a little bit earlier, by

8    allowing everybody in the marketplace, and especially

9    competitors, to lift the hood and see what's under it, they

10   learn about your product, where you're sourcing it from, the

11   pricing, your customer lists, your economics, you know, your

12   marketing and branding strategies, and you're giving them a

13   competitive advantage to go out and compete with you to get

14   and maybe steal away some of your market share and

15   cannibalize kind of what your productivity and efficiency is in

16   a business.

17   Q.   Can you look down a little bit further to 11.3.  It's

18   still part of the confidentiality clause that's on page 24.

19   And just take a minute to review that subsection, please.

20   A.   Yes.

21   Q.   Can you generally describe the terms of this clause?

22   A.   I mean, this clause ties to the confidentiality clause in

23   that it was an important provision of the agreement.  You know,

24   if certain information is being -- or confidentiality

25   information is being divulged in the marketplace, it severely,

FOX - DIRECT - PRIMAVERA                    72

1  first of all, injures FOFBakers, LLC because we could start to

2  lose business, we could start to lose clients, we could start

3  to be losing, again, a market share.

4       And in order to stop the bleeding, you need a mechanism in

5  place that you could go to court and look for injunctive relief

6  to kind of reel some of that back in so that the damage is

7  somewhat limited.

8       That goes also on a member level.  If certain confidential

9  information is being shared about a member, you need a way to

10 curtail that immediately so it just doesn't kind of have a

11 snowball effect and become irreparable.

12      So you need to have the access to court and agreements

13 that if something like this becomes detrimental and causing

14 harm to the company or an individual member, that there is

15 a mechanism to move in an expedited basis to have it

16 addressed.

17 Q.  And that would be injunctive relief or monetary relief?

18 A.  That would be injunctive relief.

19 Q.  Did all the parties agree to the final terms of this

20 agreement?

21 A.  Absolutely, yes.

22 Q.  Are you aware of an action initially brought by the

23 Rastellis against the Bakers in 2019?

24 A.  Yes, I am.

25 Q.  What was your understanding of the suit?

A.   Well, to give it a little bit of color leading up to that,
the DF Ventures side had brought forward one of the three
largest fast food companies in the world as a potential joint
venture partner.  This company had expressed serious interest
in moving forward and at that point, it became, you know,
pertinent that the company move forward in pricing decisions
and how to present the deal, what we were shooting for and
things like that, which is not our role.

     So we looked towards the managers of the company, Al Baker
and Ray Rastelli, Jr. to sit down, make certain business
decisions, figure out how it was going to be presented to this
company and, most importantly, come up with pricing decisions
and approval so this could move forward because it seemed like
this was a very live and viable option.

     So at that point, Mr. Baker was being completely
non-responsive, he was not responding to emails.  On the DF
Ventures side, our sales team was trying to keep this
opportunity alive and viable, but it was beginning to become
uncomfortable because he couldn't even give answers and we were
kind of stalling for time.

     So because the managers couldn't come to the table and
have a meeting of the minds, I believe this action in 2019 was
brought by the Rastelli parties to force Mr. Baker to come to
the table and serve in his role as manager so that we could
move the business forward.

1   Q.   Were there any interim rulings before the matter was

2   ultimately concluded regarding the Rastelli action?

3   A.   Yes, there were.

4   Q.   Okay.  Can you explain those, please?

5   A.   Managers went to court, and then I believe an arbitrator

6   was assigned and all of these management issues were brought

7   before the arbitrator and the arbitrator ruled in the

8   Rastelli's favor on each and every point.

9        And at that point, Mr. Baker then began cooperating and

10  participating in management meetings so that we could then get

11  the information we needed to potentially move forward with the

12  fast food company.

13  Q.   So following the arbitrator's decision, Mr. Baker began

14  cooperating at that point, to your knowledge?

15  A.   He began participating in management meetings, yes.

16  Q.   At some point did DF Ventures get involved in this

17  underlying action?

18  A.   Yes.  After those matters were resolved with regard to the

19  managers, there were still issues that were on the table as

20  part of the litigation.  It was important that we intervene to

21  protect our interest in (Inaudible) --

22            (Court reporter interruption)

23            THE WITNESS:  I think it was just one word.  And I'll

24  try to speak up better.  I think it was just to protect our

25  interest.

1  Q.   So what happened next in regards to the matter?

2  A.   So at that point, we were in mediation.  It was

3  recommended we go to mediation.  And all three parties

4  participated in, you know, lengthy mediation to finalize any

5  outstanding points so that we could move forward and, you know,

6  have a business to operate.

7       And not to be corny again, but to live happily ever after

8  and create a win-win-win situation.

9  Q.   Were all parties at that mediation represented by counsel?

10 A.   Absolutely.

11 Q.   And did the judge act in any type of role acting as a

12 mediator?

13 A.   Yes, a judge was assigned as the mediator and was very

14 instrumental.  We had a few different mediation sessions and a

15 lot of back and forth and was very integral to the whole

16 process of mediation.

17       MS. PRIMAVERA:  Your Honor, may I hand the witness

18 what was previously entered into evidence as DJ-2?  It's the

19 settlement agreement.

20       THE COURT:  Of course.

21 BY MS. PRIMAVERA:

22 Q.   Mr. Fox, are you familiar with this document I just handed

23 you?

24 A.   Yes, I am.

25 Q.   Can you please identify it for the record?

1    A.   This is the settlement agreement and mutual release

2    between the three parties.

3    Q.   All right.  Now, you just testified that there was a

4    mediation.

5         Did all the parties participate in the negotiation and

6    drafting of this agreement?  And by all the parties, I'm

7    referencing the Bakers, Rastellis, and DF Ventures, including

8    Daymond John?

9    A.   Yes, all three parties attended.  They were all

10   individually represented by counsel.  The Rastellis had Hyland

11   Levin as counsel, I was there along with New Jersey counsel on

12   behalf of DF Ventures.

13        And from the very beginning, the Bakers had multiple

14   attorneys.  I believe they actually had four attorneys from the

15   very beginning, beginning with John Patrick.  He was eventually

16   replaced by someone named Ed Heben.

17        Ed Heben then had New Jersey counsel working with him on

18   behalf of the Bakers named Greg Lomax.  And I believe after Ed

19   Heben, then there was also a Jayne Juvan, who was attorney out

20   of Ohio.  So the Bakers had four attorneys throughout the

21   process.

22   Q.   At the time the settlement agreement was finalized and all

23   parties signed off on it, were the Bakers represented by

24   counsel?

25   A.   At all times they had at least one, if not more than one,

 1   law firm that was representing them at all times.

 2   Q.   I would like to call your attention to paragraph 5 of

 3   DJ-2.  It's on page 2 of the settlement agreement.

 4   A.   Yes.

 5   Q.   Could you please read this clause to yourself first?

 6   A.   Okay.

 7   Q.   And you're familiar with these terms?

 8   A.   Yes, I am.

 9   Q.   Can you read into the record just the first two sentences

10   of this paragraph, stopping before the fourth to the last

11   sentence up that starts "each party and Rastelli Brothers,"

12   please.

13   A.   Read this whole thing out loud?

14   Q.   Yes.

15   A.   "Each party and Rastelli Brothers, Inc., Jabezbaker, LLC,

16   Brittani Baker, and Sabrina Baker forever agree not to solicit,

17   disrupt, interfere with, disparage and/or defame any other

18   party and such other party's employees, vendors, and

19   customers, current and/or prospective, and those of any entity

20   any such other party operates, has control of, or has any

21   interest in.

22        "Each party and Rastelli Brothers, Inc., Jabezbaker, LLC,

23   Brittani Baker, and Sabrina Baker forever agree not to make any

24   written or verbal remarks or statements, even in the form of an

25   opinion, about any other party to anyone including, but not

1  limited to, any such other party's employees, vendors, and

2  customers, current and/or prospective, and those of any entity

3  any such other party operates, has control of, or has any

4  interest in that are in any way negative, disparaging, or false

5  or which could adversely impact the reputation, goodwill,

6  credibility or value of any such other party or entity or could

7  discourage current and/or prospective customers from buying

8  products from them.

9      "Except as may be necessary to comply with the rights and

10  obligations under this agreement, the operating agreement, the

11  amendment to operating agreement of FOFBakers, LLC and the

12  addendum to the amendment of operating agreement of FOFBakers,

13  LLC, each party and Rastelli Brothers, Inc., Jabezbaker, LLC,

14  Brittani Baker, and Sabrina Baker forever agree not to contact

15  any other party's employees, current and/or prospective, and

16  those of any entity any such other party operates, has control

17  of or has any interest in."

18  Q.  Okay.  Thank you.  How did this clause come about while

19  the agreement was being negotiated in 2019?

20  A.  I mean, this was an important clause.  I mean, I would

21  basically say that this agreement was kind of resetting where

22  the business was at.  It was almost like, okay, let's leave the

23  past in the past, let's move forward, let's create a win-win

24  situation.

25      I mean, again, I'm silly with my analogies, but I guess it

1    was kind of like a couple that's leaning towards a divorce that

2    goes to couples counseling and comes out of it and says, you

3    know what, we're going to move forward with a business here,

4    everything else is in the past.

5         So it was making it very clear that not only were things

6    in the past, but nothing from the past was going to be divulged

7    and we were going to be harmonious in our efforts to move

8    forward to create a win-win situation and not, you know, hurl

9    any negativity publicly about each other to anybody and, like I

10   said, to make this business more efficient and happy going

11   forward.

12   Q.   Okay.  What, if anything else, did the Bakers receive as a

13   result of the settlement agreement, if you remember?

14   A.   Well, as part of the release, it was negotiated that the

15   Bakers would receive $33,333 as an upfront payment.  They

16   received $100,000 spread out over the course of the upcoming

17   year, individual payments of $8,333 each.

18        And then they received a royalty on all gross sales of the

19   product moving forward of four percent on the first $5 million

20   that was sold thereafter, which reduced down to three percent

21   thereafter.

22   Q.   This was from 2019 going forward?

23   A.   From the settlement agreement, yes, in November -- I am

24   sorry, 2019.  I got to check on the month.

25   Q.   Okay.  Thank you.

FOX - DIRECT - PRIMAVERA                                        80

 1       Can you turn to the end of the agreement.  It's after the

 2  signature page.  It's the amendment, the operating agreement

 3  that's part of DJ-2, because it was part of the settlement

 4  agreement?

 5  A.   Yes.

 6  Q.   All right.  It's page 3 of the amendment.

 7  A.   Yes.

 8  Q.   Okay.  Can you just review that very brief clause to

 9  yourself?

10  A.   Which clause?

11  Q.   It's paragraph 5 of the amendment, page 3, "Daymond and

12  Rastelli partner shall separately determine a mutually

13  acceptable arrangement."

14  A.   Yes.

15  Q.   Are you familiar with this clause?

16  A.   Yes, I am.

17  Q.   What were the terms of that agreement?

18  A.   The terms of that agreement were that DF Ventures would

19  receive a 1.777 percent royalty on all gross sales moving

20  forward -- I am sorry, on the first $5 million moving forward,

21  thereafter reduced to 1.3333 percent of all gross sales, and

22  would retain their economic interest of 20 percent solely in

23  case that the company was sold in the future.

24  Q.   Okay.  Why was that agreement made separately?

25  A.   Well, you have to understand, we were in Camden, New

1    Jersey multiple days, from what I remember, in mediation.  We

2    were into the late hours of the evening and it seemed like the

3    parties were finally coming to an agreement.

4        Certainly the Bakers and the Rastellis had come to an

5    agreement on the economic terms that I just laid out with

6    regards to the Bakers.  We didn't want to hold up at that hour

7    of the night anything going further because we had never really

8    thought about what does this mean to DF Ventures as far as the

9    economics.

10       As I just mentioned, the Bakers were receiving, you know,

11   a cash payment of $33,000 upfront, $100,000 over the first

12   year, and then a royalty.  We hadn't really thought about how

13   those economics would play out.  So rather than sitting there

14   at -- I believe it was already 9:30 and 10:30 at night -- we

15   had momentum that we were going to kind of come to an agreement

16   that we were going to settle and what those terms were, we said

17   that rather than holding this up, we'll sit down and figure it

18   out, but that really wasn't at that point the crux of the

19   controversy, so why delay things further when it looked like

20   things were going to settle.

21   Q.  And other than the operating agreement, the settlement

22   agreement, including this addendum, do any other agreements

23   exist between DF Ventures and the Rastellis relating to

24   FOFBakers?

25   A.  Absolutely not, no.

FOX - DIRECT - PRIMAVERA                    82

1   Q.   How much has DF Ventures received to date relating to the

2   settlement agreement, if you know?

3   A.   From the settlement agreement, I believe we received

4   approximately -- up to this date, approximately $47,000.

5   Q.   And how is the 1.777 percent calculated?

6   A.   It was actually -- although it seems complicated, it was

7   rather simple.  We basically just looked at what the royalty

8   rate was that the Baker family received, which was four

9   percent, and then we just did basically what our share of that

10  would have been based upon the original agreement.

11       The Bakers owned 45 percent equity interest, we owned

12  20 percent.  So we basically got that fraction multiplied by

13  four percent.  So if you took 20 divided by 45, multiplied it

14  by four percent, we got 1.7777 percent.

15       And their reduction down to three percent was the same

16  mathematics, that basically pro rata, we would be equal to

17  1.333 percent.  But we didn't even receive any of the money and

18  cash upfront or the $100,000 in payment, so we cut that out

19  that it was just pro rata based upon what their royalty rate

20  was.

21  Q.   Since meeting the Bakers on Shark Tank, how much, in

22  anything, has Daymond made or loss?

23  A.   Since meeting on Shark Tank, Daymond lost at least

24  $86,000, and it's probably more.

25            MS. PRIMAVERA:  Your Honor, may I show the witness

 1  an exhibit that's not yet been entered into evidence, but we

 2  did previously mark it as DJ-20.  It is a spreadsheet and it's

 3  one of the documents that Ms. Brittani Baker posted on one of

 4  the TikToks.

 5          THE COURT:  Well, if it's been on TikTok, then you can

 6  admit it into evidence.  Go ahead.

 7          MS. PRIMAVERA:  Thank you.

 8          (EXHIBIT DJ-20 WAS RECEIVED IN EVIDENCE.)

 9          MS. PRIMAVERA:  May I hand the exhibit to the witness?

10          THE COURT:  Please do.

11  BY MS. PRIMAVERA:

12  Q.  Mr. Fox, could you take a moment just to review that

13  spreadsheet I just handed to you that's marked DJ-20?

14  A.  Okay.

15  Q.  Are you familiar with this document?

16  A.  Yes, I am.

17  Q.  What is it?

18  A.  It's a spreadsheet, I believe, prepared by the Rastellis

19  that they would have distributed to all of the members.  It

20  doesn't really tell me at what points in time, but it lists

21  certain sales, certain gross margins, internal economics,

22  pricing structures with regard to FOFBakers and the products

23  that we sell.

24  Q.  Would you consider the information contained in that

25  document to be confidentials to FOFBakers, LLC?

1  A.   Absolutely.

2  Q.   Okay.  Are there any consequences of this document being

3  made public?

4  A.   I mean, absolutely.  Similar to what I had mentioned

5  before, you know, by releasing this into the general public, it

6  gives certainly competitors an ability to -- as I use my

7  analogy, lift the hood up and see what's, you know, going on

8  inside with regard to pricing, certain accounts, you know,

9  gross margins, internal economics with regard to licensing fees

10  and economic interests, all kinds of just proprietary

11  information that you would never want your competitors to

12  see.

13  Q.   Okay.  Thank you.

14          MS. PRIMAVERA:  Your Honor, I have another exhibit,

15  it's premarked DJ-21.

16          Again, it's a document that's pulled off one of

17  Ms. Baker's TikToks, Ms. Brittani Baker.

18          THE COURT:  You may show it to the witness.

19  It's admitted into evidence.

20          (EXHIBIT DJ-21 WAS RECEIVED IN EVIDENCE.)

21          MS. PRIMAVERA:  Thank you very much, Your Honor.

22  BY MS. PRIMAVERA:

23  Q.   All right.  Mr. Fox, do you mind reviewing that?

24  A.   No problem.  Just a second.

25          Okay.  I'm ready.

1    Q.   Okay.  What is that document?

2    A.   It looks like an internal email from Ray Rastelli, III, to

3    the members of the company.

4    Q.   Can you describe generally what it's saying, what it's

5    stating?

6    A.   It's basically going through our entire marketing,

7    branding optimization strategies, the individual outside

8    third-party vendors that were providing certain services at

9    that time as far as helping get our product not only to market

10   but to try and get the branding message out there and exposure

11   into the marketplace and the cost associated therewith.

12   Q.   Okay.  And would you consider the information contained in

13   this document to be confidential?

14   A.   Absolutely.

15   Q.   Are there any consequences for it to be made public?

16   A.   Yes, there are.

17   Q.   Can you describe it?

18   A.   I mean, this email is very particular, so this really

19   gives competitors and just everybody out in the marketplace a

20   real snapshot of our branding and marking strategy.  It

21   mentions four or five different specific companies by name, so

22   now competitors or anybody in the marketplace would find it of

23   interest to see how much we're spending with those companies,

24   what exactly those companies are doing, could give competitors

25   access to companies that we were doing business with that could

FOX – DIRECT – PRIMAVERA                                    87

1    worked hard for for 30-some-odd years.

2            MS. PRIMAVERA:  Your Honor, this is not a TikTok.

3    It's the website bbqconsulting.com, which we would like to

4    stipulate with the Bakers that they operate currently.  This is

5    just a screenshot of the page of the website.

6            Are the Bakers able to -- I'm blowing it up on the

7    screen.  If they're able to see it, are they able to confirm

8    that this is the website that they operate and have control

9    of?

10           THE COURT:  Mr. Baker, Ms. Baker, is this your

11   website?

12           MS. BRITTANI BAKER:  That is our website, and

13   our website domain that we own for Bubba's Boneless Ribs,

14   yes.

15           THE COURT:  All right.  Thank you.  It's admitted into

16   evidence.

17           (EXHIBIT DJ-22 WAS RECEIVED IN EVIDENCE.)

18           MS. PRIMAVERA:  Thank you, Your Honor.

19   BY MS. PRIMAVERA:

20   Q.   Mr. Fox, are you aware that there is a website that's

21   operating called bubbasbonelessribs.com?

22   A.   Yes, I am.

23   Q.   I'm going to hand you what's currently on the screen that

24   we're premarking as DJ-22.

25           Is bubbasbonelessribs.com still in operation for customer

FOX - DIRECT - PRIMAVERA

1  use?

2  A.   No, it's not.

3  Q.   Why not?

4  A.   Approximately a week ago, somehow the bubbasbonelessrib

5  website, which is germane to the company's business, was

6  somehow diverted by Brittani Baker to when you open it up it

7  automatically shoots over to bbqconsulting.com, so it bypasses

8  the ability for customers to be synergized to shop and make

9  orders.

10  Q.   So if I'm a consumer and I'm going online to try to buy

11  the ribs and I type in bubbasbonelessrib.com, it's going to

12  direct me now to bbqconsulting.com automatically?

13  A.   Automatically.

14  Q.   Okay.  And when I go there, this is what I see as a user,

15  correct?

16  A.   Yes, correct.

17  Q.   So when I go to the webpage, the first line that I see is,

18  "Looking for boneless ribs?"

19       Can you read the rest of that?

20  A.   Yes.

21       "Sorry, they are not available right now.  Unfortunately,

22  working with Daymond John, Rastelli Foods, Larry Fox, Ray, Jr.,

23  Ray Rastelli, III, is a nightmare and I have to bring awareness

24  to our story and fight for our product."

25  Q.   Is there anywhere on that website, the former

1   bonelessrib.com website, where a consumer can purchase the

2   product anymore?

3   A.   No.   That's all been shut down.

4            MS. PRIMAVERA:   Thank you.   I have nothing further.

5            THE COURT:   Mr. Al Baker, do you have any questions of

6   this witness?

7            MR. BAKER:   I do.   I have a couple questions.

8                  C R O S S - E X A M I N A T I O N

9   BY MR. BAKER:

10  Q.   Let's go back to, Mr. Fox stated that in the initial --

11  let's call it the initial year, you used a number of $400,000

12  in the initial Shark Tank orders.

13       I wanted to ask Mr. Fox, when that account was closed, how

14  much was remaining in that account, Mr. Fox?

15           MS. PRIMAVERA:   Objection.   Mischaracterizes

16  testimony.

17           THE COURT:   Well, Mr. Fox, can you answer the

18  question?

19           THE WITNESS:   I can try to answer your question, Your

20  Honor.

21           I mean, Mr. John has nothing to do, and I never had

22  anything to do with any of the accounts or accounting or

23  records, so we don't have access to it, so we would not know.

24           MR. BAKER:   I have another question then.

25  BY MR. BAKER:

1          I could keep going on and on.  I mean, Stew Leonard's.
2   We brought you Stew Leonard's to the table.  You appeared at
3   Stew Leonard's.  I sat there and went shopping for coleslaw to
4   give to the customers as you were handing out ribs and sat
5   there shaking hands.  So, yeah, you were involved every step of
6   the way, Al.
7          MR. BAKER:  May I be more specific, Your Honor?
8          THE WITNESS:  Please do.
9   BY MR. BAKER:
10  Q.  Was I ever in the room when we closed a deal, Mr. Fox?
11  A.  We're the brand ambassador.  To answer the question,
12  we're not involved in closing deals, Al.  You're the manager,
13  the Rastellis are the manager.  We never closed a deal.
14  We brought relationships to the table to the managers to
15  discuss.
16      Let me go back in time again.  We brought together Zulily.
17  We handed it off to the managers for you guys to figure out the
18  next steps.  Sure, that was our relationship, so we were
19  involved in the early stages of those conversations, and also
20  administrating it because we have history.
21      Good Morning America, we didn't close the deal.  We
22  brought it to the managers for them to discuss to figure out do
23  we move forward with Good Morning America.  I remember you on
24  those conversations.
25      We brought forward multiple grocery stores, we brought

FOX - CROSS - MR. BAKER                                94

1   forward the New York Yankees.  We handed them off to the

2   managers to discuss.  We were not in the room to close any of

3   these deals.  That's not our job.

4        Let's go to Carl's, Jr.  We were intricately involved with

5   bringing that to the forefront.  Daymond waived the speaking

6   fee in goodwill to show them that, hey, these are good people

7   to be involved.

8        We didn't have anything to do with the detailed

9   negotiations.  We don't understand the pork and the yields and

10  the pounds and the this or that, but we, again, brought these

11  things to the forefront.

12       I'll give you another example.  It wasn't our job, Al, but

13  since COVID, there's been absolutely no product available to

14  sell because supply chains have been broken and the biggest

15  problem this company has had, that none of us are really making

16  any money, is there's no product to sell.

17       It wasn't our job, but we went out there and figured out

18  your relationship we had where Daymond had a public speaking

19  gig, and I actually shook someone's hand that it turned out he

20  went to the same high school as me, that we were able to open

21  up an opportunity of a supplier in Mexico when we were at a

22  complete standstill in this business.

23       And I introduced the managers to these two suppliers in

24  Mexico for both you and your family and the Rastellis to go

25  back, that were finally actually ready to bring product in to

FOX - CROSS - MS. BAKER                    *113*

1   product that we had very little inventory on, we tried to think

2   about what we could do at that point.

3          We participated in conversations with your family and

4   the Rastellis about reaching out to an investment banking

5   company to put together a deck, that we were very involved in

6   trying to help with our expertise with with regard to seeing if

7   there was any way to sell the company or find an infusion of

8   capital when we had no inventory.

9          Those conversations went on for six to nine months.

10  We participated in those.  Then we all decided to break up

11  tasks and figure out who we could bring this project to now

12  that we were trying to source it and sell it.  So I went out to

13  certain relationships that we had; the Bakers, you guys all

14  brought it out, your team, Jennifer Flack was helping; the

15  company Mustin helped to put it together; the Court was

16  helping; the Rastellis.  We were intricately involved in that.

17         But we were pretty much at a standstill with regard to

18  inventory because there was no way to get the supply chain to

19  move any faster and we had no inventory to sell.  So being the

20  brand ambassador switched to being involved to see if there was

21  a way to help raise money for the company, to get an infusion

22  of capital, to sell the company.

23         Sadly, nobody seemed interested.  We were all on calls

24  and we were all frustrated that, unfortunately, it wasn't

25  progressing forward.  So to help the company while we had no

FOX - CONT CROSS - MS. BAKER                    *123*

1     Since 2019, I assume you mean since the settlement

2   agreement, soon thereafter we had COVID three, four months

3   later --

4          (Court reporter interruption)

5          THE COURT:  And remember, Mr. Fox, talk slowly,

6   please.

7          THE WITNESS:  Absolutely, Your Honor.

8          THE COURT:  Slower than you're talking.

9          (Discussion held off the record)

10          THE WITNESS:  All right.  So to just take a step

11   backwards, with regard to the brand ambassadorship, we signed

12   the settlement agreement in late 2019.

13          Soon thereafter, we were all confronted with

14   COVID, where we had very limited to no supply.  So being the

15   brand ambassador at that point, there wasn't any product to

16   push, there was no way to go to market, there was no way to

17   bring in new accounts, new relationships, and our focus as a

18   company, from what I was told, switched to finding a new

19   supplier.

20          That's when DF Ventures and Daymond John jumped in,

21   reached out to their contacts and was able, through our

22   relationships, to bring forward a new supplier that was going

23   to be vetted by both the Bakers and the Rastellis so that we

24   could have a new supply because currently there's nothing we

25   could do.

FOX - CONT CROSS - MS. BAKER                    *130*

1    should say anything to do with that.  Never even discussed or

2    mentioned.

3          Finally, because we were getting upon desperate times in

4    2022 and still had no supply, I went back to Smithfield and

5    said, "Can you help us here a little bit?  Do you have any

6    suppliers?  You mentioned that we have to get better pricing."

7    And they took about two to three weeks to get back to me.

8          And in February, I reported to you, your family, and your

9    attorney and said, "They're actually going to try to help us

10   and synergize us with some of their suppliers down in Mexico

11   and make introductions."

12         I got on the phone with them in February, they gave a few

13   of those leads.  I immediately tasked it to the entire team at

14   that point.  And at that point, there was nothing else for DF

15   Ventures or myself to do.

16         We're not involved in product development, costing,

17   slicing ribs, dicing ribs.  We know nothing about it.  We

18   handed it off to the entire team.  And then meetings were set

19   up.  You started to vet the process.

20         And you and your father were supposed to show up at the

21   facility in May in Mexico, and the day before, you sent an

22   email and said you weren't showing up.  So you guys were

23   engaged every step of the way.

24   Q.   Larry, do you have a direct contact at Smithfield?

25   A.   I know several of the people at Smithfield, yes.

1   confirmation for the record that in 2019 you had a business

2   dispute with the Rastellis; isn't that right?

3   A.   Yes, ma'am.

4   Q.   And there was a settlement agreement that came about once

5   that dispute came to resolution; is that right?

6   A.   Yes, ma'am.

7   Q.   And that settlement agreement is --

8          MS. COLWIN:  On the record, Your Honor, that's already

9   in the record as DJ-2.  It's already been admitted into

10  evidence.

11         THE COURT:  Correct.

12  BY MS. COLWIN:

13  Q.   Mr. Baker, that is your -- you signed that agreement;

14  isn't that right?

15  A.   Can I see the agreement you're talking about?

16  Q.   The settlement agreement.  DJ-2 is being shared with you,

17  Mr. Baker.

18       Do you see that?

19  A.   Can you show me my signature, ma'am?

20  Q.   Sure.  It goes down to page 5.

21       Mr. Baker, that's your signature there; is it not?

22  A.   Yes, ma'am.

23  Q.   And on the pages preceding, I'll have them show it to you

24  beginning with page 1.  Those are your initials JAB.  We're

25  going to scan from the beginning of the document.  That's

JAMES BAKER - CROSS - COLWIN                                         *171*

```
 1   page 1, page 2, page 3, page 4?

 2        Those are your initials; isn't that right, Mr. Baker?

 3   A.   Yes, ma'am.

 4   Q.   Now, in this -- before this settlement agreement was

 5   memorialized and signed by the parties, you were represented by

 6   counsel during the settlement of this dispute; isn't that

 7   right?

 8   A.   Yes, ma'am.

 9   Q.   You had Ed Heben from Heben & Associates, LLC?

10   A.   No, ma'am.

11   Q.   You had Greg Lomax from Lauletta Birnbaum; is that right?

12   A.   Yes, ma'am.  He was local counsel.

13   Q.   Jayne Juvan from Tucker Ellis?

14   A.   Correct.

15   Q.   John Lewis from Tucker Ellis?

16   A.   Could you repeat that, please?

17   Q.   John Lewis from Tucker Ellis as well?

18   A.   I don't recall a Don Lewis.

19   Q.   Mr. Baker, I'm not sure if you heard me correctly.  John,

20   J-O-H-N, Lewis?

21   A.   Correct.

22   Q.   And this settlement agreement was also worked on by a

23   Federal Magistrate Judge by the name of Joel Schneider; isn't

24   that right?

25   A.   Correct.
```

JAMES BAKER - CROSS - COLWIN

1  Q.  Where does it say anywhere on this document "I'm signing

2  under duress"?

3  A.  It does not.

4  Q.  Mr. Baker, I have a question pending.

5  A.  I am sorry.  Repeat that, please, ma'am.

6  Q.  I asked a question.  Where on this document does it say "I

7  am signing under duress"?

8  A.  It does not.

9  Q.  Where on this document does it say "I'm forced to sign

10  this agreement"?

11  A.  It does not.

12  Q.  Where on this document does it say "I don't agree with the

13  terms of this agreement"?

14  A.  It does not.

15  Q.  Let's go back to the restrictions.  In paragraph 5 it says

16  clearly that everyone involved that signed this agreement are

17  not to make negative comments about each other; isn't that

18  right?

19  A.  Yes, ma'am.

20        MS. COLWIN:  I'd ask for demonstrative DJ-24.

21        Your Honor, in accordance with your ruling as of

22  yesterday morning, the demonstrative and the exhibits have

23  been admitted into evidence.

24        It's DJ-24.  We'd ask that that be admitted into

25  evidence as well.

JAMES BAKER - CROSS - COLWIN                    *179*

```
 1              THE COURT:  Any objections?

 2              MR. DAHAN:  No objection, Your Honor.

 3              THE COURT:  These are social media profiles of some

 4   kind; is that correct?

 5              MS. COLWIN:  It is, Your Honor.

 6              THE COURT:  All right.  They'll be received into

 7   evidence, DJ-24.

 8              (EXHIBIT DJ-4 WAS RECEIVED IN EVIDENCE.)

 9              MS. COLWIN:  Okay.  Thank you, Your Honor.

10   BY MS. COLWIN:

11   Q.  In DJ-24, it says -- it has a picture of Daymond John and

12   the word "thief," correct, Mr. Baker?

13   A.  And the -- I could not hear the end.  Can you repeat that?

14   Q.  And word "thief."

15   A.  Speaks or -- I'm sorry.

16   Q.  "Thief."

17   A.  Oh, thief.

18   Q.  "Thief," Mr. Baker.

19   A.  It does.  May I comment on --

20   Q.  I'd like to ask another question, Mr. Baker.

21              THE COURT:  Hold on, Mr. Baker.

22              There's no question pending.  Just answer the

23   questions, please.

24              MR. BAKER:  Okay.

25              MS. COLWIN:  I'd ask for DJ-10, the video, to be
```

 1   placed up.

 2           It's admitted into evidence, Your Honor.

 3           THE COURT:  It's in evidence.

 4           (Recording played)

 5   BY MS. COLWIN:

 6   Q.  Did you hear that, Mr. Baker?

 7   A.  Can you play it again?  I did not hear.  I was writing a

 8   note.

 9           (Recording played)

10   BY MS. COLWIN:

11   Q.  Mr. Baker, would you agree with me, "My family is so

12   confident that fraud and illegal activities is taking place,"

13   correct?

14   A.  I did not hear the video, ma'am.

15           MS. COLWIN:  If you permit me, I will just -- because

16   it's already in the record, so I can get through the

17   examination quickly, with your permission, Your Honor.

18           THE WITNESS:  Okay.

19   BY MS. COLWIN:

20   Q.  Mr. Baker, I will represent to you as an officer of the

21   court that DJ-10 that's in evidence has the following statement

22   made by Brittani Baker:  "My family and I are so confident that

23   fraud and illegal activities are taking place."

24       You'd agree with me that that's negative, correct?

25   A.  Correct.

JAMES BAKER - CROSS - COLWIN                    *181*

1  Q.  I'm not going to play any of the video.  There's obviously

2  something that's happening when we share it.

3       But let me represent to you as an officer of the court,

4  DJ-8, that's already in evidence, that Brittani Baker stated

5  the following:  "So today I'm going to give you more evidence

6  on how the Rastellis and Daymond John were manipulating the

7  numbers for their benefit."

8       You would agree with me that that's negative, Mr. Baker,

9  correct?

10 A.  Yes, ma'am.

11           MS. COLWIN:  DJ-25, Your Honor, is not admitted into

12 evidence, but consistent with the ruling that you provided to

13 the parties yesterday, we'd ask that it be admitted into

14 evidence.

15           THE COURT:  I don't know what it is because it's not

16 listed.  What is it?

17           MS. COLWIN:  It's a video -- another video posted two

18 days ago by Ms. Brittani Baker.

19           THE COURT:  Okay.

20           MS. COLWIN:  I'd ask -- we will play it this time.

21 This one can be played, Your Honor.

22           THE COURT:  Play it.

23           (Recording played)

24           MR. DAHAN:  We can't hear it on our end.

25           (Recording played)

JAMES BAKER - CROSS - COLWIN                     *182*

1           THE COURT:  There's no audio on my end.  This is Judge

2    Kugler.

3           Hold on.  There's a terrible feedback going on here.

4    I don't know who's doing it.

5           MS. COLWIN:  Your Honor, I'll start over.

6           And, Your Honor, just so that the record is clear,

7    DJ-25 has been admitted into evidence, correct?  It's the video

8    that we were just referring to.

9           THE COURT:  It is.

10          (EXHIBIT DJ-25 WAS RECEIVED IN EVIDENCE.)

11          MS. COLWIN:  Thank you, Your Honor.

12   BY MS. COLWIN:

13   Q.  Mr. Baker, on that video, DJ-25, that's admitted into

14   evidence, I will represent to you as an officer of the court:

15   "We know where it went" -- meaning the $18 million -- "to

16   Daymond John, Larry Fox, Ray Rastelli, Jr. and Ray Rastelli,

17   III."

18       You would agree with me that that statement is negative,

19   correct?

20   A.  Yes.

21   Q.  Now, there are -- Bubbas Q Food Trucks has a TikTok

22   account, correct?

23   A.  Yes.

24   Q.  And Bubbas Q Food Trucks has an Instagram account,

25   correct?

JAMES BAKER - CROSS - COLWIN

1  Instagram account, correct?

2  A.   I'm not sure which account that is.  I don't know a whole

3  lot about social media, ma'am.

4  Q.   All right.  Well, let me scroll down.  It's in evidence.

5  We can clear that up at a later point with Ms. Brittani

6  Baker.

7       It says right below your -- the TikTok account that you've

8  already identified as the BubbasQfoodtrucks TikTok account, it

9  says "Daymond John and Rastelli Foods are trying to steal my

10 family's business."

11      Do you see that?

12 A.   Yes, I do.

13 Q.   You'd agree that that's negative, correct?

14 A.   It's true.

15 Q.   I'm asking, you would agree with me that that's negative,

16 Mr. Baker, correct?

17 A.   It's true.

18         MS. COLWIN:  Your Honor, move to strike.  I'll ask it

19 again.

20 BY MS. COLWIN:

21 Q.   Mr. Baker, you would agree with me that when -- on that

22 post that says "Daymond John and Rastelli Foods are trying to

23 steal my family's business," you'd agree with me that that's

24 negative, correct?

25 A.   Ma'am, I am sorry, I can't agree with you on something if

1    I don't agree with it.  I agree that it's true.

2            THE COURT:  Mr. Baker --

3            MS. COLWIN:  I am sorry, Your Honor?

4            THE COURT:  Let me try it this way.

5            Mr. Baker?

6            MR. BAKER:  Yes, Your Honor.

7            THE COURT:  It says "Daymond John and Rastelli Foods

8    are trying to steal my family's business."

9            Is that a positive comment about Daymond John and

10   Rastelli Foods or a negative comment?

11           THE WITNESS:  It's a negative comment.

12           THE COURT:  Thank you.

13   BY MS. COLWIN:

14   Q.  Mr. Baker, up to about today, you have there about 50

15   posts about the Rastellis and Daymond John since May 15th,

16   correct, to the present day, about 50 posts?

17   A.  Yes, ma'am.

18   Q.  And as of last week, you stated that there were 3 million

19   views of these 50 posts, correct?

20   A.  Yes, ma'am.

21   Q.  And you can see in DJ-23 some of these posts --

22           MS. COLWIN:  Can you just pull that back up for

23   Mr. Baker?

24   BY MS. COLWIN:

25   Q.  Some of the posts you have pinned.  Do you see that on the

JAMES BAKER - CROSS - COLWIN

1   left-hand of your screen?  Those are pins there.

2       Do you see where it says "pins"?

3   A.  Yes, ma'am.

4   Q.  At the very top of your -- of the BubbasQfoodtrucks'

5   TikTok account; is that right?

6   A.  Yes, ma'am.  That's what I can identify, yes, ma'am.

7   Q.  You want everyone who has access to the internet to see

8   these posts, don't you?

9   A.  Yes, ma'am.

10  Q.  You want to talk about these posts?

11  A.  Do I want to talk about them?

12      I couldn't hear what you said.  Can you repeat that,

13  please?

14  Q.  You want to talk about these posts?

15  A.  Is that a question, ma'am?

16  Q.  Yes, I'm asking a question.

17      You want to talk about these posts, don't you?

18  A.  To you?

19  Q.  To anyone.  You want to talk about the sum and substance

20  of these posts, correct?

21  A.  Well, first of all, that's not my account.  But yes, we

22  want that out.  We do want that on there.

23  Q.  And you have a new show that's coming on your YouTube

24  channel, Bubba and Beau Show.

25      You're going to feature some of these posts on that show,

JAMES BAKER - CROSS - COLWIN                    *187*

1   correct?

2   A.   No, we didn't make that specifically -- we have not

3   finished the concept of the show, but we are going to have a

4   show and we're part of the media.

5        I agree.  We are in the media.  We both are members of the

6   media.

7   Q.   And in your submission to the Court on June 11th, you

8   professed you were part of the media, correct?

9   A.   I agree I'm a hundred percent part of the media.  Thank

10  you.

11  Q.   Mr. Baker, you have no -- as you sit here today, you have

12  no intention of stopping any of these posts, correct?

13  A.   Correct.

14  Q.   Mr. Baker, you've represented to the Court that you have

15  no money; isn't that right?

16  A.   Well, I didn't say no money.  I don't have money to travel

17  with.  I'm on Social Security and a small pension, ma'am.

18  That's my only income.

19       If you want to know my income, my last licensing fee from

20  the Rastellis and DF Ventures was $37.  You asked.

21  Q.   So your restaurant closed; isn't that right?

22  A.   In 2015.

23            MS. BRITTANI BAKER:  '19.

24            MR. BAKER:  '19.  2019, I am sorry.

25  BY MS. COLWIN:

JAMES BAKER - CROSS - COLWIN                     *188*

1  Q.   According to Mrs. Baker, the representation that she makes

2  to the Court -- Sabrina Baker, your wife -- she also mentioned

3  to the Court that you lost your car; is that right?

4  A.   No, we had our car repossessed is what she said.  Yes, we

5  did.

6  Q.   So just to follow up on your testimony, Mr. Baker, you are

7  on a fixed income, correct?

8  A.   Correct.

9  Q.   And your fixed income is comprised of Social Security and

10 an NFL pension; is that right?

11 A.   Correct.

12 Q.   And, Mr. Baker, FOFBakers Holding Company, LLC, their

13 financial condition is poor as well, correct?

14 A.   Will you repeat that, ma'am?

15 Q.   With respect to FOFBakers Holding Company, LLC,

16 their financials, the company's financials are poor as well,

17 correct?

18 A.   I'm not quite understanding what you're saying.  I'm not

19 being paid a lot of money, if that's what you want to know.

20 Q.   But the company -- the company -- I just want to focus on

21 the company, Mr. Baker.

22      The company of FOFBakers Holding Company, LLC, it does not

23 have assets; is that right?

24 A.   Correct.

25 Q.   And JabezBaker, LLC has no assets, correct?

JAMES BAKER - CROSS - COLWIN                      *189*

1   A.   JB Baker?

2   Q.   JabezBaker, LLC has no assets, correct?

3   A.   Oh, JabezBaker has no assets, correct.

4   Q.   Has -- okay.  I just want to make sure that we're clear.

5        JabezBaker, LLC, has no assets; is that right?

6   A.   Well, it owns the patent.

7   Q.   Do you have any income going to JabezBaker, LLC?

8   A.   No.

9   Q.   Do you have any income going to FOFBakers Holding Company,

10  LLC?

11  A.   I'm trying to think of where I get paid from by the

12  Rastellis.  I'm not sure if that's through Jabez or through the

13  holding company.

14  Q.   To your knowledge?

15  A.   But my only income is from Rastelli, my only additional

16  income.  I'm trying to figure out what your question is.

17  Q.   Let me rephrase this.

18  A.   Yes, please.

19  Q.   Is there any money at FOFBakers Holding Company, LLC

20  that you could -- you, as the CEO, could take and pay a

21  debt?

22  A.   The only income I get through this company, ma'am, is the

23  royalty that I just mentioned.

24       Last month was $37.  This month was $37.  There is no

25  other income.

1  correct?

2  A.  No issues with what?  I am sorry.

3  Q.  With respect to testifying.  You feel that you can

4  understand the questions being posed to you and respond

5  truthfully; is that right?

6  A.  Yes.

7  I have a question, though, in regards to my answers.  Are

8  my answers allowed to be as detailed and descriptive as Larry

9  Fox's answers were?

10  THE COURT:  Ms. Baker, just answer the questions that

11  you're asked.  If counsel needs my assistance, she will ask for

12  it.

13  MS. BRITTANI BAKER:  Yes, Your Honor.

14  MS. COLWIN:  Thank you, Your Honor.

15  THE COURT:  Go ahead.

16  And you are to treat her as an adverse witness, right,

17  hostile witness?

18  MS. COLWIN:  I am, correct.

19  THE COURT:  Okay.  Proceed.

20  BY MS. COLWIN:

21  Q.  Ms. Baker, you have a profile on TikTok called

22  BubbasQfoodtrucks, correct?

23  A.  Correct.

24  Q.  And that's been reflected behind us.  This is right here.

25  This is DJ-23.  Correct?

BRITTANY BAKER - CROSS - COLWIN

 1  A.   Correct.

 2  Q.   And you also have a profile on Instagram on

 3  BubbasQfoodtrucks, correct?

 4  A.   Correct.

 5  Q.   That's also in D-23 in evidence; is that right?

 6  A.   Yes, ma'am.

 7  Q.   And you have a BubbasQ60 on Instagram also; isn't that

 8  right?

 9  A.   Yes, ma'am.

10  Q.   And you have a BrittaniBoBaker on Instagram, correct?

11  A.   Yes.

12  Q.   And you have by now about 50 posts about Daymond John; do

13  you not?

14  A.   Yes, ma'am.

15  Q.   And just two days ago you commented about these

16  proceedings, correct?

17  A.   Yes.

18  Q.   In fact, you said, "Thank you, sister.  Tomorrow's going

19  to be virtual, but I'll keep everyone posted for the next one

20  because if it's in-person, I'm inviting everybody."

21       Is that right?

22  A.   Correct.  The court hearings are public, correct, if

23  they're in person?

24  Q.   That's not my question, Ms. Baker.

25            MS. COLWIN:  And, Your Honor, I'd ask that that be

```
 1   Honor.  I apologize.
 2              (EXHIBIT DJ-6 WAS RECEIVED IN EVIDENCE.)
 3   BY MS. COLWIN:
 4   Q.  Ms. Baker, just so the record is clear, DJ-26, admitted
 5   into evidence, that is your comment below the
 6   BubbasQfoodtrucks, correct?
 7   A.  Yes, ma'am.
 8   Q.  And there are thousands -- similar to the comments that
 9   you see here, there are thousands of comments to your post;
10   isn't that right?
11   A.  Yes.
12   Q.  You have millions of views, correct?
13   A.  Yes.
14              MS. COLWIN:  Now, Your Honor, with your permission,
15   I'm going to show video DJ-9 that's been admitted into
16   evidence.
17              THE COURT:  You may.
18              MS. COLWIN:  Thank you, Your Honor.
19              (Recording played)
20   BY MS. COLWIN:
21   Q.  Ms. Baker, that's your image on that video; isn't that
22   right?
23   A.  Yes, it is.
24   Q.  And you want that video and your message to be broadcast
25   as much as conceivably possible, correct?
```

BRITTANY BAKER - CROSS - COLWIN                    *196*

 1  A.   Yes, I do.  I want to share my story with as many people

 2  as I possibly can.

 3          MS. COLWIN:  We'll just move to strike the portion as

 4  unresponsive, Your Honor.

 5          THE COURT:  Well, it's not a simple answer, so I'm

 6  going to deny your request.

 7          But let's get focussed, Ms. Baker, on the actual

 8  question being asked.

 9          THE WITNESS:  Yes, Your Honor.

10          MS. COLWIN:  I'd ask for the comment, DJ-27.

11          Consistent with your rulings of the Court, I'd ask

12  that this also be admitted into evidence, Your Honor.  DJ-27

13  will be shown in just a moment.

14          (Recording played)

15          MS. COLWIN:  Your Honor, may I ask that this

16  be admitted into evidence?

17          THE COURT:  Is it just an audio tape?  What is

18  it?

19          MS. COLWIN:  It's an audio.

20          THE COURT:  All right.  Okay.  It's admitted into

21  evidence.

22          (EXHIBIT DJ-7 WAS RECEIVED IN EVIDENCE.)

23          THE COURT:  Ms. Baker, that's your voice, correct?

24          MS. BRITTANI BAKER:  Yes, Your Honor.

25          THE COURT:  Thank you.

BRITTANY BAKER - CROSS - COLWIN

1   BY MS. COLWIN:

2   Q.   You're applauding that there's at least a million views as

3   of that date; isn't that right, Ms. Baker?

4   A.   Yes.

5           MS. COLWIN:  DJ-9, admitted into evidence, Your Honor.

6           To move things along, as an officer of the court, I'm

7   just going to state for the record what the quote is.

8   BY MS. COLWIN:

9   Q.   Ms. Baker, I'll represent to you as an officer of the

10  court in DJ-9 you stated, "TikTok, I need you to do your

11  thing."

12       You stated that; did you not?

13  A.   Yes, I did.

14  Q.   And the reason why you state that is because you wanted

15  these posts to be disseminated as far and wide as conceivably

16  possible, correct?

17  A.   My experience working with the Rastellis and Daymond John

18  is a nightmare.  I'm trying to share that story with as many

19  people as I can.  So, yes.

20  Q.   Ms. Baker, my question was clear.

21       You want these posts to be shared with as many people as

22  possible, correct?

23  A.   Correct.

24  Q.   You want everyone who has access to the internet to see

25  these posts; isn't that right?

BRITTANY BAKER - CROSS - COLWIN                    *198*

1   A.   That is correct.

2   Q.   In your post you have a variety of hashtags; do you not?

3   A.   Yes, I do.

4   Q.   You have #SharkTank, correct?

5   A.   Yep.

6   Q.   You have #DaymondJohn, correct?

7   A.   Yep.

8   Q.   You have #foryoupage, correct?

9   A.   Yes.

10  Q.   And these hashtags were meant to increase the reach and

11  visibility of your posts; isn't that right?

12  A.   Absolutely.

13  Q.   Now, you have responded to these posts as well,

14  correct?

15  A.   Yes.

16          MS. COLWIN:  Let me begin with DJ-12, admitted into

17  evidence, Your Honor.

18  BY MS. COLWIN:

19  Q.   Now, it says -- in the comments from a TikTok user says,

20  in DJ-12, admitted into evidence:  "Keep it coming.  Sounds

21  like Daymond should be sued at the least and in prison

22  probably.  Something he's done must be criminal."

23       You see that, correct?

24  A.   Yes, I see that.

25  Q.   And you commented on that right below it and you write --

BRITTANY BAKER - CROSS - COLWIN

*199*

1   -- that's you, BubbasQfoodtrucks, as the creator:  "Thank you

2   for your support."

3        Isn't that right?

4   A.   Yes.

5   Q.   So you were pleased that this TikTok comment referred to

6   Daymond John as a criminal?

7   A.   Because I believe that.  Yes.

8   Q.   I asked, you were pleased that Daymond John was deemed a

9   criminal based on your post; isn't that right?

10  A.   Correct.

11  Q.   And you would agree with me that having someone say that

12  Daymond John is a criminal is negative; isn't that right?

13  A.   I think it's the truth.

14  Q.   I'm asking, Ms. Baker, when Daymond John is described

15  as a criminal and he should be in prison, that is negative,

16  correct?

17  A.   Yes.

18        MS. COLWIN:  DJ-15.

19  BY MS. COLWIN:

20  Q.   TikTok user in DJ-15, admitted into evidence writes:

21  "Send your story to every station, news reporter, bloggers,

22  meat bloggers, restaurant bloggers.  Make as much noise as

23  possible."

24        And Daymond John was tagged.  "@DaymondJohn?"

25        Is that right?

BRITTANY BAKER - CROSS - COLWIN

1  A.   No.  I was just responding.

2  Q.   You just responded.  You could have just done a

3  little heart, but you chose to put exclamation points,

4  correct?

5  A.   I didn't put clapping hands or anything.  I was just

6  interacting with their comment, thanking them for their

7  support.

8  Q.   Ms. Baker, you would agree with me that exclamation points

9  means, yes, right, emphasis of it, correct?

10 A.   Emphasis, correct, but that's it.

11 Q.   DJ-16.  On DJ-16, admitted into evidence, a TikTok person

12 writes:  "Time to blow up Twitter and include Shark Tank as

13 well.  No one wants bad publicity.  That's bad for their

14 brand."

15     You agreed with that comment, didn't you, Ms. Baker?

16 A.   I didn't agree.  I just interacted with it.

17 Q.   You put below that an emphasis with the exclamation

18 point?

19 A.   Exclamation points.

20 Q.   And that's emphasis, correct?

21 A.   That's emphasis.

22 Q.   And someone is saying in that comment above to "include

23 Shark Tank" and "no one wants bad publicity," you would

24 consider that negative, wouldn't you?

25 A.   I guess so.

1  Q.  Below that, another commenter writes:  "This seems like a

2  case of fraud, breach of contract, patent infringement, and

3  contributory patent infringement and sue those personally

4  responsible."

5       You also engaged below that -- that's you,

6  BubbasQfoodtrucks' creator, correct?

7  A.  Correct.

8  Q.  You put in a host of exclamation points as an emphasis;

9  isn't that right?

10  A.  Correct.

11  Q.  DJ-19, admitted into evidence, one of the TikTok

12  commenters writes:  "I definitely unfollowed him and will never

13  support a business venture he's attached to again."

14       You see that, Ms. Baker; isn't that right?

15  A.  I see it, yes.

16  Q.  And below that you thanked that comment; isn't that

17  right?

18  A.  I'm sorry.  I did what with it?

19  Q.  You wrote the words, "Thank you."

20  A.  Correct.

21  Q.  You appreciated that this TikTok individual would never

22  want to work with any business that Daymond John supports;

23  isn't that right?

24  A.  That is correct.

25  Q.  And below that another TikTok comment says:  "I hope no

BRITTANY BAKER - CROSS - COLWIN

*203*

1   one does business with him again," multiple exclamation points.

2       Isn't that right?

3   A.   Yes, ma'am.

4   Q.   And you responded to that commenter with multiple

5   exclamation points; isn't that right?

6   A.   I did.

7   Q.   Giving emphasis to their comment; isn't that right?

8   A.   Correct.

9   Q.   Now, you would agree with me that calling someone a thief

10  is negative, correct?

11  A.   I don't really agree with that.

12  Q.   So, Ms. Baker, if I went to the top of this roof -- I'm on

13  the 20th floor.  If I went to the top of the roof and I said,

14  "Brittani Baker is a thief," is that positive for you?

15  A.   If it's true, they're just being exposed.

16  Q.   I'm asking you a question.  I'm not asking about truth.

17  I'm asking a question.

18      Would it be positive for you if I stood on the top of this

19  building and said you were a thief?

20  A.   It would be positive for the person that's been taken

21  advantage of.

22  Q.   So, Ms. Baker, are you telling -- telling everyone out

23  here that they want to say that you're a thief, that would be a

24  positive for you, every single person --

25  A.   I'm not a --

1  Q.  -- that says that about you?

2  A.  I'm not a thief.  But if I was a thief and somebody was

3  exposing me for being a thief --

4  Q.  Ms. Baker, you're not answering my question.  I'm asking a

5  very simple question.

6      You would agree with me that calling someone a thief is

7  negative --

8  A.  I don't agree.

9  Q.  -- whether it's true or not?

10  A.  I don't agree.

11  Q.  You think it's positive then calling someone a thief?

12  A.  If they're a thief, yes.

13  Q.  You didn't -- I'm going to ask the question one more

14  time.

15      Regardless if it's true, putting truth aside, calling

16  someone a thief is negative, correct?

17  A.  No.  I'm not going to agree with you.  I am sorry.  You

18  can't make me agree with you.  I don't agree because there's

19  different --

20  Q.  Calling -- it's a yes or no, Ms. Baker.

21      Is calling someone a thief positive?

22  A.  Yes, if they're a thief.

23  Q.  Calling someone a scam artist, is that a positive in your

24  estimation?

25  A.  Yes.  If they are a scam artist, yes.

BRITTANY BAKER - CROSS - COLWIN                    *205*

1          MS. COLWIN:  Your Honor, I'd ask for Ms. Baker to

2     answer the question and strike the portions of her

3     question(Sic) that are not responsive.

4          THE COURT:  Counsel, she has answered the question.

5     That you don't agree with it is a different story.  I may not

6     agree with it, is a different story.  But she has answered the

7     question.

8          MS. COLWIN:  Thank you, Your Honor.

9     BY MS. COLWIN:

10    Q.  Setting the truth aside, calling someone a crook is

11    negative, correct?

12    A.  No.

13    Q.  Setting the truth aside, calling someone a scumbag is

14    negative, correct?

15    A.  I didn't call anybody any of these things.

16         MS. COLWIN:  Move to strike, Your Honor.

17    BY MS. COLWIN:

18    Q.  Setting the truth aside -- we're not here to debate the

19    truth.  I'm asking a very simple question.

20         Setting the truth aside, calling someone a scumbag is

21    negative; isn't that right?

22    A.  No.

23    Q.  Saying "I hope this cancels his useless ass forever,"

24    that's negative, correct?

25    A.  No.  That's negative for your client, it's not negative

BRITTANY BAKER - CROSS - COLWIN                    *206*

1  for me.

2  Q.  As you sit here today, Ms. Baker, you have no intention of

3  stopping posting, correct?

4  A.  My intentions are to share my family's experience.

5          MS. COLWIN:  Move to strike.

6  BY MS. COLWIN:

7  Q.  Ms. Baker --

8          THE COURT:  Excuse me.  Ms. Baker, you really need to

9  answer some questions.  You're really affecting your

10  credibility.

11          MS. BRITTANI BAKER:  Okay.

12  BY MS. COLWIN:

13  Q.  As you sit here today, Ms. Baker, you have no intention of

14  stopping to post comments, videos, about Daymond John and DF

15  Ventures, correct?

16  A.  Correct.

17          MS. COLWIN:  Thank you.  I have nothing further, Your

18  Honor.

19          THE COURT:  All right.  Let's start with counsel for

20  Rastelli.  Do you have any questions at this time?

21          MR. DAHAN:  Not at this time, Your Honor.  Again, I

22  would just reserve to call any of the Bakers on

23  cross-examination during my case in chief.

24          THE COURT:  All right.

25          Mr. Baker, do you have any questions based on what we

1   doing business with Daymond John."

2          There's a response from BubbasQfoodtrucks.  It says:

3   "Thank you."  It has prayer hands after that, the prayer hand

4   emoji.

5          Below that there's a comment by a member of the public

6   that says:  "So Daymond had never met Rastelli, but then when

7   he did, they joined forces and played you?  Am I getting that

8   right?"

9          The response from BubbasQfoodtrucks:  "Exactly," with

10  multiple exclamation points.

11         Please go to the last post on that page.

12         There's a comment by a member of the public that says:

13  "Has there been an audit of all of the financial records as of

14  yet?"

15         That's relevant because you will hear testimony today

16  how the Bakers have never requested or performed an audit of

17  the records of Rastelli.

18         Let's go to the next page.  Let's go to the bottom,

19  the next to the last comment where it says "I hope you."

20         This is a comment by a member of the public:  "I hope

21  you sue his ass.  He did you and your pops dirty.  This whole

22  thing is awful.  Where is the money?  He's stealing it, plain

23  and simple."

24         There's a response from BubbasQfoodtrucks.  And this

25  states:  "Where is the money is the question."

 1          Please go to the next page.  Go to the post that says

 2   "How come you."

 3          There's a comment by a member of the public that

 4   states:  "How come you did not get a better top line

 5   commission?  Also, how is profit calculated?"

 6          BubbasQfoodtrucks provides a response:  "We had one

 7   percent of total sales and 45 percent of net profits."

 8          You will hear testimony about how that is inaccurate.

 9          Please go to Exhibit 61.  Can you blow up the first

10   paragraph, please.

11          This is a GoFundMe page that was established by

12   Brittani Baker and perhaps the other defendant Bakers.  The

13   first paragraph reads:  "We are the Bakers, a family-owned

14   business that experienced the American dream turned into a

15   nightmare.  Our success on Shark Tank caught the attention of

16   viewers everywhere, but little did we know the deception that

17   awaited us from Daymond John and Rastelli Foods."

18          Please go to the next paragraph.

19          It states:  "Our product has generated over

20   $18 million in sales, however, despite this, we have received

21   less than four percent of the revenue before taxes spread out

22   over the past eight years."

23          You will hear testimony that shows that that statement

24   is inaccurate.

25          Please go to the next paragraph.

1          It reads:  "We are excluded from important discussions

2   pertaining to our patented product and left without access to

3   real-time accounting information and have no access to our

4   website, Bubbasbonelessribs."

5          You will hear testimony how that is false because

6   Brittani Baker did have access to that website.

7          Please go to the next paragraph.

8          First sentence reads:  "We are seeking your support to

9   fund our legal battle against these unethical practices."

10          Please go to Exhibit 62.

11          Your Honor, we have a demonstrative exhibit as well

12   that we're putting up.  This is a post by a member of the

13   public that reads:  "Google Philip Rastelli."

14          In response, BubbasQfoodtrucks says:  "No surprise

15   there, friend.  They are definitely running an organized crime

16   scheme."

17          Please go to Exhibit 63.  Can you blow up that exhibit

18   where it says "Rastelli is."

19          This is a comment by a member of the public:

20   "Rastelli is Mafia," exclamation point.

21          The response from BubbasQfoodtrucks is:  "Yep.  With

22   their organized crime schemes preying on small businesses."

23          Please go to Exhibit 70.

24          This is a comment by a member of the public that says:

25   "@bubbasQfoodtrucks, can you let us know all the Rastelli and

1  Q.   Are you aware if Shopify recently contacted Rastelli in

2  connection with that account?

3  A.   Yes.

4  Q.   And was that by email?

5  A.   Yes.

6  Q.   Was that email kept in Rastelli's records in the ordinary

7  course of its business?

8  A.   Yes.

9        MR. DAHAN:   Let's go to Exhibit Rastelli 71.  And can

10  you blow up the middle portion of that email.

11  BY MR. DAHAN:

12  Q.   Mr. Rastelli, this is an email from Theo at Shopify on

13  June 13, 2023, just a little earlier this month.

14  A.   Yes.

15  Q.   Do you recognize this email?

16  A.   I do.

17  Q.   And can you read the paragraph that says:  "We have

18  received."

19  A.   Yes.  It says:  "Hello, Ray, Theo here.  I am an account

20  security support specialist here at Shopify.  I hope your day

21  is going well.  We have received a request from Brittani to

22  adjust the store owner email of bubbaq.myshopify.com.  As per

23  our ownership verification procedure, we have requested that

24  they provide documentation providing ownership of the account.

25  As you are the current store owner, the purpose of this email

1   is to gather your feedback on this request.  If you're aware of

2   this change, can you kindly advise us what has prompted this

3   request."

4   Q.   Okay.  Now, when it refers to Brittani, who do you

5   understand that Brittani to refer to?

6   A.   Brittani Baker, who had administrative access, as she

7   requested.

8   Q.   Did -- strike that.

9        Who owns the Shopify account?

10  A.   Rastelli.

11  Q.   Did any of the Bakers ask Rastelli to modify the account

12  as referred to in this email?

13  A.   No.

14  Q.   What was your reaction to Brittani Baker's attempt to

15  modify this account?

16  A.   Well, dumbfounded is not a good word for this.  This is

17  out and out stealing.  When somebody takes the livelihood of

18  the company which is selling a company online and actually

19  takes it down like she did, and now in this case is requested

20  Shopify to actually change the ownership, which she has no

21  ownership in, it's appalling.

22  Q.   Are you aware of any industry journals who wrote a story

23  about the Bakers' social media posts?

24  A.   Yes, I am.

25  Q.   And which one?

RASTELLI, JR. - CROSS - PRIMAVERA                    *371*

1          MS. PRIMAVERA:  Good morning, Your Honor.  Brittany

2   Primavera.

3          THE COURT:  Hello, Ms. Primavera.  You may begin.

4               C R O S S - E X A M I N A T I O N

5   BY MS. PRIMAVERA:

6   Q.   Good morning, Mr. Rastelli.  How are you?

7   A.   Very good.

8   Q.   With regard to FOFBakers, LLC and this venture, other than

9   the operating agreement, the settlement agreement, including

10  the addendum and supplement, do any other agreements exist

11  between DF Ventures, LLC and the Rastelli Goods?

12  A.   No.

13  Q.   Do you know what the total amount of distribution DF

14  Ventures has received in connection with FOFBakers, LLC in this

15  venture since its inception?

16  A.   Approximately $113,000.

17  Q.   Thank you.  And what is the total amount, if you know, of

18  distribution that DF Ventures has received since the 2019

19  settlement agreement?

20  A.   Approximately $49,000.

21  Q.   Does Daymond John or DF Ventures participate in the

22  management or control of FOFBakers, LLC?

23  A.   No.

24  Q.   Does Daymond John or DF Ventures transact business for

25  FOFBakers, LLC?

RASTELLI, JR. - CROSS - PRIMAVERA                              *372*

1   A.   No.

2   Q.   Does Daymond John or DF Ventures have the power to act,

3   advise the company, or make monetary decisions on behalf of

4   FOFBakers, LLC?

5   A.   No.

6   Q.   The functions that I just named, are they vested

7   exclusively in the managers of FOFBakers, LLC?

8   A.   Yes.

9   Q.   Daymond John is not a manager of FOFBakers, LLC, correct?

10  A.   Correct.

11  Q.   Does Daymond John or DF Ventures have access to the bank

12  accounts, records, finances, or credit card of FOFBakers, LLC?

13  A.   No.

14  Q.   Daymond John's duties and roles in FOFBakers, LLC is

15  limited to being a brand ambassador, on-air television

16  personality for the company, to provide sales' contacts to the

17  company, and to provide marketing, promotions, product

18  development, sales, advertising services and supports of that

19  nature to the company; is that correct?

20  A.   Correct.

21  Q.   In this limited role, the one I just described, has

22  Daymond John fulfilled his obligations to FOFBakers, LLC?

23  A.   Yes, he has.

24       MS. PRIMAVERA:   Thank you.   We have nothing further on

25  behalf of DF Ventures.

RASTELLI, JR. - CROSS - SCHACHTEL                    *373*

1                THE COURT:  Thank you.

2                Mr. Schachtel, you may begin.

3                MR. SCHACHTEL:  Thank you, Your Honor.

4                C R O S S - E X A M I N A T I O N

5    BY MR. SCHACHTEL:

6    Q.   Mr. Rastelli, when did you first become acquainted with

7    the Baker family?

8    A.   Approximately 2015.

9    Q.   Okay.  And how were you introduced to the Bakers in 2015?

10   A.   We were introduced through a broker.

11   Q.   Okay.  Was the broker an affiliate of DF Ventures or is

12   that a separate entity?

13   A.   No, separate.

14   Q.   Did DF Ventures connect you to the Baker family?

15   A.   No, the Baker family came through the broker.

16   Q.   Okay.  At what point in time did you discuss entering into

17   a limited liability company or joint venture with the Baker

18   family to distribute their boneless barbecue rib product?

19   A.   It was either late '14 or early ' 15.

20   Q.   And how did you -- strike that.

21        Prior to entering into that meeting, did you meet with the

22   Baker family?

23   A.   Yeah, we met with the Baker family a number of times.

24   Q.   And who did you meet with on behalf of the Baker family?

25   A.   Primarily with Al Baker and his wife, Sabrina was

JAMES BAKER - CROSS - DAHAN

*435*

1  Q.  Well, where do you consider your place of residence,

2  Florida?

3  A.  Florida, yes, sir.

4  Q.  Fair to say you reside there most of the year?

5  A.  Correct.

6  Q.  Now, you had mentioned you were in Arizona previously.

7     How did you get from Florida to Arizona?

8  A.  When I got from Florida to Arizona in Easter, we flew

9  there.  We took two flights.  We flew there the weekend before

10 Easter.

11 Q.  Okay.  Now, the members of FOFBakers Holding Company, LLC

12 are you, Sabrina Baker, and Brittani Baker, correct?

13 A.  I don't have that in front of me.  I know I am and

14 Brittani is a member, but I don't recall Sabrina being

15 involved.

16    Which FOFBakers are you talking about?  There's two.

17 Q.  FOFBakers Holding Company, LLC.

18 A.  I know that my daughter and I, we share the patent.

19 Q.  Okay.  And the members of Jabezbaker, LLC are you,

20 Brittani Baker, and Sabrina Baker?

21 A.  No.  I think it's just me and Brittani, we're the owners

22 of the patent.

23 Q.  Now, Mr. Baker, your family has been represented by many

24 lawyers over the years; isn't that correct?

25 A.  Yes, sir.

JAMES BAKER - CROSS - DAHAN

*450*

1  team advised you not to travel to Mexico because of safety

2  concerns, correct?

3  A.   No, the Secretary of State -- they contacted the Secretary

4  of State.  That's who had posted on their website.  And the NFL

5  security guy is the one who told me I wouldn't recommend you go

6  there.

7  Q.   And if you had traveled to Mexico, you would have done so

8  by plane, correct?

9  A.   Correct.

10 Q.   And you agree with me that nowhere in this email do you

11 state that you can't travel due to any medical issues you have,

12 correct?

13 A.   Correct, I didn't.

14 Q.   Now, Mr. Baker, if a judgement was entered against your

15 family for the damages, the monetary damages Rastelli claims it

16 suffered in this lawsuit, your family would not be able to pay

17 it, correct?

18 A.   Correct.

19 Q.   In fact, Mr. Baker, you previously represented to this

20 Court that you traveling here to New Jersey for the hearing

21 would impose a financial hardship on you, correct?

22 A.   Correct.

23 Q.   And at that time your wife also represented to the Court

24 that you lost your house and car, correct?

25 A.   We have.

JAMES BAKER - DIRECT - SCHACHTEL

*499*

1  of the supplier and the co-packer, you reached out to them and

2  you were told in response to your contact that there was no

3  more product, is that what you said?

4  A.  Correct.

5  Q.  All right.  And I note that as of the last six months in

6  particular, it looks like there was really a marked drop-off in

7  the income.

8      Do you have any explanation of why that happened or what

9  the reason for that is over the last six months or so?

10  A.  Yeah.  According to the Rastellis, they don't have any

11  ribs.

12  Q.  But even through the summer, fall of last year, you're

13  still generating some sales here through October, and then

14  starting in September -- or I am sorry, starting in November

15  there is really a serious decline.

16      So again, any insight as to why that is?

17  A.  The only thing I can tell you is that according to the

18  Rastellis, they no longer had ribs, and we could see that we

19  were losing customers.

20  Q.  Okay.  And did you try to contact the Rastellis in the

21  fall of last year when you saw these numbers really take a

22  nosedive?

23  A.  Our last conversation with Ray, III was September 26th,

24  and that was a part of the conversation.  We got an email from

25  him and a part of the conversation was about the lack of ribs,

1   financial statements.  So that's the issue, that those weren't

2   provided.

3            THE COURT:  Mr. Schachtel, if you'll just answer my

4   questions, I think I can cut through a lot of this.  Please.

5            MR. SCHACHTEL:  Sure.

6            THE COURT:  Are you going to present any evidence that

7   there was anything inaccurate about those monthly statements?

8            MR. SCHACHTEL:  Well, that's the testimony of

9   Ms. Baker, I believe, who's going to testify later.

10           THE COURT:  That the monthly statements are

11  inaccurate, she has personal knowledge of that?

12           MR. SCHACHTEL:  My understanding is that that's her

13  claim, correct.

14           THE COURT:  Okay.  Now, there's been all this talk

15  about invoices.  You heard Mr. Rastelli's testimony yesterday,

16  and it had come earlier before you got in the case too, that

17  the problem right now, according to Rastelli's side, is that

18  there's no product to sell, correct?  There's very little

19  product to sell.

20           MR. SCHACHTEL:  Yeah.  And that's their fault because

21  they're responsible for product.  But yeah, I understand that's

22  their position.

23           THE COURT:  All right.  So if there's no product in

24  the pipeline, there will be nothing to invoice; is that

25  correct?

1            MR. SCHACHTEL:  Your Honor, I'm not a witness here,

2    I'm not a party here.  I can't really answer these questions.

3            So, you know, my understanding is that Rastelli is

4    responsible for procuring relationships, for making sure that

5    there was product in the pipeline to sell, and the fact that

6    they haven't done that and they haven't been able to procure a

7    supplier for 18 months is something the Bakers feel is a breach

8    of their obligations under that settlement agreement.

9            THE COURT:  Is there going to be evidence presented on

10    behalf of the defendants that the Rastelli testimony that

11    there's little product to sell is inaccurate?

12            MR. SCHACHTEL:  Your Honor, the Baker's position is

13    that the Rastellis breached the settlement agreement by failing

14    to employ commercially reasonable efforts to ensure that there

15    was product to sell in stores and that representations that

16    they made regarding their efforts were inaccurate.

17            So the Bakers are prepared to testify to that.

18    Brittani Baker is prepared to testify to that today.

19            THE COURT:  That's, of course, not what I asked.  I

20    said, are you going to present evidence that the testimony from

21    the Rastellis that there's very little product out there to

22    sell is inaccurate?

23            MR. SCHACHTEL:  Your Honor, my response I think speaks

24    for itself.  Ms. Baker's testimony is a form of evidence and

25    she's going to testify today to that issue.

1          THE COURT:  So she has personal knowledge that there

2    is product available that could have been sold, is that what

3    you're saying?

4          MR. SCHACHTEL:  Your Honor, I don't know everything

5    that she's going to say or she's not going to say.

6          What my client's position is, is that the Rastellis

7    did not use commercially reasonable efforts, which is their

8    obligation as part of the settlement agreement, to ensure that

9    there is product to be sold in stores, and the failure to do

10   that is a material violation of the settlement agreement.

11         So Ms. Baker, I believe, is prepared to testify to

12   numerous instances of essentially what is neglect, in her

13   opinion, by the Rastellis to meet their obligations under that

14   agreement.  And that is, you know, evidence that we hope the

15   Court will consider as a testimony of a party.

16         THE COURT:  Well, it depends on her personal

17   knowledge, of course.

18         So let me make sure I understand something else.  Is

19   it your contention that the failure of Rastelli to provide

20   invoices is a material breach of the agreement such that it

21   excuses the Bakers' obligation to perform?

22         MR. SCHACHTEL:  That is -- yeah, that is part of the

23   argument.

24         THE COURT:  Which part of the agreement does the

25   alleged failure to provide invoices violate?

1   phone call.

2        My dad and I have another LLC that we're partners in, and

3   that's the LLC that assigned this licensing agreement to this

4   company.

5   Q.   Okay.  And what is the LLC that you're a member in?

6   A.   It's FOFBakers as well.

7   Q.   Okay.  And --

8   A.   And Jabezbaker.

9   Q.   And what is your interest in that entity?

10  A.   My dad and I, in our own LLC, he's 51, I'm 49.  Same thing

11  with Jabezbaker, the company that holds the patents, he's 51,

12  I'm 49.

13  Q.   And is that entity an owner or a member of the FOFBakers,

14  LLC that's the subject of this dispute?

15  A.   Yes.

16  Q.   And what percentage of ownership does your entity have in

17  the LLC that's the subject of this dispute?

18  A.   45 percent.

19  Q.   And what percentage of voting -- or what percentage --

20  strike that.

21       What percentage of voting interest does your LLC have in

22  the FOFBakers, LLC?

23  A.   51 percent.

24  Q.   And were you a party to the 2019 litigation and also the

25  settlement negotiations that resulted in the execution of the

BRITTANI BAKER - DIRECT - SCHACHTEL

*602*

1  amended operating agreement for FOFBakers in September of

2  2019?

3  A.   Yes.

4  Q.   And to your knowledge, what were the issues that prompted

5  the litigation between the Bakers and Rastelli and DF Ventures

6  in 2019?

7  A.   The original issues were accounting issues.  Questions

8  about sales, our lack of transparency, us wanting to be more

9  involved with the profits.  Questioning, you know, why a

10  $5.8 million deal didn't produce the profits that they told us

11  to expect.

12       It was a lot of questions about accounting as to why we

13  wound up in settlement and mediation.

14  Q.   Okay.  You attended -- or strike that.

15       Did you attend the settlement or mediation proceedings

16  that resulted in the execution of the amended operating

17  agreement in September of 2019?

18  A.   It was multiple days.  I was there the first couple of

19  days, and then I exported the customers out of our website and

20  Rastellis filed a lawsuit against me, and I was advised not to

21  attend the in-person last day of that mediation settlement.

22  Q.   Okay.  But did you understand the material terms of the

23  settlement agreement that ended the 2019 litigation?

24  A.   Honestly, I did not see it that day.  They called me and

25  they told me a few things about it.  And they said, you know,

BRITTANI BAKER - DIRECT - SCHACHTEL

1  it's getting late, we've been here for days, this is the best

2  we can do, do we have your approval to move forward?

3      I wasn't clear on all of the terms, but I guess now I am.

4  Q.  As you're here today, do you understand what the terms,

5  the material terms of the 2019 settlement agreement were

6  between your entity and the Rastellis and the DF Ventures?

7  A.  Yes.

8  Q.  What is your understanding as to the obligations of the

9  Rastellis under the 2019 settlement and operating agreement?

10  A.  Their obligations basically stayed the same as they were

11  originally, to make, source, produce, distribute, use their

12  best commercially reasonable methods to push this product out

13  there, distribute this product, source this product, using all

14  of their resources and their connections to distribute this

15  product.

16  Q.  All right.  And what was your understanding as to the

17  obligations of DF Ventures, Daymond John, and any other parties

18  associated with those entities as a result of the amended

19  operating agreement and settlement agreement?

20  A.  Daymond John's responsibilities were going to stay the

21  same as what they were after we originally went on Shark Tank,

22  to be the brand ambassador and help us market this product to

23  the masses; to, you know, use his social media presence and his

24  name to help us grow this business.

25  Q.  Okay.  And what was your understanding as to the

1  speak about and share with what they're terming the nightmare

2  of working with the plaintiffs, both Daymond John and the

3  Rastellis.

4          THE COURT:  Well, here's what you're going to do.

5  Ms. Baker is here testifying.  When your turn comes, you may

6  ask about that, okay.  We'll get to the bottom of it.

7          MS. KUCINE:  Thank you, Your Honor.

8          THE COURT:  All right.  Thank you.

9          All right.  Mr. Schachtel, continue with your direct.

10         Ms. Baker, you're still under oath.

11         THE WITNESS:  Yes, Your Honor.

12    C O N T I N U E D   D I R E C T   E X A M I N A T I O N

13  BY MR. SCHACHTEL:

14  Q.   Brittani, just to touch on this issue that's just been

15  raised, are you familiar with what was just alleged, that

16  there's been any change to the website?

17  A.   I'm not familiar.  I have not been on social media, I have

18  not made any updates, I have not made any posts, I have not

19  done anything since the Judge ordered me to not.

20  Q.   Have you solicited email addresses for the purpose of

21  disseminating a newsletter or information of any kind to give

22  people access to the website?

23  A.   Not at all.  I haven't made any changes since I took our

24  domain down.  I have not made any changes.  There's a

25  subscription thing on there I think from when it was my

1  website, but I haven't added anything new.

2  Q.   Okay.  Do you have any insight as to why DF Ventures

3  believes that there has been a change to the website in the

4  last several days?

5  A.   No.  They just want to make it look like I violated

6  something, but I have been following the orders and haven't

7  changed anything.  I haven't touched anything at all.

8  Q.   Okay.  So fair enough.  I'm going to move back to where we

9  left off a couple days ago.

10      If you recall, we were speaking about -- we reviewed the

11  amended operating agreement and the settlement agreement and

12  the accompanying supplement, which was a handwritten additional

13  term sheet that were agreed and entered into in September of

14  2019 to resolve the litigation between you and the other

15  parties.

16      So I want to just ask you if you can refresh, reorient us

17  as to what your understanding was as to the Rastelli's

18  obligations under that 2019 amended operating agreement and

19  settlement?

20  A.   What their duties were?

21  Q.   What were their obligations to the business and to the

22  Baker entities with respect to all things related to the

23  products that were the subject of your LLC?

24      MR. DAHAN:  Your Honor, I'm just going to -- Your

25  Honor, I'm going to object.  This line of questioning has

1  we've asked for the direct sales reports from the customers.

2  We have to -- it's clear that the trust in this entire

3  partnership is gone.

4       But we're forced to trust Rastelli's sales reports that

5  they send us.  We don't trust those.  We have no way to verify

6  them.  We --

7  Q.   What specific misrepresentations have been made

8  financially after you signed the 2019 settlement agreement, if

9  any?

10            MR. DAHAN:  Objection, Your Honor.  Leading the

11  witness.

12            MR. SCHACHTEL:  I don't believe it's leading.

13            THE COURT:  It's overruled.  He asked what

14  representations or misrepresentations have been made.

15            THE WITNESS:  The sales, definitely the sales, the

16  payments to Daymond John.

17            Every time we ask about what Daymond Johns got paid,

18  we get a different number.  Larry Fox here has thrown out a

19  couple of numbers.

20            It's always been about the accounting, it's always

21  been about the sales.  It's the same thing.

22  BY MR. SCHACHTEL:

23  Q.   Brittani, what specific documentary evidence or statements

24  are you relying on when you say that there have been

25  misrepresentations about the sales?

BRITTANI BAKER - CONTINUED DIRECT - SCHACHTEL

1  A.   The gross receipts because we can't get them directly from

2  the customers.

3       So I mean, I don't know.  That's what I'm trying to figure

4  out.  We're forced to believe whatever they send us.  That's

5  not what we want.  We've been asking for direct reports to be

6  included in all information.

7       So what we're saying is we don't believe that it's fair

8  business dealings taking place because we're left out of all

9  the important conversations pertaining to everything.

10 Q.   All right.  Brittani, with respect to your knowledge and

11 your allegation that there have been discrepancies in the

12 amount of payments that have been paid to Daymond John, what

13 is the source of your knowledge on those claims?

14 A.   The source to our knowledge is that they have a

15 confidential payment arrangement.  We don't know.

16      That's the problem.  The problem is that we don't

17 have access to this information.  That's what's causing

18 everything.

19 Q.   All right.  Prior to being served with this lawsuit, did

20 you ever -- were you ever notified that the other members

21 of the LLC were claiming that your father had made

22 unauthorized use of the credit card that was provided to him by

23 Rastellis?

24 A.   No, not at all.

25 Q.   So to your knowledge, was there ever any communication

BRITTANI BAKER - CROSS - COLWIN

1 were trying to have the videos removed.  I put this up before

2 the order.  I'm not going to violate the Judge's order.  That's

3 pure disrespect.  I'm not going to do that.

4        This was up before his order.  So --

5            MS. COLWIN:  Your Honor --

6            THE WITNESS:  -- if I was going to violate the order,

7 I would --

8            THE COURT:  Hold on.  Hold on.  You've got to stop

9 arguing.  You can't talk over each other.

10            Let's ask a question.  Ms. Baker, you can then answer

11 the question.  All right?

12            THE WITNESS:  Sure.

13            THE COURT:  Please ask your question.

14 BY MS. COLWIN:

15 Q.  Ms. Baker, you agree with me, if this subscription button

16 existed after June 16th, there would not be dozens upon dozens

17 upon dozens of comments on your pages looking for an update;

18 isn't that right?

19 A.  They want an update because I haven't posted.  They were

20 going to want updates anyway.

21        I put that there before the Judge's order in case social

22 media took my pages down.  I didn't put this up there because

23 people were requesting it.  I put that up because I was

24 forward-thinking, if social media takes my post down, I still

25 want a way to be able to share my story.

1          That's why I --

2               MS. COLWIN:  Your Honor --

3               THE WITNESS:  Not for any other reason.  I mean,

4     that's honest truth.  I did that before the order.

5     BY MS. COLWIN:

6     Q.   And I just want to make sure that the honest truth,

7     according to your testimony, is that you have not done and

8     changed any of your platforms; is that right?

9     A.   My lawyer told me to take out something in the bio.  He

10    told me to take out the negative comment that I said Rastellis

11    are trying to steal my business.  Under his advice, I took that

12    out and put "co-inventor of the patented boneless ribs."

13         I didn't say anything negative.  He said remove that bio,

14    that's what I did.

15    Q.   So when you testified during your direct that you had not

16    touched any of your social media platforms, you lied; isn't

17    that right?

18    A.   That's not a lie.  That's not -- I didn't respond to

19    anybody.  I'm not posting.

20         That's what the order said.  The order didn't say you

21    can't open social media.  The order said you can't post about

22    this case, you can't comment.  That's what I have not been

23    doing.

24         It's a habit to scroll on social media, log in.  I haven't

25    been talking to people, telling them about this case.  I