IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| DF VENTURES, LLC, *et al.*, | : |
| Plaintiffs, | : |
| v. | Civ. No. 23-3126 (RBK/AMD) |
| FOFBAKERS HOLDING COMPANY LLC, *et al.*, | **OPINION** |
| Defendants. | : |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Plaintiff DF Ventures, LLC's ("DFV") and Plaintiff Daymond John's Complaint (the "Complaint") (ECF No. 1) and Motion for a Preliminary Injunction (ECF No. 3). On June 7, 2023, the Court issued an Order to Show Cause (ECF No. 5), which denied Plaintiffs' initial application for a temporary restraining order (TRO) and ordered Defendants FOFBakers Holding Company, LLC ("FOFBakers"); Jabezbaker, LLC ("Jabezbaker"); James "Al" Baker; Brittani Bo Baker; and Sabrina Baker to show cause as to why this Court should not issue a preliminary injunction against them to take down all their social media posts about Plaintiffs and bar them from making similar posts in the future.

The Court held an evidentiary hearing on the matter and its related matter, *Rastelli Partners, LLC, et al. v. James A. Baker AKA Al Baker, et al.*, Civ No. 23-2967, beginning June 13, 2023 and ending July 5, 2023. The Court heard argument and evidence over six days during that time. At the end of the June 14 hearing date, the Court consolidated the preliminary injunction hearing with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2), thus turning the proceeding into an application for a permanent injunction. (Transcript

1

of Hearing on Motion for Preliminary Injunction, at 310, *DF Ventures, LLC and Daymond John v. FOFBakers Holding Co., LLC, et al.* (No. 23-3126) (hereinafter, "T.")). On June 16, 2023, the Court granted a joint application with Plaintiffs in the related case for temporary restraints on Defendants after they continued to post on social media and give interviews to local news outlets while the hearing continued. (ECF No. 24). In summary, the Order barred Defendants and their officers, agents, servants, employees, and attorneys from making any kind of public negative comments or encouraging anyone else to make any negative comments that would disparage, defame, or otherwise adversely impact the reputations of Plaintiffs here and Plaintiffs in the related case. (*Id.*). The Court also ordered the parties to submit supplemental briefs with proposed findings of fact and conclusions of law for the Court to consider based on the exhibits and testimony presented during the hearing. (T. at 733–34).

Having heard the evidence and arguments presented by all parties during the hearing and having further considered the parties' supplemental briefs, for the following reasons, the Court **GRANTS** Plaintiffs' application for a permanent injunction.

**I.      JURISDICTION**

The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1332. Complete diversity exists between the parties. John is a New York citizen. (Complaint at ¶ 16). DFV's members are John and Larry Fox, both of whom are New York citizens, and, thus, so is DFV. (*Id.* at ¶¶ 16, 30–31). Al Baker is a Florida citizen. (*Id.* at ¶ 32). Brittani Baker is a citizen of either California or Ohio. (*Id.* at ¶ 33). Sabrina Baker is a Florida citizen. (*Id.* at ¶ 34). FOFBakers's members are Al, Brittani, and Sabrina Baker, thus making FOFBakers a citizen of Florida and either California or Ohio, but not New York. (*Id.* at ¶¶ 35–36). Jabezbaker's members are also Al, Brittani, and Sabrina Baker, thus making Jabezbaker a citizen of Florida

and either California or Ohio, but not New York. (*Id.* at ¶¶ 37–38). Given the business venture's size, we find that the amount in controversy exceeds $75,000.

The Court has personal jurisdiction over Defendants due to a forum-selection clause contained within the 2019 Settlement Agreement into which the parties entered. (ECF No. 1-3, Complaint, Ex. C, "2019 Settlement Agreement" at 4, ¶ 14). Further, Plaintiffs properly served Defendants. After some jurisdictional mishaps under a different docket number, Plaintiffs filed the instant Complaint here on June 7, 2023. On June 8, 2023, June 10, 2023, and June 11, 2023, Defendants filed four different responses and letters with the Court under this docket number, evidencing that they were on notice and aware of allegations against them in this matter. (ECF Nos. 7, 12, 13, 14). Defendants also appeared at a June 12, 2023 telephonic status conference after which the Court converted the evidentiary hearing into a virtual, videoconference hearing *at Defendants' request*. The Court then sent Zoom links to Defendants via the same email addresses Plaintiffs sent notice under the original docket numbers, and Defendants appeared at every Zoom hearing. Until now, Defendants never once claimed defective service or lack of notice. As such, we find service adequate and, to the extent it was not, we find that Defendants waived any issues they had with service of process by responding to Plaintiffs' allegations and participating during the entire hearing without once raising a service of process issue until now.

Defendants argue that this Court lacks jurisdiction to hear this case because of the dispute resolution mechanism set up in Paragraphs 11 to 14 of the Amendment to Operating Agreement of FOFBakers, LLC ("Amended OA"). We disagree. First, Defendants did not invoke this provision at any point during these month-plus-long proceedings until now. Although the Court did ask the parties to work through their issues at the very beginning of this matter, and, in fact, at the Court's urging, the Rastelli Plaintiffs sent a letter to Defendants asking to use that dispute

resolution process on June 5, 2023, (Exhibit Rastelli-67), Defendants declined to mediate or otherwise negotiate a settlement. Instead, they actively chose to proceed here in this Court. They may not now hide behind the Amended OA's dispute resolution clause for fear that this Court might provide an adverse ruling. Second, the dispute here does not "aris[e] from or relat[e] to" the Amended OA or the original FOFBakers, LLC Operating Agreement. It arises from and relates to the non-disparagement clause contained within the 2019 Settlement Agreement. As such, the Amended OA's dispute resolution mechanism does not apply here.

## II.     FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact, which we will follow with separate conclusions of law:

1. Daymond John is not involved in FOFBakers, LLC's day-to-day operations or management. (T. at 17–18).

2. Daymond John is not a co-manager of FOFBakers, LLC; he is the entity's sole non-managing member. (T. at 22–23).

3. Daymond John's role with FOFBakers, LLC was to "expand their brand social media wise, make connections for their brand, and be the face of the brand to extend the brand out to the market." (T. at 23).

4. Daymond John has no access to the company's financial statements or accounts. (T. at 66–67).

5. Since the beginning of the relationship with the Rastellis, Daymond John has invested, at a minimum, two $100,000 contributions to the business and, in comparison, only received cash distributions totaling around $112,000 to $113,000. (T. at 100). Putting

aside any other potential capital investments John contributed to the venture, that puts John at approximately a $87,000 to $88,000 loss on this venture.

6. Daymond John provided Defendants with unlimited license to use his intellectual property to promote the products and advance the business. (T. at 46–47).

7. John went beyond his usual practice of providing limited licenses to use his IP and instead allowed Defendants "an ability to use [his] intellectual property for the rest of the existence of the company" without "any kind of guardrails or borders on anything." (T. at 46–47).

8. On September 5, 2019, Rastelli Partners, LLC; Raymond M. Rastelli, Jr.; DF Ventures, LLC; FOFBakers Holding Company, LLC; and James A. "Al" Baker entered into the 2019 Settlement Agreement.[1] (Exhibit DJ 2).

9. The 2019 Settlement Agreement is valid and enforceable. We do not credit Al Baker's assertions that he was coerced into signing the 2019 Settlement Agreement under duress. (T. at 174–78). Mr. Baker signed this agreement, and he was represented by multiple (at least three) attorneys during mediation and negotiation of the agreement. (T. at 171). Further, United States Magistrate Judge Joel Schneider led the mediation that resulted in this 2019 Settlement Agreement. (T. at 171).

10. Paragraph 5 of that 2019 Settlement Agreement, titled "Restrictions," states that Rastelli Partners, LLC; Raymond M. Rastelli, Jr.; DF Ventures, LLC; FOFBakers Holding Company, LLC; and Al Baker (referred to collectively in the agreement as "the Parties" or individually as "Party") as well as Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani

---

[1] The 2019 Settlement Agreement mutually releases all claims any Party here might have from the very beginning of their relationship during their Shark Tank episode up to and including September 5, 2019, the date the Parties executed the 2019 Settlement Agreement. As such, any issues that took place during that period are not relevant here. This matter relates only to issues that arose since the 2019 Settlement Agreement.

Baker, and Sabrina Baker "forever agree not to solicit, disrupt, interfere with, disparage and/or defame any other Party and such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in. Each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to make any written or verbal remarks or statements (even in the form of an opinion) about any other Party to anyone including, but not limited to, any such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in, that are in any way negative, disparaging or false or which could adversely impact the reputation, goodwill, credibility or value of any such other Party or entity or could discourage current and/or prospective customers from buying products from them." (Exhibit DJ 2 at 2–3, ¶ 5).

11. As part of the 2019 Settlement Agreement, Defendants agreed to receive a combined payment of approximately $133,333 ($33,333 upfront and the remaining $100,000 spread out as monthly installments), 4% of future gross receipts on the first $5 million in gross sales, and 3% of future gross receipts thereafter. (T. at 79).

12. Brittani Baker controlled four social media accounts: (1) TikTok account @bubbasqfoodtrucks; (2) Instagram account @bubbasqfoodtrucks; (3) Instagram account @bubbasq60; and (4) Instagram account @brittanibobaker. (T. at 192–93).

13. In a TikTok post, Brittani Baker said, "And where did the money go with Rastelli and Daymond John at the forefront of it? It probably went to the same places or people that the majority of this $18 million in sales went. I'm telling you guys that Daymond has aligned with our co-packer to try to push us out of our business just like they aligned

together and pushed the co-inventors of the jerky company right on out of their business." (Exhibit DJ 4).

14. In a TikTok post, Brittani Baker said, "So what's the common denominator in all of this mess? [points at a picture of Daymond John] This man." (Exhibit DJ 5).

15. In a TikTok post, Brittani Baker said, "Daymond is trying to play people with this number." (Exhibit DJ 6).

16. In a TikTok post, while showing an image that reads, "5. Daymond and [Rastelli Partners, LLC] shall separately determine a mutually acceptable arrangement concerning payments to Daymond as a Member of Company ("Daymond Payment")[,]" Brittani Baker said, "Where did the money go?" (Exhibit DJ 7).

17. In a TikTok post, in front of a background that shows the cover of the Los Angeles Times article titled "Ex-NFL player thought 'Shark Tank' would launch his barbecue empire. It became a nightmare, he says[,]" Brittani Baker said, "So today I'm gonna give you guys more evidence on how the Rastellis and Daymond John were manipulating the numbers for their benefit." (Exhibit DJ 8).

18. In a TikTok post, Brittani Baker encouraged viewers to share her video, "blow this video up," and tag other news outlets. She did this in front of the same image of the Los Angeles Times article. (Exhibit DJ 9).

19. In a TikTok post, Brittani Baker said, "My family and I are so confident that fraud and illegal activities are taking place." She did this in front of the same image of the Los Angeles Times article. (Exhibit DJ 10).

20. A TikTok user commented on one of Brittani Baker's TikTok posts that features Shark Tank and the hashtag "#DaymondJohn[,]" "Wow! They are criminal like the rest[.]" User

BubbasQfoodtrucks (the account from which Brittani Baker made her posts), replied to that comment, "Thank you for your support[.]" (Exhibit DJ 12).

21. A TikTok user commented on one of Brittani Baker's TikTok posts that had the hashtag "#sharktank[,]" "I lost All response [sic] for @Daymond John I car [sic] even watch Shark Tank anymore[.]" The BubbasQfoodtrucks account replied to that comment, "!!!!!![,]" which the Court finds means that the BubbasQfoodtrucks account wished to emphasize the comment and approve of its message. (Exhibit DJ 15).

22. A TikTok user commented on one of Brittani Baker's TikTok posts that had the hashtag "#DaymondJohn[,]" "This seems like a case of fraud, breach of contract, patent infringement and contributory patent infringement and sue those personally responsible." The BubbasQfoodtrucks account replied to that comment, "!!!!!![,]" which the Court again finds means that the BubbasQfoodtrucks account wished to emphasize the comment and approve of its message. (Exhibit DJ 16).

23. A TikTok user commented on one of Brittani Baker's TikTok posts that shows a Los Angeles Times article titled, "Daymond John seeks temporary restraining order against former 'Shark Tank' contestant[,]" "I definitely unfollowed him and will never support a business venture he's attached to again." The BubbasQfoodtrucks account replied to that comment, "Thank you[.]" (Exhibit DJ 19).

24. A different TikTok user commented on that same TikTok post, "I hope no one does business with him again!!!" The BubbasQfoodtrucks account replied to that comment, "!!!!!![,]" which the Court again finds means that the BubbasQfoodtrucks account wished to emphasize the comment and approve of its message.  (Exhibit DJ 19).

25. Brittani Baker diverted the Bubbas Barbecue Boneless Ribs product website to bbqconsulting.com, which says, "Looking for our Boneless Ribs? Sorry they are not available right now. Unfortunately working with Daymond John, Rastelli Foods, Larry Fox, Ray Jr. & Ray Rastelli 3 is a nightmare and I have to bring awareness to our story and fight for our product[.]" The site also reads, "WORKING WITH DAYMOND JOHN AND RASTELLI FOODS SINCE APPEARING ON SHARK TANK IS A NIGHTMARE[.]" Further, the site says, "DAYMOND JOHN LARRY FOX, Ray Rastelli Jr. Ray Rastelli 3 & RASTELLI FOODS ARE TRYING TO STEAL MY FAMILIES [sic] BUSINESS[.]" (Exhibit DJ 22) (emphasis in original).

26. The website also contains text that reads, "I am Brittani Bo Baker my dad is former NFLer AL Bubba Baker. Our story has been told by an award winning investigative journalist with the Los Angeles Times[.] Unfortunately we are not the only small business that has been affected by Daymond John and Rastelli Food[.] Welcome to our website[,] where we share the untold story behind our challenging journey with Daymond John and Rastelli Foods. What began as an exciting opportunity on Shark Tank quickly turned into a nightmare as we discovered their relentless efforts to take over our patent and exclude us from our own business. Daymond John and Rastelli Foods have joined forces[,] intentionally shutting us out of important conversations and decisions concerning our patent. It has become apparent that Daymond John has a confidential payment arrangement with Rastelli Foods[,] raising serious questions about their motives. This is not the first time Daymond John has engaged in deals with Rastelli Foods[,] creating a concerning pattern. . . . Working with Daymond John and Rastelli Foods has been a true nightmare[,] with our dreams turning into a constant battle for justice. Our

9

website is dedicated to shedding light on these injustices and rallying support from individuals who believe in fairness and integrity in business. We refuse to let corporate greed prevail and are determined to protect our patent and our rightful place in the industry. By sharing our story and seeking your support[,] we aim to bring attention to the need for transparency and accountability in business dealings. If you can support our cause by donating to our Go Fund Me campaign, aimed at covering legal fees and ensuring a fair fight against the forces that seek to silence us. Every contribution brings us closer to reclaiming our business and preserving our legacy." (Exhibit DJ 22).

27. On TikTok, Brittani Baker made a post that included a still image that showed Daymond John with the heading, "I am NOT to be Trusted with anything" and also posted another still image that included Daymond John and had the heading, "I am a Master Manipulator, Liar, Adultorer [sic] & THIEF!" (Exhibit DJ 24) (emphasis in original).

28. In a TikTok post, Brittani Baker said, "And we've been asking questions about where that $18 million went. We have no access to real-time accounting, no transparency, and no explanations for where the money went even though we know where it went: to Daymond John, Larry Fox, Ray Rastelli, Jr., and Ray Rastelli III." (Exhibit DJ 25).

29. Brittani Baker created a GoFundMe page that reads, in part, "We are the Bakers, a family-owned business that experienced the American dream turned into a nightmare. Our success on Shark Tank caught the attention of viewers everywhere, but little did we know the deception that awaited us from Daymond John and Rastelli foods[,]" and "We are seeking your support to fund our legal battle against these unethical practices." (T. at 221–22).

30. Brittani Baker attempted to change the owner of the company's Shopify account from the Rastellis to herself. (T. at 353–54).

31. Although it is not entirely clear when it was created or when it first appeared, there exists a pop-up window on the bbqconsulting.com website that prompts viewers to subscribe to receive email updates about Defendants perceived "nightmare" situation involving the Rastellis, John, and DFV. (Exhibit DJ 28).

32. Defendants presented no evidence that either DFV or John breached the 2019 Settlement Agreement.

33. Defendants presented no evidence that either DFV or John breached the Amended OA.

34. Defendants presented no evidence that either DFV or John breached the Addendum to the Amendment to the FOFBakers, LLC Operating Agreement ("Addendum to the OA").

35. Defendants presented no evidence that either DFV or John breached the Supplement to the Amendment to the FOFBakers, LLC Operating Agreement ("Supplement to the OA").

36. Until this lawsuit, Al Baker, as co-manager of the company, never asserted in writing that DFV or John breached or was in violation of any agreement with Defendants. (T. at 587–588).

### III.   CONCLUSIONS OF LAW

Pursuant to Rule 52(a), the Court states the following conclusions of law. For a Court to grant a permanent injunction, the "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010). To succeed on a breach of contract claim, a plaintiff must show that (1) the parties entered into a valid contract; (2) the defendant(s) failed to perform under the contract's terms; and (3) the defendant's failure to perform injured the plaintiff. *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. App. Div. 2007).

DFV and John have shown that the Bakers breached the 2019 Settlement Agreement. Contrary to some of Al Baker's assertions while questioned, the 2019 Settlement Agreement is a valid and enforceable contract which binds him, Brittani Baker, and Sabrina Baker. Mr. Baker was represented by multiple attorneys during its negotiation and a United States Magistrate Judge was involved in the mediation and the agreement's negotiation. Defendants have presented no evidence (other than unsupported assertions) that anyone coerced Mr. Baker to sign the 2019 Settlement Agreement for himself and on behalf of his wife and daughter, nor have they shown that any of their own attorneys or the federal judge leading the mediation and the agreement's negotiation coerced him or failed to adhere to their respective duties.

Mr. Baker claims, specifically, that the coercion occurred when he "was forced to call [Sabrina and Brittani Baker] on the phone and sign on their behalf, otherwise, they were going to sue my daughter." (T. at 175). Although we can understand that might be frustrating for Mr. Baker, that is not coercion. That is—generally speaking—the point of a settlement agreement. Opposing parties come together and agree that each side will receive some consideration in exchange for a promise not to sue or to drop a lawsuit based on the claims subsumed by that agreement. Saying something along the lines of "you have to sign this settlement agreement, or we will sue you" is not coercion, especially when legal counsel represents both sides during the settlement process. That is simply how settlement agreements work.

12

Defendants clearly breached the 2019 Settlement Agreement. Paragraph 5 plainly states that Al, Brittani, and Sabrina Baker "forever agree not to . . . disparage and/or defame any other Party and such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in." (Exhibit DJ 2 at 2–3, ¶ 5). Further, per the agreement, they "forever agree not to make any written or verbal remarks or statements (even in the form of an opinion) about any other Party to anyone including, but not limited to, any such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in, that *are in any way negative, disparaging or false or which could adversely impact the reputation, goodwill, credibility or value of any such other Party or entity or could discourage current and/or prospective customers from buying products from them*." (Exhibit DJ 2 at 3, ¶ 5) (emphasis added).

All the Bakers' posts are negative, disparaging, or both and certainly could impact DFV's and John's reputation, goodwill, and credibility. We have listed many posts and comments made by Defendants online in our Findings of Fact section above, but we will recount some highlights here. In TikTok posts and comments, Brittani Baker said the following: (1) "I'm telling you guys that Daymond has aligned with our co-packer to try to push us out of our business."; (2) she insinuated that John and DFV stole money from her, her family, and the company; (3) "So today I'm gonna give you guys more evidence on how the Rastellis and Daymond John were manipulating the numbers for their benefit."; (4) "My family and I are so confident that fraud and illegal activities are taking place."; (5) she thanked a commenter for their support after that commenter called DFV and John criminals; (6) "WORKING WITH DAYMOND JOHN AND RASTELLI FOODS SINCE APPEARING ON SHARK TANK IS A NIGHTMARE[.]"; and (7)

13

on images of Daymond John, she wrote "I am NOT to be Trusted with anything" and "I am a Master Manipulator, Liar, Adultorer [sic] & THIEF!" We do not credit Brittani Baker's testimony that her posts, including calling Daymond John a thief, were positive or at least not negative. (T. at 203–06). It is beyond obvious to the Court that, even if you believe the statement to be true, calling someone a thief is a negative and disparaging comment.

Defendants argue that DFV and John violated some agreement obligations first, thus excusing any potential breach on their part. But the evidence shows that DFV and John complied with all the agreements, at all times. John and DFV never breached a duty owed to Defendants under the 2019 Settlement Agreement, the Amended OA, the Addendum to the OA, or the Supplement to the OA. In addition, as recounted in the Findings of Fact, John made at least $200,000 in capital contributions, received much less than that in distributions, and allowed the Defendants an unlimited license to use his intellectual property to promote the product. At bottom, when pressed during closing arguments to point to a specific provision Defendants believed DFV and John breached or violated, they could not do so. (T. at 756–57) ("MR. SCHACHTEL: So I can't point to a specific portion of the operating agreement that DF Ventures violated.").

John and DFV also established injury stemming from Defendants' violation of the 2019 Settlement Agreement. John testified that the same week Defendants started posting their comments on social media, a major television network cancelled a show with which John was involved that the network previously greenlit. He also testified that he lost a speaking engagement and a "major brand" he was meant to do an activation with stopped all discussions with him while the Defendants put out their posts. (T. at 35).

The largest harm John and DFV have suffered from Defendants' actions, though, is reputational harm. John testified that trust and reputation are an essential part of his business. (T. at 18). The amount of reputational harm that Defendants' posts, which have received millions of views and include at least two interviews with major news outlets, have caused is incalculable. Defendants' comments and posts refer to John as a master manipulator and a thief, say that he is not to be trusted, say that working with him is a nightmare, that their business is not the only business John has negatively affected, and that John is trying to steal their business. These posts clearly caused reputational harm that John will now have to deal with and counter.

That reputational harm is irreparable. *Great Caesars Ghost, LLC v. Unachukwu*, No. 19-5408, 2020 WL 2394052, at *4 (D.N.J. May 12, 2020) ("Irreparable injury includes loss of control of reputation . . . and loss of good will.") (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)); *see also Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (citing *Opticians*, 920 F.2d at 195)). Defendants unmitigated, calculated, and virulent attack on John and his reputation is, as we said in our original order granting temporary injunctive relief, unusual in its vehemence and persistence. And as Brittani Baker testified, she has no intention of stopping these posts about John and DFV, presumably absent a court order. (T. at 206). The amount of harm that these posts calling John a thief and a manipulator, as well as accusing him of fraud and trying to steal Defendants' business, is incalculable, and that loss of control of his reputation and goodwill—an essential component of his business and life—constitutes irreparable harm.

For the same reasons, any remedy at law, i.e., monetary damages, would not sufficiently remedy these reputational harms. As we have said, the amount of harm Defendants' actions have caused to John's reputation and goodwill with the public and particularly with other businesses is

15

incalculable. And, further, as we have said, Brittani Baker testified that she does not intend to stop making these posts. *See Hermès Int'l v. Rothschild*, No. 22-cv-384, 2023 WL 4145518, at *9 (S.D.N.Y. June 23, 2023) (stating that a plaintiff has no adequate remedy at law if he can show that "absent an injunction, the defendant is likely to continue" with his course of harmful conduct).

The balance of hardships also militates toward granting injunctive relief. Here, the Court weighs the harm caused to the movant by denying the injunction against any harm caused to the non-moving party by granting the injunction. *Great Caesars Ghost*, 2020 WL 2394052, at *4 (citing *TD Bank N.A. v. Hill*, 928 F.3d 259, 283–84 (3d Cir. 2019)). The harm to John and DFV if we do not grant the injunction is obvious. Their reputation will continue to greatly suffer if Defendants continue their nonstop buzzsaw campaign against them.

As it relates to Defendants, one question has loomed in the Court's mind throughout the proceedings: why would the Bakers do this? Surely, the Bakers want to make money off their patents, their products, and this business? But still, the Bakers engaged in this social media and news media war against DFV, John, and the Rastellis. At least as it relates to their financial interests, doing so shoots themselves in the foot. Their barrage of interviews and social media posts does nothing but work to kill the business's brand. What's more, the takeover of the company website, first, does the same, but second, makes it impossible for customers to place online orders. (T. at 88). The Court therefore can only draw one logical conclusion: the Bakers are not doing this to try to improve the business or to further some other legitimate purpose. Instead, the Bakers' enmity, antipathy, and animosity toward John, DFV, and the Rastellis overcame their financial self-interest and their ability to reasonably work through their issues with John, DFV, and the Rastellis. That vitriol compelled them to breach the 2019 Settlement

Agreement and make these repeated, targeted, hostile, negative, and disparaging public comments and posts.

There are also no First Amendment issues presented here. Defendants voluntarily and validly waived their free speech rights when they executed the 2019 Settlement Agreement and agreed to receive significant cash payments and a promise of continuing royalty payments in the future in exchange for limited restraints on their speech, namely, that they would not speak negatively of or disparage Plaintiffs. *See USA Techs., Inc. v. Tirpak*, No. 12-2399, 2012 WL 1889157, *9–10 (E.D. Pa. May 24, 2012) (finding that a party waived its First Amendment rights by agreement where agreement was "not a one-way street" and was negotiated by counsel). Of course, those future royalty payments assume there would be gross sales from which to calculate the royalties, but that is the agreement Defendants made, and the Court will hold them to it.

As such, forcing Defendants to stop making these posts and take down all the posts and comments that currently exist does not present a real hardship to Defendants. To the extent one could argue it does, it certainly does not outweigh the hardships allowing those posts to continue would cause John and DFV. Defendants knew the terms to which they agreed. The only harms suffered by Defendants here are self-inflicted. *See Trico Equipment, Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *9 (D.N.J. June 15, 2009); *see also Great Caesars Ghost*, 2020 WL 2394052, at *4 (finding that, in granting injunctive relief against a defendant barring that defendant from continuing to violate a non-disparagement clause, the only harm suffered by the defendant would be that the defendant must now actually abide by the agreement's terms and that harm did not outweigh the harm the defendant was actively causing to the plaintiff's business reputation).

Finally, we believe that granting the permanent injunction furthers the public interest. The public is best served if the Court enjoins Defendants and obligates them to uphold their end of the bargain—a bargain to which they agreed. *See id.* ("Although this matter involves a dispute between private parties, the public has an interest in the protection of private contractual rights.").

Consequently, DFV and John have satisfied all the requisite elements to show that Defendants breached the 2019 Settlement Agreement and that Defendants actions warrant a permanent injunction. The Court will list the specific terms of that injunction in the accompanying Order but, in summary, the Court will forever bar Defendants from violating the 2019 Settlement Agreement's non-disparagement clause and will order Defendants to take down all existing social media and other online posts that violate the agreement.

### IV. CONCLUSION

For these reasons, the Court **GRANTS** Plaintiffs' application for a permanent injunction. An appropriate Order follows.


Dated: July 21, 2023                                    /s/ Robert B. Kugler
                                                        ROBERT B. KUGLER
                                                        United States District Judge

18